**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JOSEPH BOLOGNA**<br>**and DIANA BOLOGNA**<br>c/o 1524 Locust Street<br>Philadelphia, PA 19102 | : | |
| | : | |
| | : | |
| | : | |
| _Plaintiffs,_ | : | **CIVIL ACTION COMPLAINT** |
| v. | : | |
| | : | |
| **LAWRENCE S. KRASNER, in his** | : | **No.** |
| **individual capacity and in his official** | : | |
| **capacity** | : | |
| District Attorney of Philadelphia | : | **JURY TRIAL DEMANDED** |
| 3 South Penn Square | : | |
| Philadelphia, PA 19107 | : | |
| | : | **PLAINTIFFS' COMPLAINT FOR** |
| and | : | **MALICIOUS PROSECUTION,** |
| | : | **DEPRIVATION OF DUE PROCESS,** |
| **TRACY TRIPP, in her individual capacity** | : | **AND CIVIL RIGHTS VIOLATIONS** |
| District Attorney of Philadelphia | : | **PURSUANT TO 42 U.S.C. § 1983.** |
| 3 South Penn Square | : | |
| Philadelphia, PA 19107 | : | |
| | : | |
| and | : | |
| | : | |
| **SGT. GERALD ROCKS, BADGE #730, in** | : | |
| **his individual capacity** | : | |
| District Attorney of Philadelphia | : | |
| 3 South Penn Square | : | |
| Philadelphia, PA 19107 | : | |
| | : | |
| and | : | |
| | : | |
| **THE CITY OF PHILADELPHIA** | : | |
| C/O City Solicitor's Office | : | |
| One Parkway | : | |
| 1515 Arch Street | : | |
| 15th Floor | : | |
| Philadelphia, PA 19102-1595 | : | |
| | : | |
| _Defendants._ | : | |

## CIVIL ACTION COMPLAINT

**AND NOW**, Come Plaintiffs Joseph Bologna and Diana by and through undersigned counsel, Bochetto and Lentz, P.C., and hereby aver as follows in support of their Civil Action Complaint against the District Attorney of Philadelphia, Lawrence S. Krasner, Assistant District Attorney of Philadelphia, Tracy Tripp, Sergeant Gerald Rocks and the City of Philadelphia (collectively, "Defendants").

## I.   FACT SUMMARY

1.       On the evening of June 1, 2020, Philadelphia Police Staff Inspector Joseph Bologna was on duty responding to mass protests instigated by the killing of George Floyd. While on duty, Bologna and another officer attempted to arrest a protestor who had assaulted police. A Temple University student named Evan Gorski tried to stop the arrest by grabbing and pulling the protestor back and away from the arresting officer. Bologna struck Gorski with an ASP police baton a single time in the upper back to stop him from interfering with the arrest. Bologna's use of the baton was entirely consistent with state and federal[1] law governing the use of force by a police officer in making an arrest and acting in self-defense.

Section 508 of the Pennsylvania Crimes Code states, in relevant part:

> ***Use of force in law enforcement. (a)  Peace officer's use of force in making arrest.--***
> *(1)  A peace officer, or any person whom he has summoned or directed to assist him, need not retreat or desist from efforts to make a lawful arrest because of resistance or threatened resistance to the arrest. **He is justified in the use of any force which he believes to be necessary to effect the arrest and of any force which he believes to be necessary to defend himself or another from bodily harm while making the arrest***.

(18 Pa.C.S.A. § 508) (Emphasis and footnote added).

---

[1] "Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it."  Graham v. Connor, 490 U.S. 386, 396–97, 109 S. Ct. 1865, 1871–72, 104 L. Ed. 2d 443 (1989).

2.      After Bologna stopped Gorski from interfering with the arrest, he attempted to take him into custody. Gorski resisted and he and Bologna fell to ground. At the same time Gorski grabbed Bologna's baton and threw it into the street. While he was struggling to take Gorski into custody, the brim of Bologna's bike helmet made incidental contact with the back of Gorski's head causing a cut to his scalp. A nearby protestor filmed the incident on an iPhone and posted it on social media; the video shows Bologna striking Gorski in the upper back with the baton and the subsequent struggle. The entire video lasts 36 seconds. The portion of the video showing Bologna striking Gorski lasts less than 2 seconds. The video shows Bologna hit Gorski in the upper back when Gorski interferes with an arrest.



(A true and correct screenshot of the video, attached hereto as **Exhibit "A."**) The video was reposted hundreds of times and generated extensive media coverage. The ensuing public narrative included the false claim that Gorski did nothing to justify the use of force and that Bologna hit him on the head with the intent to cause serious injury.

3.      On June 4, 2020, the video was referred to the Philadelphia Police Department's Internal Affairs Division for investigation. At the same time, District Attorney Larry Krasner

watched the video and learned that it had "gone viral" all over the country. Despite knowing that Gorski had engaged in criminal conduct and that Bologna's use of force was entirely legal, Krasner declined all charges against Gorski and instead charged Bologna with a crime. Krasner made the bad faith, malicious decision to charge Bologna with a crime before the completion of the Internal Affairs investigation.

4.     Krasner's pre-investigation decision to charge Bologna with a crime without probable cause was consistent with his long-standing pattern, practice, and policy as District Attorney to deprive police officers of their constitutional rights by tampering with evidence, concealing or omitting exculpatory evidence and perverting established legal standards. Krasner knew a fair investigation of the Bologna's use of force would not support his malicious pre-investigation decision to charge Bologna with a crime, so he pre-empted and obstructed the Internal Affairs Division investigation and orchestrated his own corrupt pre-probable cause investigation.

5.     Whereas ordinarily Krasner and Tripp as prosecutors might enjoy absolute immunity for their official actions, in this case they were both acting outside their "District Attorney" capacities as advocates and were instead engaged in "investigative", pre-probable cause activities outside of court and prior to the initiation of any judicial phase of the prosecution. These pre-probable cause investigative activities were carried out under the color of state law with malicious intent and were intentionally and systematically violative of Bologna's Constitutional rights.

6.     By falsifying evidence and manipulating witness testimonies, among other things, as here, Krasner and Tripp were not performing tasks which are entitled to absolute immunity.

7.      By maliciously carrying out investigative, pre-probable cause tasks before the initiation of judicial process Krasner and Tripp, like police investigators, are entitled only to qualified immunity and are therefore liable for the conduct detailed herein.  Kalina v. Fletcher, 522 U.S. 118 (1997) (prosecutor not absolutely immune for certification of probable cause affidavit containing false statements); Buckley vs Fitzsimmons, 7509 U.S. 259 (1993) (prosecutor's fabrication of evidence during any investigation not protected by absolute immunity); Burns vs Reed, 500 U.S. 478 (1991) (advice and direction to police that they could hypnotize a suspect during interrogation was investigative in nature, and not entitled to absolute immunity).

8.      The Krasner investigation relied on two false claims: (i) that Gorski did nothing to justify the use of force (i.e., not interfering with an arrest) and (ii) that Bologna acted without legal justification and with criminal intent by hitting Gorski in the head with the ASP baton in order to cause serious bodily injury.

9.      On June 5, 2020, an Internal Affairs Division investigator attempted to interview Gorski about the incident. Gorski's attorney, Jonathan Feinberg, Esquire, prevented the investigator from interviewing Gorski because he was already cooperating with Krasner's malicious effort to prosecute Bologna.

10.      The same day, Feinberg – with Krasner's assistance – presented Gorski for an interview with Assistant District Attorney Tripp and Sergeant Rocks. During that interview, Tripp made sure to solicit false testimony from Gorski that he was not interfering with an arrest and that Bologna had hit him in the head.

11.      Krasner and Tripp knew Gorski was lying when he claimed that he was not interfering with an arrest and that he was hit in the head because they had seen incontrovertible video evidence proving his statements were false. They were also advised by an investigator from

the Internal Affairs Division that, based on their review of the video evidence, the use of force by Bologna was legally justified and consistent with police department directives.

12.     In keeping with Krasner's established policy of violating the constitutional rights of police officers, Krasner and Tripp advised Rocks to include Gorski's false testimony in the affidavit of probable cause and omit any reference to Gorski interfering with an arrest. Rocks complied with their direction even though he had also watched the video and knew Gorski's statements were false.

13.     Krasner and Tripp also knew that Bologna's conduct was not criminal because they had extensive experience with 18 Pa C.S. § 508 and they knew that under that statute Bologna was "…*justified in the use of any force which he believes to be necessary to effect the arrest*…."

14.     Krasner, as a former civil right lawyer, and Tripp as an experienced lawyer and former Public Defender, also knew that under federal law Bologna had the right "*to use some degree of physical coercion or threat thereof to effect*" an arrest.

15.     Nonetheless, in keeping with Krasner's established policy of violating the rights of police officers, Krasner and Tripp directed Rocks in preparing a false affidavit of probable cause indicating that Bologna's conduct was criminal.

16.      Krasner and Tripp directed and assisted Rocks in drafting the Affidavit of Probable cause which was based on the solicitation of false testimony, the material omission of Gorski's conduct in interfering with an arrest and Krasner and Tripp's intentionally malicious advice and direction regarding 18 Pa C.S. § 508 and federal law.

17.     The use of the false testimony, the material factual omission and intentionally maliciously incorrect and misleading advice were all designed to vindicate Krasner's bad faith pre-investigation decision to charge Bologna with a crime without probable cause.

18.     After Krasner and Tripp approved the false Affidavit of Probable Cause, Rocks prepared a Criminal Complaint. The Criminal Complaint contained the knowingly false allegation that Bologna had hit Gorski "once in the back of the head with his ASP…"

19.     The Criminal Complaint also falsely alleged, without citation, that Bologna's conduct was "in violation of police directives." (*Id.*)

20.     Lastly, the Criminal Complaint alleged Bologna's use of force "was not reasonable and showed a reckless disregard to the value of human life." (*Id.*)

21.     Based on these intentionally false statements and material omissions, charges against Bologna were approved. Bologna was then charged with a series of crimes including, *inter alia*, aggravated assault, a felony of the first degree. If convicted and sentenced, Bologna faced up to 35 years in prison.

22.     The Krasner investigation lasted less than 72 hours. Shockingly, the Affidavit of Probable Cause was approved within 3 hours of the Gorski interview.

23.     Krasner issued a press release at the same time that Tripp approved and signed the Affidavit of Probable Cause.

24.     In the press release Krasner falsely claimed that Bologna "struck" Gorski in the head with a "metal police baton" while Gorski was "exercising his constitutionally protected right to protest injustice..." And that Gorski was protesting "against racism and injustice."

25.     Krasner's press release repeated the knowingly false claim that Bologna used his ASP baton to "strike a Temple University student in the back of his head…." The press release intentionally omitted any reference to Gorski's conduct in interfering with an arrest. The Krasner press release highlighted the fact that videos of the incident "went viral and were shared by people across the country." The press release also noted Gorski had been arrested but "upon careful review

of the video and other evidence, including by *District Attorney Krasner himself*, the DAO declined to charge the student."

26.     Despite Krasner's blatant interference and the pending charges against Bologna, the Internal Affairs Division continued their separate investigation for another 13 months. That investigation included a full analysis of the incident, including evidence intentionally omitted by the Krasner investigation.

27.     The Internal Affairs Division investigator interviewed ten officers who were present at the scene, reviewed all of Gorski's medical records, and obtained two expert opinions.

28.     The Krasner lead investigation did not interview any officers, review any medical documents, or obtain any expert opinions prior to filing charges against Bologna.

29.     The first expert opinion obtained by Internal Affairs Division was from a "Use of Force" expert based on a review of the video evidence and police directives. The expert found that Bologna had not violated any police directives.

30.     The second expert opinion was from the city's Chief Medical Examiner, Dr. Samuel Gulino. Dr. Gulino concluded that the medical records and video evidence confirmed Bologna had <u>not</u> hit Gorski in the head with the ASP and that Gorski's injuries resulted from contact with the bike helmet. Krasner, Tripp, and Rocks later tried to get Dr. Gulino to change his opinion, but he refused.

31.     Internal Affairs Division investigators ultimately found no evidence of any crime or departmental violation by Bologna.

32.     In an effort to avoid responsibility for their conduct during the Krasner investigation, Krasner and Tripp continued to disregard this and other dispositive evidence of Bologna's innocence for almost four years.

33.     Krasner and Tripp acted outside the scope of their prosecutorial functions as advocates when they bypassed and obstructed an existing pre-probable cause law enforcement investigation – the Internal Affairs Division's investigation – and conducted their own corrupt investigation. Acting as investigators and administrators, Krasner and Tripp worked together with Rocks to deprive Bologna of his rights under the Federal Constitution by charging him with a crime without probable cause.

34.     Unsurprisingly, three years and eight months after his unlawful arrest, a jury found Joseph Bologna not guilty of all charges after deliberating for less than twenty-two minutes. Krasner publicly responded to the verdict by suggesting Bologna was guilty anyway and falsely accusing him of past acts of corruption.

35.     Now, Joseph Bologna and his wife, Diana, file this lawsuit seeking vindication and just compensation.

## II.     <u>PARTIES</u>

36.     Plaintiff, Joseph Bologna ("Bologna"), is an adult individual, resident of the Commonwealth of Pennsylvania, and a citizen of the United States of America. From 1990 to 2020, a span of thirty (30) years, Bologna served as a public servant for the City of Philadelphia. Bologna may be served with pleadings in this case at 1524 Locust Street, Philadelphia, PA 19102.

37.     Plaintiff, Diana Bologna ("Diana or Mrs. Bologna") is an adult individual, resident of the Commonwealth of Pennsylvania, and a citizen of the United States of America. Mrs. Bologna may be served with pleadings in this case at 1524 Locust Street, Philadelphia, PA 19102.

38.     Defendant, Lawrence S. Krasner ("Krasner"), is an adult individual, resident of the Commonwealth of Pennsylvania, and a citizen of the United States of America. Mr. Krasner assumed office as the District Attorney of Philadelphia on January 1, 2018, and upon re-election,

currently holds that position. His term is set to end on January 5, 2026. Mr. Krasner was acting "under color of state law" in his official capacity as the City of Philadelphia's District Attorney and a policy maker. Mr. Krasner is also sued in his individual capacity.

39.     Defendant, Tracy Tripp ("Tripp"), is an adult individual, resident of the Commonwealth of Pennsylvania, and a citizen of the United States of America. Mrs. Tripp assumed office as the Assistant District Attorney of Philadelphia in or about February 2018. Mrs. Tripp was acting "under color of state law" in her official capacity as Assistant District Attorney employed by the District Attorney's Office of the City of Philadelphia. Mrs. Tripp is also sued in her individual capacity.

40.     Defendant, City of Philadelphia is a municipal corporation and is the legal entity responsible for itself, the Office of District Attorney for the City of Philadelphia. The City is also responsible for Tripp and Rocks both of whom are employees of the Office of the District Attorney for the City of Philadelphia. At all times relevant, the City employed Krasner and Tripp. For purposes of this lawsuit, the City is considered a "person" under 42 U.S.C. § 1983 claims and is directly liable for all unconstitutional acts and deprivations of its agents, employees, and personnel. Krasner at all times relevant hereto set policy for the District Attorney's Office. The District Attorney's Office is a part of the City of Philadelphia.

41.     Defendant, Gerald Rocks ("Rocks"), is an adult individual, resident of the Commonwealth of Pennsylvania, and a citizen of the United States of America. Mr. Rocks was employed by the City of Philadelphia as the Acting Chief of County Detectives and was acting "under the color of state law" in his official capacity. Mr. Rocks is also sued in his individual capacity.

42.     Lawrence S. Krasner, Tracy Tripp, and Gerald Rocks are properly named pursuant to 42 U.S.C. § 1983 as each individual "subject[ed], or cause[d] to be subjected, [a] citizen of the United States . . . to the deprivation of [his] rights, privileges, or immunities secured by the Constitution and laws" and therefore "shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . .." 42 U.S.C. § 1983.

43.     The City of Philadelphia is also a properly named defendant pursuant to 42 U.S.C. § 1983 as municipalities are to be held liable for certain violations of constitutional rights committed by their officers, including, Tripp and Krasner, and their agents (actual or ostensible), servants, and/or employees, including Detective Rocks, as more fully set forth herein. *Monell v. Dep't of Soc. Servs. Of City of New York*, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978).

### III.     JURISDICTION, VENUE, AND DEMAND FOR JURY TRIAL

44.     This Court has original and subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343 as the cause of action arises under the United States Constitution and The Civil Rights Act of 1871 (42 U.S.C. § 1983) and possesses supplemental jurisdiction over state claims pursuant to 28 U.S.C. § 1367.

45.     Venue is proper in the United States District Court for the Eastern District of Pennsylvania pursuant to 28 U.S.C. § 1391(b)(2) as a substantial part of the events giving rise to the claims set forth at length herein occurred in Philadelphia County, Pennsylvania.

46.     Plaintiff hereby demands a jury trial pursuant to the Seventh Amendment of the United State Constitution as the amount in controversy far exceeds twenty dollars and seeks reasonable attorney's fees as permitted by 42 U.S.C § 1988.

### IV.     FACTS COMMON TO ALL COUNTS

47.     On May 25, 2020, George Floyd was murdered by a police officer in Minneapolis, Minnesota.

48.     George Floyd's murder was captured on video and widely circulated on social media, which in turn instigated protests in cities throughout the country.

49.     In Philadelphia, many protestors turned violent and destructive.[2]



50.     Beginning on May 30, 2020, violence, looting, and arson wracked the City.

51.     The Philadelphia Police were given the difficult task of responding to this violence.

52.     Between Saturday, May 30 and Sunday, May 31, 2020, two hundred and eight (208) protestors were arrested and at least eighteen (18) police officers were injured on duty.

53.     Of the officers with known injuries, "seven suffered chemical burns to their faces, two had head injuries, [] four had hurt limbs"[3] and "five [] were . . . struck by rocks [and] bricks"[4]

54.     Officers on duty witnessed, amongst other things, protestors try to set police officers and their vehicles on fire by throwing and detonating Molotov cocktails.

55.     In one instance, an officer was run over by a car from persons fleeing an arrest.

56.     Rioters harassed officers with incessant obscenities screaming "F—k You!", Motherf---ers!" and calling officers "racists, pigs, murderers, and fascists."

---

[2] (ABC news reports, "Smoke rises from a fire engulfing a police cruiser in Center City during the 'Justice for George Floyd' protest, May 30, 2020, in Philadelphia.") (Photograph by: Yong Kim / The Philadelphia Inquirer.)
[3] Philadelphia News Conference, May 30, 2020, 8:14 P.M. (https://twitter.com/PhilaOEM/status/1266885618572898305?s=20)
[4] https://www.nbcphiladelphia.com/news/local/after-violent-protests-philadelphia-wakes-up-a-city-in-tatters/2414067/

57.     On June 1, 2020, following two consecutive days and nights of violence, tensions were high in Philadelphia.

58.     Early that morning, Bologna, a 53-year-old Police Staff Inspector with thirty (30) years of service, reported for duty.

59.     June 1, 2020, was Bologna's third day in a row policing the city, working an 18-hour shift.

60.     Bologna had extensive experience in leading police officers during mass protests and other large public gatherings.

61.     Bologna had no reason to know that June 1, 2020, would be the first day of an almost 4-year nightmare.

**Krasner's Established Policy of Depriving Police Officers of their Constitutional Rights**

62.     In November 2017, Krasner was elected to the office of Philadelphia District Attorney.

63.     Prior to his election Krasner worked in private practice as a criminal defense and civil rights attorney.

64.     In 2000 Krasner represented protestors who were arrested for disrupting the Republican National Convention ("RNC") in Philadelphia.

65.     Krasner described the Philadelphia police officers who responded to the RNC protest as looking *"like the Gestapo"*.[5] A reference to the Nazi political police force infamous for torture, murder and organizing the deportation of Jews to Hitler's death camps.

---

[5] https://slate.com/business/2016/07/police-were-brutal-during-the-2000-rnc-but-they-seem-to-have-chilled-out.html

66.     At Krasner's 2017 campaign night party, his supporters celebrated his victory with chants of "F\*\*k the Police," "No Good Cops in a Racist System," and "F\*\*k the FOP," referring to the Fraternal Order of Police.

67.     After his election, Krasner established a transition committee to advise him on the development of office policy and staffing decisions.

68.     Krasner appointed his close friend, attorney Michael Coard, Esquire, to the committee.

69.     Coard views the Philadelphia police department as an illegitimate organization and has publicly referred to the police as "slave patrols."[6]

70.     When Krasner won his election, Coard posted a message on his Facebook page; "[f]..k you police union."

71.     Coard has celebrated the killing of police officers on social media by, among other things, posting images of pigs flying to heaven in the immediate aftermath of the shooting of 10 police officers in Dallas, Texas. (A true and correct screenshot of Coard's Facebook post, attached hereto as **Exhibit "B."**)

72.     Coard commented on his own post about the Dallas shootings that he was "Celebrating, Nuff said." (*Id.*)

73.     Five of the officers in Dallas died from their wounds. At the time of Coard's post, three of the officers were already dead.

74.     Krasner appointed Coard to his transition committee because he shared Coard's view of police as illegitimate, and he intended to establish policies consistent with his and Coard's shared antipathy towards police.

---

[6] https://www.phillymag.com/news/2015/05/04/10-steps-end-police-brutality-slave-patrols/

75.     Krasner hired Tripp to lead the DA office's Special Investigations unit because she was also proudly anti-police and would carry out Krasner's policy of targeting police officers for malicious prosecution without probable cause.

76.     The Special Investigation's unit that Tripp took over had existed in the District Attorney's office in one form or another for over 40 years.

77.     As early as 1970, then District Attorney and future United States Senator Arlen Specter began serious efforts to investigate and charge police officers who broke the law.

78.     In April 1970, Specter charged two police officers with felonies for shooting an unarmed black juvenile.

79.     District Attorney Specter initiated numerous other investigations and prosecutions of police misconduct.

80.     In January 1978, then District Attorney and future Mayor and Governor Edward Rendell established the Police Brutality unit charged with investigating abuse of force and other misconduct by police officers.

81.     That unit which was later renamed The Special Investigations Unit has investigated hundreds of police officers since its founding.

82.     Krasner has described the District Attorney's office under his predecessors, including Specter and Rendell, as a *"cover up organization for police misconduct."*[7]

---

[7] https://www.inquirer.com/politics/philadelphia-district-attorney-da-larry-krasner-first-term-election-20210514.html

83.     After he took over as District Attorney, Krasner updated the Special Investigation unit page on the office website:



"The district attorney's office has whitewashed police-involved shootings and police corruption for decades. There's been zero accountability.

We won't charge every case. But it will look different when we're not whitewashing."

**LARRY KRASNER**
District Attorney
City of Philadelphia

84.     Krasner made these public accusations of "cover-up" and "whitewash" to mask his own policy of using the authority of the District Attorney to target police officers for malicious prosecution in violations of their constitutional rights.

85.     Krasner and Tripp implemented this policy by using Special Investigations to investigate and charge a number of police officers without probable cause.

86.     Krasner has used his status as District Attorney to abuse the office's legal authority to carry out personal vendettas against police officers he has personally decided are deserving of retribution.

87.     Krasner's targeting of police officers for unjustified prosecution is motivated by personal and ideological animus and not by facts, evidence, or the pursuit of justice.

88.     Krasner's established policy is to prosecute police officer at every opportunity regardless of whether they are guilty of a crime.

89.     For example, in 2017, Officer Ryan Pownall was cleared by the State Attorney General's office of any wrongdoing in the officer involved shooting of David Jones.

90.     The individual who Pownall shot was the cousin of Asa Khalif, Krasner's close political supporter.

91.     During his campaign for District Attorney, Krasner promised Khalif that if he was elected, he would re-open the case and charge Pownall with murder.

92.     At the time Krasner made that promise, Khalif was already a well-known "anti-law enforcement" personality. He campaigned for Krasner and appeared alongside him at multiple campaign events.

93.     After his election, Krasner appointed Khalif to the District Attorney' LGTBQ advisory committee.

94.     Krasner agreed with Khalif's history of anti-police activism.

95.     On May 31, 2020, the day before Bologna's encounter with Gorski, Khalif was the leader of a confrontation between police and protestors at the police administration building at 8th and Race Street.

96.     Khalif stood across the street from the Police Administration building screaming through a bullhorn at a line of police officers, repeatedly calling the officers "motherf**kers" and accusing them of multiple acts of murder.[8]

97.     After Krasner became District Attorney, he fulfilled his campaign promise to Khalif and instructed the State Attorney General's office to re-open the Pownall case file and send it back to his office for investigation.

98.     In the aftermath of Krasner's election, Khalif publicly restated his demand that Krasner prosecute Pownall:

> "*We want the officer arrested and charged with the death of David Jones. Nothing has changed and we are consistent with that demand," said Asa Khalif, Black Lives Matter PA leader*."[9]

---

[8] https://twitter.com/i/status/1267189810994860034
[9] https://www.phillytrib.com/news/david-jones-case-returns-to-d-a-s-office/article_af091748-b817-5580-96ea-4a5c10f887bb.html

99.    As part of his effort to prosecute Pownall, Krasner made public comments misrepresenting the facts of the case and describing Officer Pownall as using Jones' spine as "target practice:"

> "*But that doesn't mean when someone is running away, who is unarmed, whose hands are empty, who is just trying to get away, **that doesn't mean it's time for target practice on their spine.***" [10]

(Emphasis added).

100.    Krasner knew when he made these comments that Jones had not been "unarmed" but had pointed a loaded firearm at Officer Pownall prior to the shooting.

101.    These intentionally false and inflammatory comments were made as part of an effort to prejudice potential fact finders and to deny a police officer his right to due process.

102.    To fulfill his pledge to Khalif, Krasner directed Tripp to fraudulently obtain a Grand Jury indictment of Pownell for murder.

103.    With Krasner's advice, consent, direction and approval, Tripp secured a Grand Jury indictment through fraud.

104.    After reviewing the District Attorney's conduct in the Pownall case, Court of Common Pleas Judge Barbara A. McDermott found that Tripp had "mislead the grand jury." Specifically, the Judge concluded that Tripp:

> "*. . . made an intentional, deliberate choice not to inform the grand jurors about the justification defense under Section 508. While former ADA Tripp was aware of Section 508 and its applicability to the Defendant's case at the time of the Grand Jury proceedings, she decided not to advise the Grand Jury about Section 508 after consulting with other, more senior Assistant District Attorneys.*"

105.    After reviewing an appeal of the Pownall matter, Justice Kevin M. Dougherty of Pennsylvania's Supreme Court stated:

---

[10] https://whyy.org/articles/philly-da-larry-krasner-reflects-on-chauvin-verdict-where-case-against-former-officer-ryan-pownall-stands/

> "*Little that has happened in this case up to this point reflects procedural justice. On the contrary, the DAO's prosecution of Pownall appears to be 'driven by a win-at-all cost office culture' that treats police officers differently than other criminal defendants.*"

106.    The "win at all cost culture, that treats police officers differently than other criminal defendants" is the established policy under Krasner.

107.    When Tripp decided not to advise the Grand Jury about 18 Pa C.S. § 508, she was acting under Krasner's established policy—of taking steps to deny police officers both due process and the benefit of the law in order—to manufacture probable cause and maliciously charge officers for otherwise lawful conduct.

108.    While Krasner did not personally appear before the Grand Jury, Pownall's counsel noted in arguments before Judge McDermott it is clear "*...who's calling the shots over there*[,]" referring to Krasner. (Tr. Commonwealth v. Pownall, CP-51-CR-0007307-2018, 90:13-15).

109.    In 2019, Krasner filed charges of perjury against Officer James Saxton for allegedly lying under oath about a drug arrest. Officer Saxton was acquitted of all charges after a jury concluded there was "no evidence" of a crime.

110.    The prosecution of Officer Saxton was based on the officer providing sworn testimony that Krasner and Tripp claimed was inconsistent with video evidence.

111.    The accusations against Saxton were referred to Internal Affairs for investigation.

112.    In October of 2019, Police Internal Affairs investigator, Captain Nicholas DeBlasis reviewed the video evidence of the narcotics arrest and compared it to Saxton's in court testimony.

113.    Captain DeBlasis is an expert in narcotics investigations.

114.    Captain DeBlasis advised Tripp there was no probable cause to charge Saxton with a crime.

115.   At the time DeBlasis advised Tripp that there was no probable cause, there was an ongoing investigation by the Philadelphia Police Department's Internal Affairs Division ("IAD") into whether Saxton had committed any departmental violations.

116.   Krasner and Tripp pre-empted the IAD investigation and did their own investigation with a pre-determined outcome.

117.   Tripp and Krasner ignored the expert conclusions of Captain DeBlasis and other evidence of innocence in order to charge Saxton before the IAD investigation was complete.

118.   Krasner and Tripp knew Saxton had not committed a crime but charged him anyway in keeping with Krasner's established policy of taking steps to deny police officers due process and the benefit of the law in order to manufacture probable cause and maliciously charge officers for otherwise lawful conduct.

119.   Krasner issued a press release falsely claiming without evidence that Saxton "lied under oath at a preliminary hearing."

120.   These intentionally false and inflammatory comments were made as part of an intentional effort to deny a police officer his constitutional rights.

121.   In April of 2021, Krasner charged two police officers, James and Patrick Smith (the "Smiths") with assault.

122.   The charges were later dismissed after a Judge determined there was no evidence of a crime.

123.   The charges against the Smiths were based on a corrupt investigation by Krasner's office during which his investigators ignored evidence of innocence.

124.   When he announced the charges against the Smiths, Krasner made public comments intended to damage the officers' ability to get a fair trial:

*"It is truly disturbing that the victim, who has Asperger syndrome, may have struggled to communicate his distress and fear," Krasner said when charging the Smiths. "Additionally, the defendants' claims at the time that they were members of a 'town watch,' that the victim was involved in thefts from vehicles in the area, or that the victim's injuries were caused by a trip and fall were not corroborated by investigation."*

125.    The accusations against the officers were false.

126.    These intentionally false and inflammatory comments were made as part of an intentional effort to deny a police officer his constitutional rights.

127.    Krasner knew the Smiths had not committed a crime but charged them anyway, in keeping with his established policy—of taking steps to deny police officers due process and the benefit of the law — to manufacture probable cause and maliciously charge officers for otherwise lawful conduct.

128.    In July 2020, Krasner announced charges against police officer Richard Nicoletti.

129.    Nicoletti was part of the response to the George Floyd protest. He was accused of assault for using pepper spray on protestors at close range.

130.    The charges against Nicoletti were initially dismissed by a Judge but later reinstated.

131.    After a jury was unable to reach a verdict at the trial against the officer, Common Pleas Judge Roxanne Covington granted a change of venue based on the District Attorney's prejudicial public statements.

132.    Judge Covington cited the prejudicial "media guidance" memorandum issued by the District Attorney's office as the reason for the forum change.

133.    The release of the media guidance was deliberately coordinated by the District Attorney's office so reporters received it on the day the lawyers in the case were picking a jury.

134.    The "guidance" falsely described Nicoletti as "a former Philadelphia SWAT officer who was arrested and charged for *tear-gassing* protesters on I-676 during the racial injustice uprisings."

135.    Nicoletti deployed pepper spray against individual protesters, not tear gas.

136.    Nicoletti was not involved in any decision to deploy tear gas.

137.    No one who did deploy tear gas was ever prosecuted.

138.    Despite knowing that Nicoletti was not accused of any action related to tear gas, the District Attorney's memo maliciously linked to a 10-minute New York Times video entitled, "How the Philadelphia Police Tear-Gassed a Group of Trapped Protesters."

139.    Krasner's effort to poison the public—by releasing false and inflammatory statements about an accused officer—is part of his established policy of taking steps to deny police officers due process and the benefit of the legal process.

140.    Krasner and his office attempted to prevent Nicoletti's defense from presenting exculpatory evidence at his trial.

141.    Specifically, they tried to exclude the SWAT team's standard operating procedures for the use of pepper spray as evidence because the procedures demonstrated that Nicoletti was following police protocol.

142.    Much like his conduct in the Pownall Grand Jury, Krasner sought to conceal and pervert the federal and state law on the use of force in order to deny an officer his constitutional rights.

143.    Krasner and his office also asked the judge to prevent Nicoletti from presenting evidence of his honorable service as an Army Ranger in combat in Iraq and Afghanistan.

144.    Finally, Krasner and his office attempted to prevent any testimony from Pennsylvania state Trooper Keith Gamber, who had been trapped by protestors on the Vine Street Expressway.

145.    At Nicoletti's first trial, Gamber told the jury how he had to abandon his police car when he was surrounded by protesters who climbed on the vehicle and spray-painted "PIGS".

146.    "I had nowhere to go," Gamber told the jury. "It was pure chaos . . . I was basically a sitting duck."

147.    Gamber credited Nicoletti with saving him but Krasner did not want the jury to hear this mitigating evidence.

148.    Krasner's effort to preclude evidence of innocence in the prosecution of police is consistent with his established policy of taking steps to deprive police officers of their constitutional rights by manufacturing probable cause and maliciously charging officers for otherwise lawful conduct.

149.    In September of 2023, Krasner charged Officer Mark Dial with murder in connection with the shooting of Eddie Irizarry.

150.    At the press conference announcing the charges Krasner released videos of the shooting incident to the media.

151.    The videos were released without comment or explanation and while the investigation of the shooting was ongoing.

152.    At the initial hearing of the Dial case, Municipal Court Judge Wendy Pew dismissed all the charges against the officer because she concluded Dial had a reasonable belief that Irrizary was armed after he heard his partner shouted "GUN!."

153.    After Judge Pew dismissed the charges, based on her review of the evidence and law on the use of force by police, Krasner made public comments suggesting that Judge Pew's decision was corrupt and not based on the evidence:

> *"Now, obviously, we could be honest about what happened in that courtroom," Krasner told reporters. "Every fair-minded person in Philadelphia knows what they think about that."*

154.    Krasner's effort to poison the public by releasing false and inflammatory statements about an accused officer is part of his established policy of taking steps to deny police officers their constitutional rights.

155.    Krasner's display of the videos at a press conference and inflammatory comments about the Judge's decision were made pursuant to his policy of denying police officers the same rights he affords to other defendants.

156.    Krasner has an established policy of depriving police officers of their constitutional rights by

a.) Pre-empting and obstructing active law enforcement investigations in order to prevent the accumulation of exculpatory evidence of innocence and instead solicit and utilize knowingly false evidence of guilt;

b.) Concealing, perverting or otherwise mischaracterizing legal authority and or giving an investigating officer misleading or false advice or instructions with regard to the law governing the use of force in order to justify a pre-investigation decision to charge a police officer with a crime;

c.) Illegally tampering with evidence including coaching witnesses to provide false testimony;

d.) Intentionally concealing and or omitting material evidence of actual innocence;

e.) Conducting truncated, knowingly corrupt pre-probable cause investigations in order to obtain an arrest warrant or some other illicit result;

f.) Intentionally and deliberately targeting peace officers for malicious purposes other than the pursuit of justice; and

g.) Maliciously, intentionally and deliberately depriving police officers of due process and constitutional rights, including the rights of police officers to use legally justified, reasonable force in the lawful pursuit of their duties.

157.    As detailed below, the corrupt pre-probable cause investigation of Bologna was part of Krasner and the City of Philadelphia's established policy as described above.

### The Blockade of Interstate 676 ("I-676")

158.    On Monday, June 1, 2020, when Bologna reported for duty, there were already thousands of protestors gathered in and around Center City, Philadelphia.

159.    The protestors chanted "F**k the Police" and held up signs with similar messages.

160.    The day before, on May 31, 2020, protestors had attempted to enter and block Interstate 676 ("I-676") at the Broad and Vine Street entrance ramp. State and local police were able to intervene and stop the protestors and keep the highway clear.

161.    I-676 is a submerged uncovered highway beneath the level of the city surface streets. Over 100,000 vehicles per day cross the highway's 1.75-mile stretch through Center City. Keeping the highway open and free from obstruction is an essential public safety responsibility.

162.    On June 1st, a mass of protestors made their way up the Benjamin Franklin Parkway toward the Art Museum where they were supposed to gather in peaceful protest. As the crowd headed up the Parkway a large group of protesters suddenly diverged from the march route and rushed onto the I-676 on-ramp at 22nd street.

163.    This group of protestors again attempted to enter and block the highway.[11]

---

[11] https://6abc.com/philadelphia-protest-philly-news-in/6222528/



164.    By pulling down a fence, and overwhelming the police who were present, the protestors succeeded in entering I-676 and completely blocking the highway.

165.    The Philadelphia Police Department leadership gave the order for officers to use tear gas to clear the human blockade and free the civilians and members of law enforcement who were trapped on the highway.

166.    Bologna was leading a team of officers on bikes attempting to control the crowd on the streets above the highway.

167.    The tear gas deployed on I-676 drifted upwards, hitting Bologna and his bike team.

168.    The team went to the Police District at 20th and Pennsylvania Avenue to wash the tear gas out of their eyes and mouths. While they were at the district, Bologna heard a call over the police radio: protestors were trying to re-enter I-676.

169.    Bologna jumped on his bike and led a group of bike officers back to the on-ramp at 22nd Street. Several hundred protestors were already there, gathered on the lawn of the Park Towne Place apartment complex across from the ramp leading to I-676.

170.    Bologna and the officers were severely outnumbered.

171.    Bologna directed the officers to set up an ad-hoc barricade called a "bike fence," to block the protestors from making their way back onto I-676.[12]

172.    For everyone's safety Bologna and the other leaders on site decided to move the protestors back and away from the ramp and lingering tear gas.

173.    Bologna and his team moved forward slowly while repeatedly asking the protestors to "back away" and "move out of the area."

174.    Captain Frank Palumbo, another officer at the scene that day, described their repeated requests as being "as diplomatic as possible."

175.    Most of the protestors complied with the directive to move back, but a small group resisted.  This resistance was organized and directed by leaders within the crowd of protestors.

176.    The small group ignored the police commands and instead pushed up against the bike fence screaming at the officers, calling them "pigs," "Nazis," and "fascists."

177.    Evan Gorski, a student at Temple University, was one of the leaders of the group that pushed and antagonized the officers.



178.    Gorski grew up in the Philadelphia suburbs in Montgomery County and attended private school in the city at the Germantown Friends School.

---

[12] The "bike fence" is a basic maneuver in which officers place their bicycles between themselves and the crowd. It provides a barrier for the officer and an increased reactionary gap for any potential threat.

179.    Gorski can be seen on video of the confrontation wearing black gloves, a mask, carrying a backpack and moving back and forth along the police line giving directions to the other non-compliant protestors.

180.    The temperature on June 1st 2020 was in the 70s with clear skies. Gorski's masks, gloves and backpack were all equipment being carried in his role as a leader of the disruptive protestors assaulting and harassing police.

181.    Some of the protestors in Gorski's group threw projectiles at police and grabbed and pulled the officers' bikes trying to pull individual officers out of the bike line and into the crowd.

182.    According to several witnesses, protestors in Gorski's group were kicking and punching officers during this confrontation.

183.    Gorski's friend, Trevor, was carrying a plastic water bottle full of liquid which he intermittently splashed on the officers. During the previous three days, officers had routinely been splashed with urine and chemicals by protestors carrying bottles filled with liquid.

184.    At one point during this June 1st confrontation, Officer Terrell Greene ("Officer Green") was knocked to the ground by a protestor.

185.    When Officer Greene got off the ground, another masked protestor dressed in all black grabbed his bike and tried to pull it into the crowd.

186.    In response, Officer Greene firmly grabbed the man's right arm and began to pull him towards the bike line, away from the crowd, and behind the bike fence.

187.    Officer Greene was attempting to place the individual under arrest.

188.    Bologna saw Officer Greene struggling to make the arrest and attempted to interfere by reaching out to grab the protestor's arms.

189.    Gorski saw Bologna and Officer Greene trying to complete the arrest and ran directly towards the officers, reaching out and grabbing onto the left arm of the protestor being arrested, and tried to pull him away from the police.

190.    At the same time, other protestors began grabbing onto the protestor – who was the target of the arrest – pulling him back into the crowd by linking arms.

191.    Grabbing, pulling, or linking arms with other protestors in an effort interfere with police making an arrest was an organized tactic which had been used repeatedly by protestors since the riots began two days earlier.

192.    A protestor would assault police and then other protestors would pull the offender back into the crowd to help them avoid arrest.

193.    When Bologna was trying to help Greene, he saw Gorski dart in from his right side and reach out and grab the protestor to prevent Greene from completing the arrest.

194.    Bologna turned his attention to Gorski, attempted to grab him, missed, and then raised his right arm and hit Gorski one time on his upper back with his ASP baton.

195.    Bologna then tried to arrest Gorski because he reasonably believed he committed a crime by interfering with an arrest.

196.    Gorski resisted arrest.

197.    When he and Bologna were falling to the ground, Gorski yanked the ASP baton out of Bologna's hand and threw it.

198.    At some point during the struggle, the brim of Bologna's helmet made incidental contact with the back of Gorski's head, causing a cut to Gorski's scalp.

199.    Gorski was arrested and charged with (i) assault on police, (ii) failure to disperse, (iii) disorderly conduct and (iv) obstruction of justice.

200.     As Gorski sat on the curb in custody and receiving medical treatment from the police staff, Bologna walked over to him and asked why he had acted as he did.

201.     Gorski "mumbled an apology."

202.     Police took Gorski to Thomas Jefferson University Hospital located at 111 S. 11th Street, Philadelphia, PA 19107 for medical treatment.

### The Video

203.     Sometime after Gorski's arrest, a video of Bologna striking him with the ASP baton started to circulate online.

204.     The video is 36 seconds long and the portion showing Bologna striking Gorski is less than 2 seconds.

205.     The video was re-posted and viewed thousands of times along with the false claim that Bologna's use of the baton had caused Gorski's head injury.

206.     Many hundreds of social media viewers condemned Bologna and falsely portrayed Gorski as a peaceful protestor who had done nothing to justify the use of force.

207.     These accusations were broadcast nationwide less than a week after the police murder of George Floyd and quickly lead to calls for action against Bologna.

208.     Krasner viewed the video and directed the Office of the District Attorney's Charging unit to decline all charges against Gorski.

209.     Krasner cited "insufficient evidence" as the basis of his decision.

210.     Krasner's public statements suggested he decided to decline the charges against Gorski based on the video evidence:

> *"But upon careful review of video and other evidence, including by District Attorney Krasner himself, the DAO declined to charge the student."*

211.    In reality, Krasner's decision ignored the video evidence of Gorski interfering with a lawful arrest and hindering the apprehension of a protestor who had assaulted a police officer.

212.    To carry out his unlawful scheme to charge Bologna, Krasner knew he had to exonerate Gorski and control the pre-probable cause investigation.

213.   IAD started an investigation of the Bologna video shortly after it was posted to social media.

214.    IAD specializes in, amongst other things, investigating police officers who are, or may be, accused of crimes.

215.    Krasner and Tripp decided to pre-empt and obstruct the IAD investigation and conduct their own fraudulent pre-probable cause investigation ("the Krasner Investigation") to concoct "probable cause" and carry out their unlawful decision to charge and arrest Bologna for a crime he did not commit.

216.     Krasner and Tripp were not acting in their prosecutorial role as advocates when they decided to (i) review the video, (ii) interview a witness, and (iii) make investigative findings prior to the establishment of "probable cause"—they engaged in all of these pre-probable cause investigative activities with a malicious intent to manipulate evidence in order to charge Bologna with a crime he did not commit.

217.    Their acts during the pre-probable cause Krasner investigation were carried out in their investigative and administrative capacity and not in preparation for any pending judicial process.

218.    On June 5, 2020, the assigned IAD investigator attempted to interview Gorski as part of his investigation of the videotaped incident.

219.    Gorski's attorney, Jonathan Feinberg, Esquire ("Feinberg"), blocked the interview and prevented IAD from speaking to Gorski.

220.    Feinberg was already communicating directly with Krasner.

221.    Krasner had advised Feinberg not to cooperate with the IAD investigation and instead work directly with Tripp to take a statement from Gorski in order to justify false charges against Bologna.

222.    Krasner had already decided to charge Bologna with a crime before any interview took place.

223.    Sergeant Rocks was used as the detective for the Krasner investigation because he was the Acting Chief of County Detective and answered directly to Krasner. Krasner had personally selected Rocks for the position of Chief of County Detectives.

224.    Feinberg concentrates his private practice on suing police for, amongst other things, excessive force.

225.    According to his website, Feinberg's criminal practice is focused on "habeas corpus matters and state post-conviction challenges to convictions and prison sentences."

226.    Gorski had no issues related to habeas corpus or any post-conviction matters. In fact, at the time of the June 5th, Krasner investigation interview, all criminal charges against Gorski had been declined by Krasner personally.

227.    Feinberg had assurances from Krasner that his client was free and clear and would not be charged with a crime.

228.    As a result, Rocks and Tripp did not read Gorski the Miranda warnings prior to conducting the Krasner investigation interview because he was not at any risk of prosecution.

229.    Feinberg was not representing Gorski as a criminal attorney to protect his 5th amendment rights. He was retained by Gorski for a different purpose: to pursue a civil rights lawsuit against Bologna and the City.[13]

230.    Krasner and Tripp's conduct in interfering with the IAD investigation and conducting their own corrupt pre-probable cause investigation falls outside of the scope of their prosecutorial function as advocates. They both acted in a pre-probable cause investigative and administrative capacity.

231.    The Gorski interview was not conducted in preparation for any judicial process.

232.    The interview had three purposes: (i) to pre-empt and obstruct the IAD investigation (ii) to fabricate probable cause and (iii) to manufacture civil liability against Bologna and the city.

233.    Krasner acted to further these objectives and not in the interest of justice.

### *The Krasner Investigation Interview*

234.    The interview of Evan Gorski was conducted via video call. Tripp and Rocks were in a room together with a District Attorney paralegal.



---

[13] It is to be noted that Mr. Feinberg and DA Krasner have a long-time close personal and professional relationship. In fact, DA Krasner's wife was an attorney at Feinberg's law firm. Moreover, in 2022 while Bologna's criminal charges were pending, Feinberg's firm represented DA Krasner in proceedings before a federal judge related to the alleged misconduct of the DA's Office.

(A true and correct screenshot of the interview, attached hereto as **Exhibit "C."**)

235.    Tripp supervised the entire Gorski interview, provided questions for Rocks to ask, and permitted Gorski's attorney, Feinberg, to interrupt the interview and coach his client.

236.    Krasner had arranged the interview by connecting his friend, Feinberg, with Tripp.

237.    Krasner was in constant communication with Tripp during the investigation.

238.    Throughout the pre-probable cause investigation, Krasner provided Tripp with advice and guidance all for the malicious purpose of charging Bologna with a crime without probable cause.

239.    Krasner and Tripp's conduct during this pre-probable cause interview was outside the scope of their prosecutorial function as advocates. They both acted as pre-probable cause investigators and administrators and not in preparation for any judicial process.

240.    Gorski was obviously prepped on how to answer questions before the interview. In response to the first question about what he was doing that day he responded:

> *"I was participating peacefully in the protests . . . ."*

(Gorski Interview, 2:30-3:07).

241.    Krasner, Tripp, and Rocks knew this statement was false because they had reviewed the video showing Gorski interfering with an arrest and directing other protestors who were in a physical confrontation with police.

242.    Gorski was not "peacefully protesting." He was arrested for assault. Gorski was a leader of a group of protestors who violently obstructed police and punched, kicked, and shoved individual police officers and then interfered when the police tried to arrest perpetrators.

243.    When asked by Rocks if he "*knew the protestor that the police were originally attempting to take into custody*[,]" Gorski responded that he *"didn't know the exact protestor."* (Gorski Interview, 3:34).

244.    Tellingly, Gorski answered the question and did not correct Rock's initial statement that the police were "*attempting to take* [a protestor] *into custody,* "

245.    Feinberg quickly interrupted the interview and began to testify in response to Rock's reference to police attempting to take someone into custody:

> *"I don't think Evan [Gorski] noticed one way or the other about whether that guy was being taken into custody. It appears that police were just kind of grabbing people and shoving them along."*

(Gorski Interview, 3:42-3:47).

246.    Feinberg then testified as to his opinion of Gorski's response:

> *"I don't think he said that anyone was being taken into custody. [Being pulled into the bikes and taken into custody] are two completely different things. Being taken into custody indicates an arrest."*

(Gorski Interview, 4:01-4:12).

247.    During Feinberg's testimony, Gorski nodded his head in agreement.

248.    Krasner and Tripp allowed Feinberg to participate in and interfere with the interview because his coaching of Gorski furthered Krasner's objective: to charge Bologna with a crime he did not commit.

249.    The interruption and testimony by Feinberg had the intended effect of coaching Gorski. When asked again by Rocks about his *"intention"* in *"intervening and pulling [the other protestor] away,"* Gorski – understanding that he must now answer questions in a certain manner – responded that his *"only intention"* was to *"grab the protestor and pull him back . . .."* (Gorski Interview, 4:25-4:30).

250.    This testimony denying that Gorski was trying to stop officers from making an arrest was false.

251.    Krasner, Tripp, and Rocks all knew Gorski's testimony was false because they had watched the video, and they were aware of Gorski and other protestors' tactic of interfering with arrest.

252.    Krasner, Tripp, and Rocks all knew that the video showed Gorski and other protestors wearing masks, gloves and backpacks and using hand signals to communicate and organize efforts to break through barricades and swarm officers trying to make arrests in response violence and other criminal conduct.

253.    This was all part of an organized effort by some protestors to antagonize, assault, disrupt and interfere with police efforts to maintain and protect peaceful demonstrations.

254.    Krasner and Tripp understood that if the Krasner investigation included the fact that Gorski was engaged in this organized conduct and interfering with an arrest then under federal law and Section 508 (the same section Krasner and Tripp concealed from the grand jury in the *Pownall* matter as part of the established pattern and practice of interfering with police officers' rights) Bologna's use of force would be legally justified and not a crime.

255.    Tripp, with Krasner's direction, input, advice, and approval allowed Feinberg to coach Gorski to lie and deny that he was attempting to prevent Bologna from effecting an arrest. Krasner, Tripp, and Rocks then omitted any reference to the video evidence of interference with an arrest from the investigation.

256.    After Rocks finished his questions, he checked with Tripp and asked if she had "any further questions," meaning in her role as an investigator (and not an advocate).

257.    Tripp with Krasner's advice and direction was supervising and controlling the pre-probable cause interview.

258.    In response to Rock's question Tripp instructed him to turn the laptop on mute.

*"Uh Tracy asked that we put you on mute, hang on one second."*

(Gorski Interview, 9:00-9:02).

259.    After a minute-long conversation with Tripp, Rocks unmuted and asks Gorski a few more narrowly tailored questions which he was directed to ask by Tripp:

Q.    *"There's obviously a few videos out there about this incident have you watched those videos?*
A.    *Um, I've seen them once . . . but I haven't replayed them.*
Q.    *"When you were hit **did you feel the strike on your head** or shoulder or back or like like [sic] is there anywhere, if you recall?"*
A.    *I felt it on my head, not like a passing out or numbing, but I definitely felt like something had hit my head and then shortly after when I was on the ground recovering, um, I could definitely feel my head getting heavier with blood."*

(Gorski Interview, 11:30-11:56).

260.    Rocks pointed to the back of his head with the tip of a pencil when he asked *"...did you feel the strike on your head..."* (*Id.*)

261.    Tripp was sitting behind Rocks and could see him point to the back of his head as he asked the question.

262.    Tripp directed Rocks to ask the question about the head strike despite the fact she had watched multiple videos that showed Gorski was struck in his upper back, not the head.

263.    During the interview, Gorski had not volunteered that his head "gash" came as a result of being hit by Bologna's baton.

264.    Once prompted by Rocks and Tripp, Gorski provided the false testimony necessary to charge Bologna with aggravated assault, that he felt it *"on [his] head*." (*Id.*)

265.     Tripp directed Rocks to ask where Gorski felt the strike because she knew that Gorski would falsely testify that he felt the strike on his head.

266.     Gorski lied when he claimed that he was not interfering with an arrest and that he was struck in the head with an ASP.

267.     Tripp, Krasner, and Rocks knew Gorski was lying because they had watched the videos which demonstrated both of his claims were false.

268.     Tripp, Krasner, and Rocks solicited both of these false statements as part of the Krasner investigation because they believed these false claims were essential to carrying out their unlawful scheme.

269.     Once they had Gorski's false testimony on those two points, the Krasner investigation was over. Rocks turned to Tripp after Gorski's response and asked:

> *"Do you have anything else you need?"*

(Gorski Interview, 12:01-12:08).

270.     Krasner and Tripp did not *"need"* anything else. They had obtained the false statements to charge Bologna with felony aggravated assault for "reckless disregard to the value of human life." (Gorski Interview, 12:15).

271.     Krasner, Tripp, and Rocks all knew that Gorski's claims were false because they had watched the video that showed Gorski interfered with an arrest and that Bologna did not hit Gorski on the head with the baton.

272.     After the interview formally concludes, Feinberg – on video – asked Rocks if Tripp was still present in the room, to which she replied, "*I am.*" He then asked:

> *JF*:     *"Would you mind giving me a quick call to discuss something, uh, unrelated?*
> *TT*:     *Uh sure, . . . and it's not related to this at all?*
> *JF*:     *Well . . . let's call . . . not directly related to this interview."*

(Gorski Interview, 12:01-12:08).

273.    The entire interview with Gorski lasted 13 minutes and four seconds.

274.    During the pre-probable cause Krasner investigation, Krasner and Tripp were notified that the IAD investigation had just started.

275.    IAD further advised Tripp and Krasner that a "Use of Force" expert had reviewed the video of Bologna striking Gorski and determined Bologna had not hit Gorski in the head with the baton, but instead connected with Gorski's left shoulder.

276.    A strike to the shoulder is consistent with Philadelphia officer training and protocol when using an ASP.

277.    IAD advised Tripp and Krasner of their preliminary conclusion — that the use of the ASP baton was consistent with a maneuver taught to officers during training and well within the departmental use of force regulations and state law dealing with an individual interfering with an arrest.

278.    Krasner and Tripp ignored this expert opinion and the pending IAD investigation.

279.    When IAD finished their actual, lawful investigation thirteen months later—after interviewing ten police officers, Gorski's medical records, and consulting with multiple experts— their conclusions validated their preliminary findings and directly contradicted the findings of the Krasner Investigation:

> "This investigation revealed **NO DEPARTMENTAL VIOLATIONS** against Staff Inspector Joseph Bologna.
> . . .
> The video failed to clearly depict the ASP making contact with Mr. Gorski's head. Mr. Gorski was taking aggressive assertive action toward [] Bologna who responded with a reactionary ASP strike. . . . [T]he injury suffered to the right shoulder area [of Gorski] was consistent with the ASP strike by [Bologna]. . .. [B]ased on [the expert's] training and knowledge of the Armament Systems Procedure (ASP) and the Philadelphia Police Department policy . . . Bologna's [] strike against Mr. Gorski [was] justified and within departmental guidelines."

(Internal Investigation #20-2534 Conclusion, attached hereto as **Exhibit "D."**)

### *The Affidavit of Probable Cause*

280.     Krasner and Tripp worked together with Rocks on drafting an Affidavit of Probable Cause ("Affidavit") to charge Bologna. The Affidavit describes the analysis of two videos, *"from two different angles,"* showing the "interaction between Police and protestors" in the area of 299 N. 22nd Street on June 1, 2020, at approximately 6:00 P.M. (A true and correct copy of the Affidavit of Probable Cause, attached hereto as **Exhibit "E."**) (Emphasis added.)

281.     The Affidavit does not allege that the videos show Bologna striking Gorski in the head; instead, it says the videos show that, "Bologna struck [Gorski] with his ASP knocking him to the ground . . .." (*Id.* at ¶ 4).

282.     During the preparation of the Affidavit of Probable cause Krasner and Tripp directed Rocks to include Gorski's false testimony that he was struck in the head with the ASP; *"EG (Evan Gorski) stated the Officer hit him one time causing a cut on the back of his head, which required stitches and staples to close."*

283.     Krasner, Tripp, and Rocks maliciously included Gorski's false testimony in the Affidavit of Probable Cause because they believed an intentional strike to the head and resultant injury were facts needed to justify charging Bologna with a crime.

284.     Krasner, Tripp, and Rocks intentionally and maliciously omitted the fact that Gorski was interfering with an arrest when he was struck by Bologna because they knew that Bologna's conduct was legally justified and not criminal if he was attempting to effect an arrest.

285.     Krasner and Tripp advised Rocks draft the Affidavit of Probable Cause falsely asserting that Bologna's conduct was criminal even they knew it was not.

286.     Krasner and Tripp were both very familiar with Section 508 of the Pennsylvania Crimes Code which states in relevant part:

> *Use of force in law enforcement. (a) Peace officer's use of force in making arrest.-- (1) A peace officer, or any person whom he has summoned or directed to assist him, need not retreat or desist from efforts to make a lawful arrest because of resistance or threatened resistance to the arrest.* *He is justified in the use of any force which he believes to be necessary to affect the arrest and of any force which he believes to be necessary to defend himself or another from bodily harm while making the arrest.*

(18 Pa C.S. § 508) (Emphasis added).

287.     Not only had Krasner and Tripp previously withheld Section 508 from the Pownall grand jury, they unsuccessfully argued to the State Supreme Court that the statute was unconstitutional.

288.     As a result of those past experiences, Krasner and Tripp knew Section 508 would fatally undermine any criminal charges against an officer who used reasonable force to effect an arrest.

289.     Krasner, as a former civil right lawyer, and Tripp as an experienced lawyer and former Public Defender, also knew that under federal law Bologna had the right the right "*to use some degree of physical coercion or threat thereof to effect*" an arrest.  Graham v. Connor, 490 U.S. 386, 396–97, 109 S. Ct. 1865, 1871–72, 104 L. Ed. 2d 443 (1989).

290.     In order to charge Bologna with a crime, Krasner and Tripp maliciously falsified the evidence, omitted material facts, gave Rocks intentionally, maliciously, misleading advice and direction on the law in order to concoct probable cause.

291.     Krasner had an established policy to conceal, misapply, pervert or provide knowingly incorrect legal advice and direction to investigators and fabricate probable cause in a

deliberate effort to deprive police officers of the benefit of Section 508 and their rights under state and federal law to use reasonable force carry out their duties.

292.   The Affidavit of Probable Cause makes no reference to use of force rules and regulations or Gorski's interference with an arrest.

293.   Tripp approved the Affidavit at 5:30 PM, about two hours after the coached interview with Feinberg and Gorski.

294.   Krasner approved and issued a press release at the same time.

295.   The Krasner investigation ended less than 72 hours after Bologna's encounter with Gorski.

296.   The entire investigation consisted of watching videos of the incident and a concocted, coached 13-minute interview with Gorski.

297.   The Affidavit of Probable Cause was approved and the press release was issued within three hours of the Gorski interview.

298.   There was no mention in the release of Gorski's conduct in interfering with an arrest.

299.   Instead, the press release falsely accused Bologna of hitting a *"Temple University Student in the back of the head while he was participating in mass demonstrations against racism and injustice…."*

300.   Krasner's press release highlighted the fact that videos of the incident "*went viral and were shared by people across the country"* and linked the charges to the *"moment."*

301.   This was reference to the aftermath of the murder of George Floyd.

302.    *"Americans,"* Krasner said, *"are taking to the streets to demand a remaking of political, economic, and legal systems that serve the powerful at the expense of citizens health, welfare and lives. There can be no safety or peace without justice."*

303.    Three days after issuing the inflammatory press release, Krasner testified in front of City Council during budget hearings and bragged about how quickly he had charged Bologna:

> *"...on the eve of 30,000 people gathering on the Benjamin Franklin Parkway after there had been unrest,* **I was not willing to delay any further in bringing criminal charges against a particular inspector**...*...Part of the reason we have this incredible unrest in the United States right now is that the prosecutor in Minneapolis sat on his hands and he sat on his hands for days and days and days until the collective outrage which goes back hundreds of years make no mistake but the collective outrage built and built and built..."*

(https://www.youtube.com/watch?v=K5hYflD2W98 (2:53)) (Emphasis added.)

304.    Krasner's public comments linking Bologna with George Floyd and hundreds of years of "collective outrage" were part of his concerted effort to deny Bologna his constitutional rights.

305.    Krasner's statement that he was not willing to delay bringing charges against "*a particular inspector"* is further evidence of his direct personal involvement in the corrupt pre-probable cause investigation and his personal malice towards police generally and Bologna as an individual.

306.    After Bologna was found not guilty by a jury, Krasner provided further evidence that his pre-probable cause decision to charge Bologna was malicious.

307.    When asked about the verdict at press conference on an unrelated matter, Krasner refused to acknowledge his wrongful conduct and instead chose to defame Bologna on national television, suggesting that despite his acquittal Bologna was guilty of other misconduct:

> *Those of you who remember a little history will remember looking at the cover of the [Philadelphia] Daily News . . ... And you saw Bologna, and you saw him on the*

*cover of the Daily News with a knife . . . And he was cutting wires to a CCT system while he and a bunch of other narcotics officers did some things in that space that were very questionable . . .. This is not the first time that we have heard about Bologna."*

308.    Krasner also suggested Bologna was guilty despite the verdict and defended his corrupt investigation:

*"I know that the culture in the system, the culture in society, tends to give every benefit of the doubt to law enforcement who are charged with crimes," Krasner said. "We accept this outcome. I am proud of the fact that our investigations unit worked so hard to try to get justice in ways that my predecessors never even tried."*

309.    These post-verdict comments further evidence Krasner's pre-probable cause investigation was malicious and conducted for a purpose other than justice.

310.    That other malicious purpose was to target Bologna without probable cause because of Krasner's personal animus toward him and to carry out Krasner's established policy of charging police officers without probable cause because of his animus toward police in general.

### *The Criminal Complaint*

311.    Rocks, with Tripp and Krasner's oversight and approval, prepared a Criminal Complaint against Bologna, charging him with: (i) 18 Pa.C.S. § 907 Possession of an Instrument Crime, (ii) 18 Pa.C.S. § 2702(a)(1) Aggravated Assault, (iii) 18 Pa.C.S. § 2702(a)(4) Aggravated Assault, (iv) 18 Pa.C.S. § 2705 Reckless Endangering Another Person, and (v) 18 Pa.C.S. § 2701(1) Simple Assault. (**Exhibit "F."**).

312.     If convicted and sentenced for each of these offenses, Bologna faced up to 35 years in prison.

313.    The Criminal Complaint contained the knowingly false claim that Bologna had hit Gorski "once in the back of the head with his ASP…" (*Id.*)

314.    Rocks signed the complaint under oath stating, "I swear to or affirm the within complaint is true and correct…." Krasner, Rocks, and Tripp all knew the complaint was false when they submitted it to the court for approval. (*Id.*)

315.    Rocks swore to the false statement that Bologna had hit Gorski in the head even though he had watched the video and knew this was not true.

316.    The Criminal Complaint also alleged, without a specific citation, that Bologna's conduct was "in violation of police directives" and "not reasonable and showed a reckless disregard to the value of human life." (*Id.*)

317.    Krasner, Tripp, and Rocks all knew that the statement in the Criminal Complaint that there was a "violation of police directives" was false because they had access to the department's directives.[14]

318.    Police Directive 10.2 states in part:

> *The use of the …Baton/ASP is authorized whenever the offender is physically aggressive or assaultive and there is a[n] immediate likelihood that they may injure themselves or others. Such behaviors may include punching, kicking, **grabbing, or approaching with a clenched fist.***

319.    After Bologna was arrested, Feinberg filed the planned civil lawsuit on behalf of Gorski against the City of Philadelphia.

320.    Feinberg's complaint reproduced almost verbatim the false facts collected during the Krasner Investigation:

> *"Joseph Bologna, a high-ranking staff inspector with the Philadelphia Police Department, violently assaulted 21-year-old Evan Gorski by striking him on the head with an ASP, a metal baton designed to cause injury. The strike caused a deep laceration on the back of Mr. Gorski's head, requiring repair with ten surgical staples. **Mr. Gorski had done nothing to provoke the assault**."*

---

[14] https://www.phillypolice.com/assets/directives/D10.2-UseOfModerateLimitedForce.pdf

321.    Less than a year after Bologna's arrest, the City of Philadelphia paid Gorski and his attorney $170,000 based on the false testimony solicited during the Krasner investigation.

### *The Prosecution of Joseph Bologna*

322.    The claims here are brought against Krasner and Tripp based on their conduct before the initiation of the judicial process.

323.    The factual allegations about Krasner and Tripp's subsequent conduct during the post-probable cause judicial process phase of the prosecution are included here as evidence of their malicious intent during the pre-probable cause investigative and administrative phase.

324.    Bologna turned himself in at the Northeast Detective Division at the 15th Police District, where his arrest was processed.

325.    He was fingerprinted, photographed, and had conditions for pretrial release set by a Magistrate.

326.    Bologna spent seven hours in custody at the police district before he was released on his own recognizance. During those seven hours he was not free to leave the police district and was under arrest.

327.     On January 15, 2021, the Honorable Henry Lewandowski III presided over a preliminary hearing in the case of *Commonwealth vs. Joseph Bologna*.

328.    A week before the preliminary hearing, on January 6, 2021, the City Chief Medical Examiner, Dr. Sam Gulino, issued an expert opinion based on his review of the video, still photographs of Gorski's injuries, Gorski's medical records, and other portions of the ongoing IAD investigation.

329.    Dr. Gulino was an experienced medical examiner who had conducted hundreds of autopsies and provided expert testimony in hundreds of cases providing opinions on the cause of a wide variety of physical injuries.

330.    His opinion based on his experience and review of the materials was that *"Bologna struck Mr. Gorski in the left upper back with the ASP"* and that the head injury happened when *"Bologna's bicycle helmet made contact with Mr. Gorski's head."*

331.    This exculpatory opinion was purposefully not shared with Bologna's attorneys before the preliminary hearing.

332.    Withholding the exculpatory opinion is contrary to Krasner's published policy with regard to other potentially exculpatory information at preliminary hearings for non-police defendants.

333.    That policy requires: "Making Brady disclosures regarding police misconduct at preliminary arraignment."[15]

334.    Despite being aware of Dr. Gulino's expert opinion and having continued access to the exculpatory video evidence, Tripp and Krasner directed their subordinate to proceed in court with the false testimony from the Krasner investigation.

335.    At the preliminary hearing, Krasner's assistant, Sanhita Sen ("Sen")—under Krasner and Tripp's supervision and direction—solicited false testimony from Gorski that Bologna struck him in the head with the ASP baton.

336.    Gorski repeated the false claims from the Krasner investigation:

*"I was struck on the head with an ASP and received a wound on my head,"*

---

[15] https://phillyda.org/about/

(Lewandowski Hearing N.T., 11:22-23.)

> Q.    *Do you recall how many times you were struck? Was it—*
> A.    *Yeah. I only remember being struck once and then hitting the ground.*

(Lewandowski Hearing N.T., 12:6-9.)

> *"At that point I was struck on the head."*

(Lewandowski Hearing N.T., 12:22-23.)

337.    Sen repeated the same false allegations during her questioning of Gorski:

> Q.    *"Do you know who struck you on the head?"*

(Lewandowski Hearing, N.T. 12:2.)

> Q.    *"When this strike occurred with the ASP to your head, do you recall if Officer Bologna said anything to you?"*

(Lewandowski Hearing, N.T. 22:13-15.)

338.    Under cross examination, when confronted with the video evidence Gorski still insisted on his pre-probable cause false testimony:

> Q. *Show us where it hit your head?*
> A. *So the frame before is when the ASP was bouncing off of my head….*

(Lewandowski Hearing, N.T. 37:13-15.)

339.    Under questioning from Sen, Gorski also repeated his false testimony denying that he had a physical contact with officers or interfered with an arrest:

> *"And then I saw that there was a different protestor being brought into the line. And so I went to try and pull the protestor back."*

(Lewandowski Hearing N.T. 12:19:22.)

> Q.    *You described it was a chaotic scene. Were you engaging directly with any officers?*
> A.    *I was following orders from officers.*
> Q.    *Was there any physical contact between you and any other officers?*
> A.    *No physical contact prior.*

(Lewandowski Hearing N.T. 12:24-25 and 13:1-4.)

> Q.      *Evan, just prior to being struck by the ASP, just to be clear, were you –did you come into physical contact with Officer Bologna or any other officer prior to being struck?*
> A.      *No, I was not in physical contact with any others that day besides the incident where I was struck.*

(Lewandowski Hearing N.T. 12:24-25 and 13:1-4.)

340.    Tripp and Krasner knew this testimony was false.

341.    This was the same false testimony Gorski had been coached to provide during his interview with Tripp and Rocks.

342.    Under cross examination at the preliminary hearing Gorski reluctantly admitted to interfering with the police:

> Q.      *It's clear to you that whoever that person is with the black backpack is going to be stopped, detained, arrested for whatever reason by members of the Philadelphia Police Department, is that right?*
> A.      *Yes.*
> …….
> Q.      *You are interfering with police conduct right there, right?*
> A.      *That's true.*

(Lewandowski Hearing, 34:19-35:13.)

343.     Later at Bologna's criminal trial Gorski would yet again change his story and deny that he was interfering with an arrest.

> *"Q. And at the time, you know, were you attempting to interfere with an arrest?*
> *A. No. I was trying to keep the protestor out of the fray".*

(Commonwealth v Bologna Day 2:35;4-7.)

344.    Unlike Officer Saxton, Gorski was never prosecuted for perjury for providing testimony that was allegedly contradicted by video evidence and prior sworn testimony.

345.    At the hearing before Judge Lewandowski, Bologna's lawyers presented the frame by frame of the video and the testimony of an expert on the use of force.

346.   Both the video and the use of force expert made it clear Bologna legally struck Gorski on the upper back to stop him from interfering with an arrest.

347.   Despite having the video, Gorski's medical records and Dr. Gulino's expert opinion, Assistant District Attorney, Sen, under Krasner and Tripp's supervision and direction, insisted during oral argument that "*the strike landed on Evan's Gorski's head.*" (Lewandowski Hearing N.T. 84:2-3.)

348.   It was necessary for Krasner and Tripp to persist in this false claim in order to protect themselves by continuing the prosecution in an attempt to conceal their malicious misconduct during the pre-probable cause investigation.

349.   After viewing the video and hearing the testimony from Gorski, Judge Henry Lewandowski dismissed all charges:

> "*THE COURT: Thank you. Having heard the evidence and the arguments, specifically the evidence from the complaining witness, who he himself said he knew that the police were attempting to stop, detain or effectuate an arrest. He did say he wasn't sure it was a lawful arrest. He then interfered. When I heard from the expert (Sergeant Gill) I was surprised that the Commonwealth didn't bother to either talk to the expert, who is a Commonwealth employee, or have another expert on this very sensitive issue of use of force. But having heard from the only two witnesses that testified here today, I find that the Commonwealth has not met its burden on any of these charges.  This matter is discharged.*"

350.   Krasner directed Tripp to appeal Judge Lewandowski's ruling to the Court of Common Pleas.

351.   Tripp filed the Notice of Refiling Criminal Complaint on February 11, 2021.

352.   The case was assigned to the Honorable Crystal Bryant-Powell ("Judge Bryant Powell").

353.   On March 15th, 2021, the District Attorney requested a continuance of the hearing before Judge Bryant-Powell, "For Further Investigation."

354.    On April 22, 2021, Tripp, and Rocks—at Krasner's direction—met with Dr. Gulino in an effort to get him to change his opinion about whether or not Bologna caused Gorski's head injury by striking him in the head with the ASP.

355.    On May 4th, 2021, the District Attorney requested another continuance "For Further Investigation".

356.    That same day the assigned prosecutor sent Dr. Gulino an email with additional materials for him to review. This was another attempt by Krasner's office to get Dr. Gulino to change his opinion.

357.    On May 25th, 2021, the District Attorney requested a continuance because they claimed a "Victim/Witness" was unavailable.

358.    On June 30th, 2021, the District Attorney requested yet another continuance, this time for an "Expert."

359.    The expert was Dr. Gulino and Krasner and Tripp were hoping he would give into their pressure and issue a revised report.

360.    The IAD investigation of Bologna was finalized on July 27th, 2021.

361.    The investigation cleared Bologna of any wrongdoing, concluding that his use of the ASP baton to strike Gorski in the upper back while trying to effect an arrest was consistent with use of force standards and policies.

362.    The IAD report included transcripts of interviews with ten police officers, an opinion on the use of force by police expert SGT Kenneth Gill, Dr. Gulino's original January 6th report, screenshots of the video, and the videos of the incident themselves.

363.    During the yearlong investigation, Gorski never submitted to an interview by IAD.

364.    The same day the IAD investigation concluded, Dr. Gulino sent the District Attorney an addendum to his original report.

365.    The addendum reaffirmed his conclusion that Bologna had struck Gorski on the "upper back" and not on the head. (A true and correct copy of the Dr. Gulino's memorandum, attached hereto as **Exhibit "G."**)

366.    On August 31st, 2021, Bologna appeared along with his wife and lawyers before Judge Bryant-Powell for the hearing on the refiled charges.

367.    Judge Bryant-Powell reviewed the transcript of testimony provided before Judge Lewandowski.

368.    The District Attorney's Office acknowledged before Judge Bryant -Powell that they had Dr. Gulino's exculpatory opinions.

369.    Despite having Dr. Gulino's original and restated opinion, and continued access to the video evidence, the prosecutor urged Judge Bryant-Powell to base her decision on Gorski's false testimony from the preliminary hearing[16]:

> *"...as the complainant testifies, and as the court read in the preliminary hearing, that he was struck on the head by the asp."*

(Judge Bryant-Powell hearing 12:9-12.)

> *"As the court saw in the notes of testimony, Mr. Gorski unequivocally said he was struck in the head by an asp."*

(Judge Bryant-Powell hearing 25:18-20.)

---

[16] Krasner, Tripp and Rocks also had access to the conclusions of the IAD investigation which was completed on July 21, 2021- more than a month before the hearing in front of Judge Bryant-Powell. The IAD conclusions were not shared with Bologna or his counsel prior to the hearing.

370.    After reviewing the evidence *de novo*, Judge Bryant-Powell upheld Judge Lewandowski's dismissal of felony charges but found a *prima facie* case supporting misdemeanors only: Simple Assault and Possession of an Instrument Crime.

371.    Judge Bryant-Powell's finding of a *prima facie* case for the misdemeanors was based on the false allegations and material omissions in the original Affidavit of Probable Cause.

372.    This fact is confirmed by the statements of the District Attorney representing Krasner at the hearing.

373.    In response to questioning about the evidence, the assigned prosecutor—Varghese Kurian—acknowledged that the entire prosecution was based on the (false) claim that Gorski was struck in the head:

> *"If the complaining witness wasn't hit on the head with the asp and suffered those injuries, I don't believe a charge would have been appropriate."*

(Judge Bryant-Powell hearing 50:21-24.)

374.    Krasner could not accept the dismissal of the felonies because it undermined his original malicious objective and exposed his corrupt investigation.

375.    Krasner appealed to the Superior Court.

376.    The Superior Court's three Judge panel rejected Krasner's sophistry and laid bare the fruit of the corrupt investigation:

> *"[W]e disagree with the Commonwealth's contention that we must accept Gorski's testimony that he was hit in the back of the head by the baton, despite video of the incident to the contrary. It is well-settled that 'where the testimony of a witness is contradicted by incontrovertible physical facts, the testimony of such witness cannot be accepted' (citations omitted).*
>
> *Herein, Gorski's testimony clearly contradicted the video evidence regarding the part of the body where the baton made contact."*

(A true and correct copy of the Superior Court opinion, attached hereto as **Exhibit "H."**)

377.    The Superior Court opinion made clear that Krasner, in the face of "incontrovertible physical facts" (i.e., the video), consciously opted to ignore evidence of innocence and use false testimony to charge Bologna with a crime he did not commit.

378.    Krasner again appealed, seeking "re-argument en banc."

379.    The District Attorney's appeal and Application for Re-argument En Banc both repeated the false testimony that had originated during the pre-probable cause investigation:

> "Gorski testified that, as he attempted to pull the other protestor back from the line of police, defendant struck him on the head with an ASP, a collapsible metal baton approximately one foot long… ("I was struck on the head with an ASP and received a wound on my head") ("at that point, I was struck on the head")

(A true and correct copy of the Commonwealth's appeal, attached hereto as **Exhibit "I."**)

380.    The District Attorney's brief argued the video could not exonerate Bologna because it was contradicted by Gorski's testimony:

> "According to the panel, the video showed defendant strike the victim one time with the baton on the "shoulder near the base of the neck" But the video could not and did not establish such a fact definitively, and the panel's finding contradicts the victim's testimony that defendant struck him in the head."

(*Id.* at pg. 9).

381.    Despite the IAD conclusions, Dr. Gulino's two reports, and the Superior Court Opinion, Krasner continued to prosecute Bologna for another two and half years.

382.    Krasner knew that if he dropped the charges against Bologna, he would have to acknowledge that his conduct during the pre-probable cause investigation was malicious and that the charges were based on knowingly false testimony and intentional and malicious omission of material facts.

383.    Krasner refused to acknowledge Bologna's innocence in order to avoid liability for his pre-probable cause malicious misconduct during the Krasner investigation.

384.    In February of 2024, Bologna finally got his day in court.

385.    Prior to the start of the trial, Bologna's lawyers, citing the Superior Court opinion, moved to preclude the prosecutor from soliciting testimony from Gorski that Bologna struck him in the head.

386.    Krasner's assistants opposed the motion. They still wanted Gorski to claim against all video and physical evidence that he was hit in the head with the ASP baton.

387.    The Judge agreed with the defense and precluded Gorski from providing testimony contradicted by the video evidence.

388.    The prosecution rested their case without introducing Dr. Gulino's testimony. They then objected when Bologna's lawyers called him as a witness, arguing that his testimony was inadmissible.

389.    When the Judge ruled that Dr. Gulino's testimony was admissible, the prosecutors under Krasner's supervision reluctantly stipulated to his testimony.

390.    The stipulation included Dr. Gulino's three-year-old opinion that the ASP strike did not cause Gorski's head injury.

391.    Gorski for his part continued as best he could to protect the Krasner investigation and himself.

392.    He testified at Bologna's trial that he had not been interfering with an arrest:

> *Q.    And at the time, you know, were you attempting to interfere with an arrest?*
> *A.    No. I was trying to keep the protestor out of the fray.*

(Commonwealth v. Bologna, Day 2; 35;4-7)

393.    He apparently forgot that he had admitted to the interference in front of Judge Lewandowski at the preliminary hearing in the matter.

394.    During closing argument, Bologna's lawyer showed the jury the video showing the strike to the shoulder and Section 508. The jury deliberated for less than twenty-two minutes and found Bologna not guilty of all charges.

395.    The rapid acquittal exposed once and for all Krasner's corrupt pre-probable cause investigation.

## DAMAGES

396.    In June of 2020, when Krasner announced that he was charging Bologna with a crime, he linked the charges to the *"moment."*

397.    This was reference to the aftermath of the murder of George Floyd.

398.    The press release falsely accused Bologna of hitting a *"Temple University Student in the back of the head while he was participating in mass demonstrations against racism and injustice...."*

399.    *"Americans"* Krasner said *"are taking to the streets to demand a remaking of political, economic, and legal systems that serve the powerful at the expense of citizens health, welfare, and lives. There can be no safety or peace without justice."*

400.    Krasner went on national television to publicize the charges against Bologna.

401.    Krasner's message was clear, Gorski was against racism and injustice and Bologna was a criminal.

402.    Krasner labeled Bologna a criminal and a target of public hatred and revulsion.

403.    The media published headlines and the false information from the Krasner investigation assailing Bologna. By way of limited example:

*Philadelphia Police Inspector Joseph Bologna will face assault charges in the **beating of a Temple student at a protest***

*Video clips of Staff Inspector Joseph Bologna over several days show aggressive responses to people protesting against **oppressive policing***

*Another blow struck against 2020's **poster child for police brutality in Philly***

404.    Members of the public took note:

*"Legit cops hate dirty cops."*

*"**Some of these officers are themselves criminals** in the eyes of the DA. Take Joseph Bologna. In 2020, Krasner's office pursued charges against the former police commander — who was fired by the department — after video emerged of him striking a Temple University student during a racial-justice protest."*

405.    Bologna and his wife began receiving threatening phone calls at their home.

406.    Two weeks after he was arrested Bologna received a text on his personal cell phone. The text stated in part:

*"Oh yeah don't worry about who I am, but I know who you are. You're a fat piece of shit pig who enjoys beating protestors right? Go f\*\*k yourself you fat f\*\*k I straight up hope you die, Pussy, suck my d\*\*k Joe faggot ass loser."*

407.    Police investigators determined that the message was sent by a 24-year-old white male from Bucks County who got Bologna's personal cell off of an Instagram site that publicized the number for the specific purpose of harassing Bologna.

408.    The phone calls to the Bologna home continued: Diana received repeated calls and messages calling her husband a "pig" and promising he would "get his."

409.    The Bologna house had to be guarded by a police detail because of the repeated threats against Bologna and his family.

410.    This ordeal lasted for three and a half years until his acquittal.

411.    During that time the headlines and venom on social media connected to the criminal charges against Bologna were rekindled with every court hearing.

412.    The media covered every court appearance and repeated the false charges at every opportunity.

413.    The stress on Bologna, Diana and their children was overwhelming.

414.    They spent countless sleepless nights worried about their future.

415.    Bologna and his wife have suffered from severe depression, anxiety, and ongoing distress as a direct result of Krasner and his subordinates' malicious actions charging him as a criminal.

416.    The defendants' malicious intentional conduct placed immense strain on Diana and Bologna's relationship and impacted their daily living.

417.    Because he was charged with crimes including felonies, Bologna was forced to "retire" from the police force in order to try and protect his pension and other benefits.

418.    During his forced retirement Bologna missed out on multiple opportunities for promotion to a higher rank and a greater salary.

419.    Bologna's extensive experience in security and investigations made him an excellent candidate for post-retirement employment as a police chief or as head of corporate security.

420.    At the time of his arrest Bologna was the Operations Commander for the police department's entire patrol division.

421.    Many former senior leaders from large city departments like Philadelphia Police are recruited and hired as Chiefs of Police in suburban or smaller city departments.

422.    These jobs in other jurisdictions allow retired officers to collect their Philadelphia pension plus an additional salary as a police chief.  Bologna would have been an ideal candidate for one of these positions that often pay hundreds of thousands of dollars annually.

423.    Bologna would also have been an ideal candidate for a variety of security-related jobs.

424.    He is a recognized expert in crowd control and security for large events.

425.    His resume includes a leadership role during the Papal visit to Philadelphia in 2015, leading the bike detail in the city in response to the Eagle's February 2018 Super Bowl victory night celebrations and the parade that followed, leading officer responding to protest during the 2016 Democratic National Convention, and numerous other large scale events.

426.    Sports teams, concert venues and any number of other private sector entities would pay significant salaries based on Bologna's skill set.

427.    These skills would normally make him a prime candidate for high paying security jobs in corporate America after he retired.

428.    Several of Bologna's former colleagues have secured corporate security jobs paying hundreds of thousands of dollars annually.

429.    Despite his acquittal from the Krasner corrupt prosecution, these opportunities have been eliminated because of the stigma associated with being charged criminally.

430.    All of this was a direct result of Krasner corrupt pre-probable cause investigation, and malicious decision to charge Bologna with a crime he did not commit.

## COUNT I
### (False Arrest and Malicious Prosecution in Violation of the
### Fourth and Fourteenth Amendments - 42 U.S.C. § 1983)
### BOLOGNA v. KRASNER, TRIPP, ROCKS AND THE CITY OF PHILADELPHIA

431.    Bologna hereby incorporates by reference all prior paragraphs as if set forth fully at length herein.

432.    42 U.S.C. § 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . ..

(42 U.S.C. § 1983 – Civil Action for Deprivation of Rights)

433.    Bologna, and Krasner, Tripp, Rocks, and the City of Philadelphia are all citizens of the United States and "persons" for purposes of a 42 U.S.C. § 1983 claim. (*See Monell v. Department of Social Services*, 436 U.S. 658 (1978)) (holding that "a local government is a 'person' that can be sued under [42 U.S.C. § 1983].")

434.    At all times during the Krasner pre-probable cause investigation, Krasner and Tripp were acting under "the color of state law" in their official capacity as District Attorney and Assistant District Attorney of the City of Philadelphia. Thus, any acts and/or omissions were conducted within the scope of their duties of employment.

435.    At all times relevant hereto, Rocks was acting under "the color of state law" in his official capacity as an employee of the Philadelphia Police Department and Acting Chief of Detectives for the District Attorney's Office. Thus, any acts and/or omissions were conducted within the scope of his duties of employment.

436.    In his official capacity as the elected District Attorney, Krasner sets the office policy including the policies described herein.

437.    At all times relevant hereto, and as fully set forth in the Fourth Amendment of the United States Constitution, Bologna has a federal right to be free from malicious prosecution. Prosecution without probable cause is in direct violation of due process afforded to United States citizens under the Fourteenth Amendment.

438. The United States Constitution, and subsequent legal precedent, is clear such that any reasonable District Attorney, Assistant District Attorney and/or Prosecutor would have known, or should have known, of these rights at the time of the complained of conduct.

439. In this matter, the Defendants violated Bologna's Fourth and Fourteenth Amendment rights to be free from false arrest and malicious prosecution without probable cause and without due process as they knowingly and willfully solicited false testimony, omitted material facts, ignored evidence of innocence, and pursued false charges against Bologna.

440. In this matter, all Defendants conspired and/or acted in concert to institute criminal proceedings for falsified criminal charges without probable cause against Bologna.

441. In this matter, Defendants engaged in the illicit conduct more fully set forth herein. Such conduct was willful, malicious, in bad faith, and in complete and reckless disregard of Bologna's federally protected and clearly enumerated constitutional rights.

442. The Defendants' intentional conduct in tampering with witnesses, suppressing exculpatory evidence and soliciting false statements in order to fabricate probable cause, was malicious, disgraceful, outrageous, and shocking.

443. In this matter, the criminal proceedings terminated in Bologna's favor. Bologna was acquitted by a jury and cleared of all of the false charges.

444. In this matter, all Defendants' dishonest acts and omissions during the investigation of Bologna were moving forces behind Bologna's injuries.

445. These individual Defendants acted in concert and joint action with each other.

446. In this matter, Defendants Krasner and Tripp were not participating in or preparing for judicial process and were acting outside of their prosecutorial functions as advocates and

engaging in an investigatory and/or administrative capacity. As such, Krasner and Tripp are not entitled to absolute immunity for the complained of conduct.

447.    As a proximate result of all Defendants' unlawful conduct, Bologna has suffered actual emotional and other injuries, and other damages and losses as described herein, entitling him to compensatory and special damages, in amounts to be determined at trial. The acts and/or omissions of Defendants, as fully set forth herein, were also set forth to intentionally deprive Bologna of his constitutional and statutory rights.

448.    At all times relevant hereto, all Defendants intended to inflict irreparable damage to Bologna's name, reputation, and future earning capacity, including but not limited to employment status, educational aspirations, and social opportunities.

449.    As a direct and proximate result of Defendants' malicious and outrageous conduct, as more fully set forth herein, Bologna has suffered irreparable damage to his future, including to future employment, educational prospects, and social opportunities.

450.    As a further result of all Defendants' unlawful conduct, Bologna has incurred special damages, including lost earnings, lost earning capacity and other related expenses, in amounts to be established at trial.

451.    Bologna is further entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and pre-judgment interest as permitted by federal law.

452.    In addition to compensatory, economic, consequential, and special damages, Bologna is entitled to punitive damages against each of the individually named Defendants under 42 U.S.C. § 1983, in that the actions of each of these individual Defendants have been taken maliciously, willfully, or with a reckless or wanton disregard of Bologna's constitutional rights.

**WHEREFORE,** Bologna demands judgment against Defendants Lawrence S. Krasner, Tracy Tripp, Gerald Rocks, the District Attorney's Office, and the City of Philadelphia, and seeks, pursuant to 18 U.S.C §2520, *et seq.*, joint and several damages substantially in excess of the jurisdictional limit to guarantee a jury trial, punitive damages, attorney's fees, and such other relief as this Honorable Court deems just.

### COUNT II
### (Established Policies, Practices, Customs,
### in Violation of the Fourth,
### Fourteenth, and First Amendments - 42 U.S.C. § 1983)
### <u>BOLOGNA v. KRASNER AND CITY OF PHILADELPHIA</u>

453.    Bologna hereby incorporates by reference all prior paragraphs as if set forth fully at length herein.

454.    42 U.S.C. § 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . ..

(42 U.S.C. § 1983 – Civil Action for Deprivation of Rights)

455.    Bologna, and Defendants, Lawrence S. Krasner in his official capacity as District Attorney, the District Attorney's Office and the City of Philadelphia are all citizens of the United States and "persons" for purposes of a 42 U.S.C. § 1983 claim. (*See Monell v. Department of Social Services*, 436 U.S. 658 (1978)) (holding that "a local government is a 'person' that can be sued under [42 U.S.C. § 1983]."")

456.    As the elected District Attorney Krasner is policymaker who establishes the policies, practices, and customs at the office.

457.    At all times relevant hereto, Bologna had the following enumerated and established rights:

a)    The right to be secure in his person from unreasonable seizure through excessive force, under the Fourth Amendment;

b)    The right to be free from false arrest by police under the Fourth and Fourteenth Amendments; and

d)    The right to be free from malicious prosecution under the Fourth and Fourteenth Amendments.

(U.S. Constitution, Fourth & Fourteenth Amendments).

458.    The well-settled policies, procedures, customs, and/or practices created by these defendants which permitted the outrageous actions with indifference to obvious and known constitutional violations include, without limitation:

a)    Pre-empting and obstructing active law enforcement investigations in order to prevent the accumulation of exculpatory evidence of innocence and instead solicit and utilize knowingly false evidence of guilt.

b)    Concealing, perverting or otherwise mischaracterizing legal authority and or giving an investigating officer misleading or false instructions with regard to the law governing the use of force in order to justify a pre-investigation decision to charge a police officer with a crime.

c)    Illegally tampering with evidence including coaching witnesses to provide false testimony;

d)    Intentionally concealing and or omitting material evidence of actual innocence.

e)    Conducting truncated, knowingly corrupt pre-probable cause investigations in order to obtain an arrest warrant or some other illicit result;

f)    Intentionally and deliberately targeting peace officers for malicious purposes other than the pursuit of justice; and

g)    Maliciously and intentionally and deliberately depriving police officers of due process and constitutional rights, including the rights of police officers to use legally justified, reasonable force in the lawful pursuit of their duties.

459.    As detailed herein the above malicious conduct targeting Bologna was part of established policies and practices of Krasner in his official capacity, the District Attorney's office and City of Philadelphia designed to arrest and charge police officers without probable cause.

460.    At all times during the pre-probable cause, Krasner investigation, Krasner was acting under "the color of state law" in his official capacity as District Attorney of the City of Philadelphia. Thus, any acts and/or omissions were conducted within the scope of their duties of employment.

461.    At all times relevant hereto, and as fully set forth in the Fourth Amendment of the United States Constitution, Bologna has a federal right to be free from malicious prosecution. Prosecution without probable cause is in direct violation of due process afforded to United States citizens under the Fourteenth Amendment.

462.    The United States Constitution, and subsequent legal precedent, is clear such that any reasonable District Attorney, Assistant District Attorney and/or Prosecutor would have known, or should have known, of these rights at the time of the complained of conduct.

463.    In this matter, all Defendants violated Bologna's Fourth and Fourteenth Amendment rights to be free from false arrest and malicious prosecution without probable cause and without due process as they knowingly and willfully solicited false testimony and pursued false charges against Bologna.

464.    In this matter, Krasner was acting outside of their prosecutorial functions as advocates and instead was engaging in an investigatory and/or administrative capacity. As such, Defendants are not entitled to absolute immunity for the complained-of conduct.

465.    In this matter, Krasner developed and maintained policies, procedures, customs, and/or practices including conducted biased and corrupted pre-probable cause investigation, exhibiting deliberate indifference to the constitutional rights of Bologna. Such conduct was a moving force behind the malicious prosecution and proximately caused the violations of Bologna's constitutional and federal rights as more fully set forth herein.

466.    These included conducting corrupt, biased internal investigations which ignored evidence of innocence, misled tribunals, and otherwise tampered with or concealed exculpatory evidence.

467.    At all times relevant hereto, all Defendants tolerated an atmosphere of lawlessness, and have developed and maintained long-standing, office-wide customs, policies, procedures, customs, practices, and/or failed to properly train and/or supervise its agents, servants, and/or employees in a manner amounting to deliberate indifference to the constitutional rights of Bologna and the public at large.

468.    At all times relevant hereto, Krasner engaged in deliberately malicious supervision of District Attorney office personnel, as part of a conscious and intentional effort to follow a course of action which violated Bologna's constitutional rights and injured Bologna.

469.    As a direct and proximate result of Krasner's implemented policies, procedures, customs, and/or practices as identified herein, Defendants intentionally and consciously deprived Bologna of his constitutional rights.

470.    Defendants' acts or omissions of, as more fully set forth herein, intentionally deprived Bologna of his constitutional and statutory rights and caused him to suffer actual physical and emotional injuries, and substantial monetary damages. Bologna is therefore entitled to both compensatory and special damages, a set amount to be determined at trial.

471.    As a further result of the Defendants' unlawful conduct, Bologna has incurred special damages, including medically related expenses, and may continue to incur further medically or other special damage related expenses, in amounts to be established at trial.

472.    As a direct and proximate result of the Defendants' malicious and outrageous conduct, as more fully set forth herein, Bologna has suffered irreparable damage to his future, including to future employment, educational prospects, and social opportunities.

473.    As a further result of the Defendants' unlawful conduct, Bologna has incurred special damages which are continuing, and other related expenses, in amounts to be established at trial.

474.    Bologna is further entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and pre-judgment interest as permitted by federal law.

475.    In addition to compensatory, economic, consequential, and special damages, Bologna is entitled to punitive damages against each of the individually named Defendants under 42 U.S.C. § 1983, in that the actions of each of these individual Defendants have been taken maliciously, willfully, or with a reckless or wanton disregard of Bologna's constitutional rights.

**WHEREFORE,** Bologna demands judgment against Defendants Lawrence S. Krasner, Tracy Tripp, the District Attorney's Office of the City of Philadelphia, and seeks, pursuant to 18 U.S.C §2520, *et seq.*, joint and several damages substantially in excess of the jurisdictional limit to guarantee a jury trial, punitive damages, attorney's fees, and such other relief as this Honorable Court deems just.

### COUNT III
### (Intentional Infliction of Emotional Distress)
### BOLOGNA v. KRASNER, TRIPP, AND ROCKS

476.    Bologna hereby incorporates by reference all prior paragraphs as if set forth fully at length herein.

477.    The "gravamen of the tort of intentional infliction of emotional distress is outrageous conduct on the part of the tortfeasor."  *Kazatsky v. King David Mem'l Park, Inc.*, 515 Pa. 183, 192, 527 A.2d 988 (1987) (citing Section 46(1) of the Restatement (Second) of Torts).

478.    At all times relevant hereto, Defendants' actions were malicious, outrageous, intolerable, and so extreme as to exceed all bounds of reasonableness and professionalism in civilized communities and societies.

479.    At all times relevant hereto, Defendant's malicious and outrageous aforementioned acts and violations were a wanton and willful disregard for the rights and feelings of Bologna.

480.    The only purpose of the Defendants' malicious and outrageous aforementioned acts was to permanently harm Bologna and violate his enumerated constitutional rights.

481.    Defendants, by their actions as more fully set forth herein, intended to inflict irreparable damage to Bologna's person, reputation, name, honor, integrity, and respect within his community and any community he sought to belong to in the future.

482.    As a direct and proximate result of the Defendants' malicious and outrageous conduct, as more fully set forth herein, Bologna was forced to suffer, and will continue to suffer, all of the losses described herein.

**WHEREFORE,** Bologna demands judgment against Defendants Krasner, Tripp, and Rocks, and seeks, pursuant to 18 USC §2520, *et seq.*, joint and several damages substantially in excess of the jurisdictional limit to guarantee a jury trial, punitive damages, attorney's fees, and such other relief as this Honorable Court deems just.

## COUNT IV
### (Loss of Consortium)
### <u>DIANA BOLOGNA v. ALL DEFENDANTS</u>

423.    Plaintiff Diana Bologna hereby incorporates by reference all prior paragraphs as if set forth fully at length herein.

424.    At all times material hereto, Diana Bologna was the lawful wife of Joseph Bologna.

425.    As a direct and proximate result of Defendants' conduct described set forth more fully herein, Diana Bologna has substantially lost the consortium and services of her husband Joseph Bologna.

**WHEREFORE,** Diana Bologna demands judgment against Defendants Krasner, Tripp, and Rocks, the District Attorney's Office and seeks, joint and several damages substantially in excess of the jurisdictional limit to guarantee a jury trial, punitive damages, attorney's fees, and such other relief as this Honorable Court deems just.

## V.    <u>PRAYER FOR RELIEF</u>

426.    Bologna prays that this Honorable Court enter judgment in his favor and against each of the Defendants, joint and severally, and grant:

a.  Compensatory damages for pain and suffering, emotional distress, fear, humiliation, and loss of enjoyment of life on all claims allowed by law in an amount to be determined at trial;
b.  Economic losses on all claims allowed by law;
c.  Special damages in an amount to be determined at trial;
d.  Punitive damages on all claims allowed by law against individual Defendants and in an amount to be determined at trial;
e.  Attorneys' fees and the costs associated with this action under 42 U.S.C. § 1988;
f.  Pre- and post-judgment interest; and
g.  Any further relief that this court deems just and proper.

## VI.   <u>NOTICE OF PRESERVATION OF EVIDENCE</u>

427.   BOLOGNA HEREBY DEMANDS AND REQUESTS THAT DEFENDANTS TAKE NECESSARY ACTION TO ENSURE THE PRESERVATION OF ALL DOCUMENTS, COMMUNICATIONS, WHETHER ELECTRONIC OR OTHERWISE, ITEMS AND THINGS IN THE POSSESSION OR CONTROL OF ANY PARTY TO THIS ACTION, OR ANY ENTITY OVER WHICH ANY PARTY TO THIS ACTION HAS CONTROL, OR FROM WHOM ANY PARTY TO THIS ACTION HAS ACCESS TO, ANY DOCUMENTS, ITEMS, OR THINGS WHICH MAY IN ANY MANNER BE RELEVANT TO OR RELATE TO  THE  SUBJECT MATTER  OF  THE  CAUSES  OF  ACTION  AND/OR  THE  ALLEGATIONS OF THIS COMPLAINT.

## VII.   <u>DEMAND FOR JURY TRIAL</u>

428.   BOLOGNA HEREBY DEMANDS A JURY TRIAL.


Respectfully Submitted,

**BOCHETTO & LENTZ, P.C.**

Date:  July 19, 2024

By:_____*/s/ George Bochetto*_____
        George Bochetto, Esquire
        PA ID No. 27783
        Gavin P. Lentz, Esquire
        PA ID No. 53609
        Kean C. Maynard, Esquire
        PA ID No. 327794
        1524 Locust Street
        Philadelphia, PA 19102
        215-735-3900
        215-735-2455 fax
        *Attorneys for Plaintiffs*