IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOSEPH BOLOGNA, et al.,<br><br>               Plaintiffs,<br>   v.<br><br>LAWRENCE S. KRASNER, TRACY<br>TRIPP, SGT. GERALD ROCKS<br>and THE CITY OF PHILADELPHIA,<br><br>               Defendants. | CIVIL ACTION<br>NO. 24-3185 |

## OPINION

**Slomsky, J.**                                                    **June 25, 2025**

I.    **INTRODUCTION** ........................................................................................................ 3

II.   **BACKGROUND** ......................................................................................................... 5

   A.    **Factual Background** .......................................................................................... 5

      1.   Plaintiff's Interaction with Evan Gorski ........................................................ 5

      2.   Internal Affairs Division Investigation ......................................................... 6

      3.   District Attorney's Office Investigation......................................................... 7

      4.   Plaintiff's Criminal Case ............................................................................... 9

      5.   District Attorney Krasner's Conduct as District Attorney of Philadelphia.................. 13

      6.   Present Litigation ......................................................................................... 15

   B.    **Procedural Background**........................................................................................ 17

III.  **STANDARD OF REVIEW** .................................................................................... 17

IV.  **ANALYSIS** ............................................................................................................. 19

   A.    **Individual Defendants' Motion to Dismiss**................................................... 20

      1.   Plaintiff's Claim for False Arrest is Time-Barred and will be Dismissed ..................... 20

2.  Plaintiff's Malicious Prosecution Claim will Survive
    Individual Defendants' Motion to Dismiss ................................................ 23

    a. Probable Cause Element ................................................................... 23

        i.   Reckless Omissions .................................................................. 26

        ii.  Reconstructed Affidavit ........................................................... 30

        iii. Materiality of Omitted Information to Probable Cause ........................ 31

    b. Malice ....................................................................................... 33

    c. Seizure ...................................................................................... 34

3.  Individual Defendants are not Entitled to Absolute Immunity
    or Qualified Immunity ...................................................................... 37

    a. Absolute Immunity ......................................................................... 37

        i.   First Prong of Absolute Immunity:  Conduct of Individual Defendants
             Underlying Plaintiff's Cause of Action ........................................ 39

        ii.  Second Prong of Absolute Immunity:  Function Served by Conduct
             of Individual Defendants ...................................................... 41

    b. Qualified Immunity ........................................................................ 43

        i.   Third Circuit Decision <u>Stringer v. County of Bucks</u> ...................... 43

        ii.  Constitutional Right at Issue .................................................. 43

        iii. Right at Issue was Clearly Established ......................................... 45

B.  **Plaintiff's <u>Monell</u> Claim in Count II** ......................................... 49

    1.  <u>Monell</u> Claim against DA Krasner and the City is not Time-Barred .......... 50

    2.  City's Motion to Dismiss the <u>Monell</u> Claim will be Denied .................. 51

        a.  The Complaint Alleges a Municipal Policy and Custom ......................... 52

        b.  District Attorney Krasner is a Municipal Policymaker ........................ 57

        c.  Plaintiff has Article III Standing Against the City ........................ 59

V.  **CONCLUSION** ............................................................................ 59

## I.    INTRODUCTION

This case is brought by Plaintiff Joseph Bologna ("Plaintiff"), a former Police Staff Inspector for the Philadelphia Police Department, against Defendants the City of Philadelphia (the "City"), District Attorney Lawrence Krasner, Esquire ("DA Krasner"), Assistant District Attorney Tracy Tripp, Esquire ("ADA Tripp"), and Sergeant Gerald Rocks, Chief of County Detectives ("Sergeant Rocks") (collectively, "Defendants").[1]

Plaintiff alleges that while working as a police officer in Philadelphia in 2020 during protests resulting from the death of George Floyd in Minneapolis, Minnesota, Plaintiff had an altercation with a protestor who interfered with the arrest of another protestor. Plaintiff used his baton and struck the interfering protestor in the upper back. The protestor was then arrested for assault on a police officer, failure to disperse, disorderly conduct, and obstruction of justice.

According to the Complaint, DA Krasner reviewed video footage of the incident and dropped the charges against the protestor. Then, DA Krasner, ADA Tripp, and Sergeant Rocks pre-empted the Philadelphia Police Department Internal Affairs Division's investigation and conducted their own pre-probable cause investigation of the incident. ADA Tripp and Sergeant Rocks interviewed the protestor who told them Plaintiff struck him on the head with the baton. Sergeant Rocks then drafted an Affidavit of Probable Cause asserting the following charges against Plaintiff: (1) possession of an instrument of crime, (2) two counts of aggravated assault, (3) reckless endangerment, and (4) simple assault. The felony counts, aggravated assault and reckless

---

[1] The "Plaintiff" referred to in this Opinion is Joseph Bologna. Diana Bologna, Plaintiff's wife, is also a plaintiff in this case. Her sole claim is for loss of consortium. Plaintiff Diana Bologna's claim will be dismissed because the statute of limitations has run on her claim. Plaintiffs agree with this dismissal. (Doc. No. 42 at 8 n.1.)

endangerment, were later dismissed by a judge in the Philadelphia County Court of Common Pleas.

In February 2024, Plaintiff was tried on the two misdemeanor charges and found not guilty. In July 2024, Plaintiff filed suit in this case against DA Krasner, ADA Tripp, Sergeant Rocks and the City of Philadelphia alleging violations of his civil rights for subjecting him to false arrest and malicious prosecution. Plaintiff also brings what is known as a <u>Monell</u> claim against the City of Philadelphia and DA Krasner alleging that they had an unconstitutional policy and/or custom of arresting and pursuing criminal prosecution of police officers without probable cause.

Plaintiff further submits that DA Krasner, ADA Tripp and Sergeant Rocks brought false charges against him based upon false testimony by the protestor that he was struck in the head with Plaintiff's baton. He also alleges that Defendants reviewed the video footage which showed Plaintiff acting in accordance with police directives. Nevertheless, Defendants prosecuted him.

Before the Court are two (2) Motions to Dismiss the Complaint; the first Motion was filed by the City (Doc. No. 20), and the second Motion was filed by DA Krasner, ADA Tripp and Sergeant Rocks (collectively, "Individual Defendants") (Doc. No 41). For reasons that follow, the City's Motion to Dismiss (Doc. No. 20) will be denied. Individual Defendants' Motion to Dismiss (Doc. No. 41) will be granted in part and denied in part.

## II.    BACKGROUND[2]

### A. Factual Background

#### 1.    Plaintiff's Interaction with Evan Gorski

Plaintiff was a Police Staff Inspector with the Philadelphia Police Department for thirty (30) years.  (Doc. No. 1 at ¶¶ 1, 58.)  On June 1, 2020, he was on duty responding to protests in Center City, Philadelphia, resulting from the death of George Floyd.[3]  (Id. at ¶¶ 1, 158.)  Plaintiff was assigned to the streets directly above Interstate 676, a heavily trafficked highway in Center City, where protesters had successfully entered and blocked the highway the day before.  (Id. at ¶¶ 160-164.)  Plaintiff led a team of officers on bicycles attempting to control the crowd on the streets above the highway.  (Id. at ¶¶ 165-167.)

Later that day, protesters were gathered on the lawn of an apartment complex across from a ramp leading to Interstate 676.  (Id. at ¶ 169.)  After seeing several hundred protestors on the lawn, Plaintiff directed other officers to set up a "bike fence" barricade, where the officers stood close together and used their bikes as a barricade to prevent protestors from entering the highway.  (Id. at ¶¶ 169-172 n.12.)  Plaintiff claims that he and the officers asked the protestors to "back away" and "move out of the area," but a small group of protestors resisted their commands.  (Id. at ¶¶ 173-176.)

Evan Gorski ("Gorski"), a Temple University student, was one of the protestors purportedly leading the resistance.  (Id. at ¶ 177.)  During this confrontation, protestors were

---

[2]    The facts set forth in this Section are sourced from the Complaint and are accepted as true at the Motion to Dismiss stage of this case.

[3]    On May 25, 2020, George Floyd, a black male, died while being detained by police officers in Minneapolis, Minnesota.  Protests ensued across the United States following his death, focusing in part on the need for racial justice.

allegedly punching and kicking officers, throwing projectiles and grabbing the officers' bikes.  (Id. at ¶¶ 181-183.)  At some point, Officer Greene, another officer on duty, was knocked to the ground and a protestor attempted to grab his bike and pull it into the crowd.  (Id. at ¶¶ 184-185.)  While Officer Greene and the protestor scuffled, Plaintiff attempted to assist Officer Greene and grabbed the protestor's arm.  (Id. at ¶ 188.)  Gorski then intervened by grabbing the protestor's arm to pull him away from the officers.  (Id. at ¶ 189.)  Plaintiff attempted to grab Gorski, missed, and then hit Gorski on his upper back with his Armament Systems Procedure ("ASP") baton.  (Id. at ¶ 194.)  Gorski then resisted arrest and fell to the ground with Plaintiff.  During the incident, Plaintiff's bike helmet made contact with the back of Gorski's head, causing a laceration on his scalp.  (Id. at ¶ 198.)  Gorski was later arrested and charged with the following crimes:  (1) assault on a police officer, (2) failure to disperse, (3) disorderly conduct, and (4) obstruction of justice.  (Id. at ¶ 199.)

A video of the protests and Plaintiff striking Gorski with his baton circulated online.  (Id. at ¶ 203.)  The video was approximately 36 seconds, and "the portion of the video showing [Plaintiff] striking Gorski lasts less than 2 seconds."  (Id. at ¶¶ 2, 204.)  Plaintiff claims that based upon the public's response after seeing the video, including "hundreds of social media viewers [condemning Plaintiff] and falsely [portraying] Gorski as a peaceful protestor . . . Defendant District Attorney ("DA") Krasner dropped all the charges against Gorski."  (Id. at ¶¶ 204-208.)

## 2.  Internal Affairs Division Investigation

Plaintiff alleges that, due to the circulation of the video online, the Internal Affairs Division ("IAD") of the Philadelphia Police Department initiated a thirteen-month (13) investigation of the incident.  (Id. at ¶¶ 213-214, 279.)  The assigned investigator interviewed ten (10) officers who were at the scene during the incident, reviewed Gorski's medical records, and obtained two expert

opinions from:  1) a "use of force" expert who reviewed the video footage, and 2) Dr. Samuel Gulino, the City's Chief Medical Examiner.  (Id. at ¶¶ 27-29.)

On July 21, 2021, the IAD completed its investigation and found that Plaintiff committed no departmental violations.  (Id. at ¶ 279.)  The investigation also showed that Plaintiff's "use of the ASP baton was consistent with a maneuver taught to officers during training and well within the departmental use of force regulations and state law dealing with an Individual interfering with an arrest."  (Id. at ¶ 277.)  It was also determined by the IAD that Plaintiff struck Gorski on the right shoulder, not on his head, as was originally claimed.[4]  (Id. at ¶ 279.)  This information was relayed to Defendants DA Krasner and Assistant District Attorney ("ADA") Tracy Tripp.  (Id. at ¶ 277.)

### 3.  District Attorney's Office Investigation

Plaintiff alleges that, coinciding with the IAD investigation, DA Krasner began conducting his own investigation into the incident.  (Id. at ¶ 215.)  He contends that an IAD investigator attempted to interview Gorski, but DA Krasner and Gorski's attorney, John Feinberg, Esquire

---

[4]  Plaintiff asserts that the IAD found the following:

> This investigation revealed **NO DEPARTMENTAL VIOLATIONS** against Staff Inspector Joseph Bologna
> . . . .
> The video failed to clearly depict the ASP [baton] making contact with Mr. Gorski's head. Mr. Gorski was taking aggressive assertive action toward [] Bologna who responded with a reactionary ASP strike . . . . [T]he injury suffered to the right shoulder area [of Gorski] was consistent with the ASP strike by [Bologna] . . . . [B]ased on [the expert's] training and knowledge of the Armament Systems Procedure (ASP) and the Philadelphia Police Department policy . . . Bologna's [] strike against Mr. Gorski [was] justified and within departmental guidelines.

(Doc. No. 1 at ¶ 279) (citing Doc. No. 1-3 at 8, 10 ("Ex. D")).

("Feinberg"), "blocked the interview and prevented IAD from speaking to Gorski."[5]  (Id. at ¶¶ 218-220.)  Instead, Plaintiff alleges that DA Krasner told Feinberg not to cooperate with the IAD investigation and work directly with him and ADA Tripp to bring "false charges" against Plaintiff.  (Id. at ¶ 221.)  Plaintiff also claims that DA Krasner assigned Sergeant Rocks to this investigation because he was the Acting Chief of County Detectives and answered directly to DA Krasner.  (Id. at ¶ 223.)

On June 5, 2020, the same day the IAD attempted to interview Gorski but was allegedly prevented from doing so, DA Krasner arranged for ADA Tripp and Sergeant Rocks to conduct a video interview with Gorski and Feinberg.  (Id. at ¶¶ 9, 226, 234, 236.)  Plaintiff claims that "[ADA] Tripp supervised the entire Gorski interview, provided questions for Rocks to ask, and permitted Gorski's attorney, Feinberg, to interrupt the interview and coach his client."  (Id. at ¶ 235.)

During the interview, Gorski told ADA Tripp and Sergeant Rocks that he was "participating peacefully in the protests" and that his "only intention [during the altercation with Plaintiff] was to grab the protestor and pull him back."  (Id. at ¶¶ 240, 249.)  Gorski also stated that Plaintiff struck him in the head with the baton.  (Id. at ¶¶ 259-266.)  Plaintiff claims that the District Attorney Defendants DA Krasner, ADA Tripp, and Sergeant Rocks (collectively, "Individual Defendants") knew Gorski's testimony was false because they watched the video

---

[5]  According to Plaintiff, John Feinberg, Esquire, was retained by Gorski to pursue a civil rights lawsuit against Plaintiff and the City.  (Doc. No. 1 at ¶¶ 229, 319.)  That case was settled among the parties.  (Id. at ¶ 321.)  He also maintains that Feinberg and DA Krasner have a "long term close personal and professional relationship," including that DA Krasner's wife was once an attorney at Feinberg's law firm.  (Id. at n.13.)  Plaintiff further submits that Feinberg's firm represented DA Krasner on another matter while Plaintiff's criminal charges were pending in 2022.  (Id.)

footage showing Gorski and others interfering with the arrest of another protestor and impeding police efforts to maintain order. (Id. at ¶¶ 250-255.) He further maintains that Individual Defendants knew that, based upon the video footage, Plaintiff struck Gorski on the shoulder/upper back, and not on his head. (Id. at ¶ 271.)

### 4. Plaintiff's Criminal Case

Plaintiff alleges that within three (3) hours of the Gorski interview, on June 5, 2020, Individual Defendants drafted an Affidavit of Probable Cause to charge Plaintiff with crimes resulting from his altercation with Gorski. (Id. at ¶¶ 293-297; Doc. No. 1-3 at 12 ("Ex. E")). He further alleges that Individual Defendants used Gorski's false testimony that Plaintiff struck him in the head in preparation of the Affidavit. (Id. at ¶¶ 280-285.) Additionally, Plaintiff asserts that they "intentionally and maliciously omitted the fact that Gorski was interfering with an arrest when he was struck by [Plaintiff] because they knew that [Plaintiff's] conduct was legally justified and not criminal if he was attempting to effect an arrest" under Section 508 of the Pennsylvania Crimes Code.[6] (Id. at ¶ 284-298.) He maintains that the Krasner investigation "consisted of watching videos of the incident and a concocted, coached 13-minute interview with Gorski." (Id. at ¶ 296.) The District Attorney's Office also issued a press release which Plaintiff alleges "falsely accused

---

[6] Section 508 of the Pennsylvania Crimes Code states:

> (a)(1) A peace officer, or any person whom he has summoned or directed to assist him, need not retreat or desist from efforts to make a lawful arrest because of resistance or threatened resistance to the arrest. He is justified in the use of any force which he believes to be necessary to effect the arrest and of any force which he believes to be necessary to defend himself or another from bodily harm while making the arrest . . . .

18 Pa. Stat. and Cons. Stat. Ann. § 508(a)(1); (see also Doc. No. 1 at ¶ 286.)

[him] of hitting a 'Temple University Student in the back of the head while he was participating in mass demonstrations against racism and injustice . . . .'" (Id. at ¶ 299.)

Plaintiff asserts that DA Krasner made comments about the charges brought against him at a City Council budget meeting and "bragged about how quickly he had charged [Plaintiff]."[7] (Id. at ¶ 303.) He further maintains that DA Krasner compared him and the police officer involved in the death of George Floyd as "evidence of [DA Krasner's] direct personal involvement in the corrupt pre-probable cause investigation and his personal malice towards police generally and [Plaintiff] as an Individual." (Id. at ¶¶ 304-305.)

Plaintiff was charged with the following crimes: (1) Possession of an Instrument of Crime, in violation of 18 PA. CONS. STAT. § 907; (2) Aggravated Assault, in violation of 18 PA. CONS. STAT. §§ 2702(a)(1) and (a)(4); (3) Recklessly Endangering Another Person, in violation of 18 PA. CONS. STAT. § 2705; and (4) Simple Assault, in violation of 18 PA. CONS. STAT. § 2701(1). (Id. at ¶ 311; Doc. No. 1-3 at 14.) The Criminal Complaint stated that Plaintiff hit Gorski "once in the back of the head with his ASP [baton], in violation of police directives, sending [Gorski] to the ground and causing a serious laceration to his head requiring multiple staples and stitches, along with multiple scrapes and bruises." (Doc. No. 1-3 at 14 ("Ex. F"); Doc. No 1 at ¶ 313.) Plaintiff

---

[7]  Specifically, Plaintiff quotes DA Krasner's comments at the budget hearing as follows:

> "…on the eve of 30,000 people gathering on the Benjamin Franklin Parkway after there had been unrest, **I was not willing to delay any further in bringing criminal charges against a particular inspector.** . . . Part of the reason we have this incredible unrest in the United States right now is that the prosecutor in Minneapolis sat on his hands and he sat on his hands for days and days and days until the collective outrage which goes back hundreds of years make no mistake but the collective outrage built and built and built…"

(Doc. No. 1 at ¶ 303) (quoting https://www.youtube.com/watch?v=K5hYflD2W98 (2:53) (emphasis in original).)

claims that Sergeant Rocks swore to this "false statement" in the Criminal Complaint even though he and the other Individual Defendants reviewed the video footage and knew that Plaintiff did not hit Gorski in the back of the head.  (Doc. No. 1 at ¶ 315.)

Plaintiff further notes that his actions were not in violation of police directives because Police Directive 10.2 allows officers to use their batons when an "offender is physically aggressive or assaultive and there is a[n] immediate likelihood that they may injure themselves or others. Such behaviors may include punching, kicking, **grabbing, or approaching with a clenched fist**." (Id. at ¶ 318 (emphasis in original).)

Once the Criminal Complaint was filed, Plaintiff turned himself in to the Northeast Detective Division, 15th Police District, where he was fingerprinted, photographed and pre-trial conditions were set by a magistrate judge.  (Id. at ¶¶ 324-326.)  Plaintiff spent approximately seven (7) hours in police custody and was later released.  (Id.)  On January 15, 2021, a preliminary hearing was held in the Philadelphia Court of Common Pleas.  (Id. at ¶ 327.)  Plaintiff claims that, one (1) week before the preliminary hearing, Dr. Samuel Gulino, the City's Chief Medical Examiner, reviewed the video footage, photographs of Gorski's injuries, Gorski's medical records, and the ongoing Internal Affairs Division ("IAD") investigation findings and issued a report that "'[Plaintiff] struck Mr. Gorski in the left upper back with the ASP' and that the head injury occurred when '[Plaintiff's] bicycle helmet made contact with Mr. Gorski's head.'"  (Id. at ¶¶ 328-330.)  Plaintiff alleges that this report was not shared with his defense attorneys prior to the preliminary hearing in accordance with the policy stated on the District Attorney's website.[8]  (Id. at ¶ 331.)

---

[8]    In this regard, Plaintiff references the Philadelphia District Attorney website where it states:

**REFORM AGENDA: OUR PROGRESS:**

Plaintiff next argues that "[d]espite being aware of Dr. Gulino's expert opinion and having continued access to the exculpatory video evidence, [ADA] Tripp and [DA] Krasner directed their subordinate to proceed in court with the false testimony from the Krasner investigation" and allowed Gorski to testify at the preliminary hearing, where he stated that Plaintiff struck him in the head with his baton. (Id. at ¶¶ 334-338.) He also submits that Gorski testified at the preliminary hearing that he did not have any physical contact with officers, nor did he interfere with the protestor's arrest during the protest, which Individual Defendants knew was false. But later, on cross-examination, Gorski admitted that he interfered with police conduct. (Id. at ¶¶ 339-343.) As a result of the testimony given at the preliminary hearing, the judge dismissed the charges against Plaintiff. (Id. at ¶ 349.)

On February 11, 2021, at the direction of DA Krasner, ADA Tripp filed a Notice of Refiling Criminal Complaint. (Id. at ¶ 351.) A new preliminary hearing was held on August 31, 2021, before Judge Crystal Bryant-Powell in the Philadelphia Court of Common Pleas.[9] However, Plaintiff alleges that on July 21, 2021, one month before this preliminary hearing, the IAD investigation was finalized and, as noted above, found no wrongdoing. (Id. at ¶¶ 360-362.) He further maintains that Individual Defendants attempted to convince Dr. Gulino to change his

---

Since District Attorney Larry Krasner took office, we've accelerated reforms, making systemwide changes to our policies and procedures, including:

. . . .

Making Brady disclosures regarding police misconduct at preliminary hearing.

(Doc. No. 1 at ¶¶ 332-333 (citing https://phillyda.org/about/).)

[9]    Plaintiff notes that the preliminary hearing was continued several times at the request of Individual Defendants. (Doc. No. 1 at ¶¶ 353-358.)

opinion about where Gorski was struck with the baton, but Dr. Gulino submitted an addendum to

his original report "reaffirming his conclusion that [Plaintiff] had struck Gorski on the 'upper back'

and not on the head." (Id. at ¶¶ 354, 356, 365.) And "[d]espite having Dr. Gulino's original and

restated opinion, and continued access to the video evidence, [and the IAD investigation findings],

the prosecutor urged Judge Bryant-Powell to base her decision on Gorski's false testimony from

the preliminary hearing." (Id. at ¶ 369.)

Based on these findings, Judge Bryant-Powell upheld the dismissal of the felony charges

but found a prima facie case supporting Simple Assault and Possession of an Instrument Crime.[10]

(Id. at ¶ 370.) Plaintiff alleges that "Judge Bryant-Powell's finding of a prima facie case for the

misdemeanors was based on the false allegations and material omissions in the original Affidavit

of Probable Cause." (Id. at ¶ 371.)

In February 2024, Plaintiff's criminal trial commenced. (Id. at 384.) Plaintiff was found

not guilty on all charges. (Id. at ¶ 394.)

### 5. District Attorney Krasner's Conduct as District Attorney of Philadelphia

Plaintiff alleges that DA Krasner, as the District Attorney of Philadelphia, established a

policy of targeting police officers and depriving them of their constitutional rights. (Id. at ¶ 62.)

He asserts that once DA Krasner was elected, he created a transition committee to "advise him on

the development of office policy and staffing decisions." (Id. at ¶ 67.) Plaintiff claims that DA

Krasner appointed people to this committee who were outwardly anti-police in order to create

policies that showed antipathy toward police. (Id. at ¶¶ 68-74.) According to Plaintiff, "[DA]

---

[10] The District Attorney's Office appealed this decision to the Superior Court of Pennsylvania.
(Doc. No. 1 at ¶ 375.) The Superior Court affirmed Judge Bryant-Powell's findings. (Id. at ¶
376; Doc. No. 1-3 at 19-20 ("Ex. H")). The District Attorney's Office appealed again, seeking
"re-argument en banc." (Id. at ¶ 378.) As noted in Defendant City's Motion to Dismiss, the re-
argument petition was denied in April 2023. (Doc. No. 20 at 8 n.3.)

Krasner described the District Attorney's office under his predecessors . . . as a 'cover up organization for police misconduct.'" (Id. at ¶ 82.)

Plaintiff further claims that DA Krasner hired ADA Tripp to work in the Special Investigations Unit, a department that has been in place since the 1970s to investigate and charge police officers who had broken the law, because she also was "proudly anti-police." (Id. at ¶¶ 75-81.) He maintains that DA Krasner and ADA Tripp use the Special Investigations Unit to investigate and charge police officers without probable cause. (Id. at ¶¶ 85-88.) For example, Plaintiff references the cases involving Officer Ryan Pownall, Officer James Saxton, Officer James Smith, Officer Patrick Smith, Officer Richard Nicoletti, and Officer Mark Dial as instances where DA Krasner and ADA Tripp brought charges against police officers without probable cause, pre-empted an IAD investigation with their own investigation, and made false and inflammatory comments to the media "as part of an intentional effort to deny a police officer his constitutional rights." (Id. at ¶¶ 89-155.) Plaintiff maintains that "[DA] Krasner has an established policy of depriving police officers of their constitutional rights by:

    a) Pre-empting and obstructing active law enforcement investigations in order to prevent the accumulation of exculpatory evidence of innocence and instead solicit and utilize knowingly false evidence of guilt;

    b) Concealing, perverting or otherwise mischaracterizing legal authority and or giving an investigating officer misleading or false advice or instructions with regard to the law governing the use of force in order to justify a pre-investigation decision to charge a police officer with a crime;

    c) Illegally tampering with evidence including coaching witnesses to provide false testimony;

    d) Intentionally concealing and or omitting material evidence of actual innocence;

    e) Conducting truncated, knowingly corrupt pre-probable cause investigations in order to obtain an arrest warrant or some other illicit result;

f) Intentionally and deliberately targeting peace officers for malicious purposes other than the pursuit of justice; and

g) Maliciously, intentionally and deliberately depriving police officers of due process and constitutional rights, including the rights of police officers to use legally justified, reasonable force in the lawful pursuit of their duties.

(Id. at ¶ 156.)

### 6. Present Litigation

On July 19, 2024, Plaintiffs Joseph Bologna and Diana Bologna filed the Complaint in this Court against Defendants.[11]  (Doc. No. 1.)  In the Complaint, Plaintiff Joseph Bologna asserts the following claims:  (1) "False Arrest and Malicious Prosecution in Violation of the Fourth and Fourteenth Amendments – 42 U.S.C. § 1983," against all Defendants[12]; (2) "Established Policies, Practices, Customs in Violation of the Fourth, Fourteenth and First Amendments – 42 U.S.C. § 1983" (a Monell claim), against DA Krasner and the City; and (3) "Intentional Infliction of Emotional Distress," against Individual Defendants.  (Id. at 58-69.)  Plaintiff's wife, Diana Bologna asserts a fourth claim, Loss of Consortium, against all Defendants.  (Id. at 69.)

Specifically, in Count One, Plaintiff alleges that "Defendants violated [his] Fourth and Fourteenth Amendment rights to be free from false arrest and malicious prosecution without probable cause and without due process as they knowingly and willfully solicited false testimony, omitted material facts, ignored evidence of innocence, and pursued false charges against [Plaintiff]."  (Id. at ¶ 439.)  He maintains that there was no probable cause for his arrest, and all criminal proceedings were terminated in his favor.  (Id. at ¶¶ 437, 443.)  He also claims that

---

[11]  DA Krasner, ADA Tripp and Sergeant Rocks are sued in the official and individual capacities. (See Doc. No. 1 at ¶¶ 38, 39, 41.)

[12]  As discussed below, Plaintiff alleged in Count I both a claim for false arrest and a separate claim for malicious prosecution.

"Defendants [DA] Krasner and [ADA] Tripp were not participating in or preparing for judicial process and were acting outside of their prosecutorial functions as advocates and engaging in an investigatory and/or administrative capacity.   As such, Krasner and Tripp are not entitled to absolute immunity for the complained of conduct."  (Id. at ¶ 446.)

In Count Two, the Monell claim against DA Krasner and the City, Plaintiff alleges that DA Krasner is a policymaker and maintained a policy and custom of arresting and charging police officers without probable cause.   (Id. at ¶¶ 456, 459.)   These policies and customs included "conducting corrupt, biased internal investigations which ignored evidence of innocence, misled tribunals, and otherwise tampered with or concealed exculpatory evidence."  (Id. at ¶ 466.)

In Count Three, the intentional infliction of emotional distress claim, Plaintiff alleges that Individual Defendants acted maliciously in violating his constitutional rights and "intended to inflict irreparable damage to [Plaintiff]'s person, reputation, name, honor, integrity, and respect within his community and any community he sought to belong to in the future."  (Id. at ¶¶ 476-482.)

Lastly, Count Four, Plaintiff Diana Bologna's loss of consortium claim against all Defendants, alleges that, because of Defendants' conduct, she "has substantially lost the consortium and services of her husband Joseph Bologna."[13,14]  (Id. at ¶¶ 423-425.)

---

[13]   Plaintiffs' Count Four, Prayer for Relief, Notice of Preservation of Evidence, and Demand for Jury Trial in the Complaint appeared to be misnumbered.  Plaintiff Diana Bologna's Loss of Consortium Claim begins under Count Four on page 69.

[14]   In Plaintiff's Opposition to Individual Defendant's Motion to Dismiss (Doc. No. 42), he does not oppose the dismissal of Count Three (intentional infliction of emotional distress) and Count Four (loss of consortium), as those claims were brought after the statute of limitations had expired.  (Id. at 8 n.1; Doc. No. 48 at 4:6-11.)  Therefore, these claims will be dismissed, leaving Joseph Bologna as the only remaining Plaintiff.

**B. Procedural Background**

On July 19, 2024, Plaintiffs filed the Complaint against Defendants. (Doc. No. 1.) On August 13, 2024, in lieu of filing an Answer, the City filed a Motion to Dismiss the Complaint for failure to state a claim. (Doc. No. 20.) On August 27, 2024, Plaintiffs filed a Response in Opposition to the City's Motion. (Doc. No. 22.) On September 3, 2024, the City filed a Reply. (Doc. No. 23.)

On January 15, 2025, DA Krasner, ADA Tripp and Sergeant Rocks ("Individual Defendants") also filed a Motion to Dismiss the Complaint. (Doc. No. 41.) On February 5, 2025, Plaintiffs filed a Response in Opposition to Individual Defendants' Motion. (Doc. No. 42.) On February 12, 2025, Individual Defendants filed a Reply. (Doc. No. 43.)

On March 6, 2025, the Court held a hearing on the Motions. (See Doc. Nos. 46, 48.) At the hearing, the Court afforded Plaintiff the opportunity to either: (1) file an Amended Complaint, or (2) file supplemental memoranda in opposition to the Motions to Dismiss. (Doc. No. 47.) The same leave under (2) was granted to Defendants. Plaintiff elected not to file an Amended Complaint. Instead, on April 2, 2025, the City filed its Supplemental Reply in Support of its Motion to Dismiss. (Doc. No. 52.) On April 8, 2025, Individual Defendants filed their Supplemental Reply in Support of their Motion to Dismiss. (Doc. No. 54.) On April 8, 2025, Plaintiff filed his Supplemental Memorandum in Opposition to both Motions. (Doc. No. 53.)

The Motions to Dismiss the Complaint (Doc. Nos. 20, 41) are now ripe for disposition.

**III. STANDARD OF REVIEW**

The motion to dismiss standard under Federal Rule of Civil Procedure 12(b)(6) is set forth in Ashcroft v. Iqbal, 556 U.S. 662 (2009). After Iqbal, it is clear that "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements do not suffice" to defeat a

Rule 12(b)(6) motion to dismiss.  Id. at 663; see also Bell Atl. Corp. v. Twombly, 550 U.S. 544

(2007).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter,

accepted as true, to state a claim to relief that is plausible on its face."  Ethypharm S.A. France v.

Abbott Labs., 707 F.3d 223, n.14 (3d Cir. 2013) (citing Sheridan v. NGK Metals Corp., 609 F.3d

239, n.27 (3d Cir. 2010)).  "A claim has facial plausibility when the plaintiff pleads factual content

that allows the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged."  Id.

Applying the principles of Iqbal and Twombly, the Third Circuit in Santiago v. Warminster

Twp., 629 F.3d 121 (3d Cir. 2010), set forth a three-part analysis that a district court in this Circuit

must conduct in evaluating whether allegations in a complaint survive a 12(b)(6) motion to

dismiss:

> First, the court must "tak[e] note of the elements a plaintiff must plead to state a
> claim." Second, the court should identify allegations that, "because they are no
> more than conclusions, are not entitled to the assumption of truth." Finally, "where
> there are well-pleaded factual allegations, a court should assume their veracity and
> then determine whether they plausibly give rise to an entitlement for relief." Id. at
> 130 (quoting Iqbal, 556 U.S. at 675, 679). "This means that our inquiry is normally
> broken into three parts: (1) identifying the elements of the claim, (2) reviewing the
> complaint to strike conclusory allegations, and then (3) looking at the well-pleaded
> components of the complaint and evaluating whether all of the elements identified
> in part one of the inquiry are sufficiently alleged."

Malleus v. George, 641 F.3d 560, 563 (3d Cir. 2011).  A complaint must do more than allege a

plaintiff's entitlement to relief; it must "show" such an entitlement with its facts.  Fowler v. UPMC

Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009) (citing Phillips v. Cnty. of Allegheny, 515 F.3d

224, 234-35 (3d Cir. 2008)).  "[W]here the well-pleaded facts do not permit the court to infer more

than the mere possibility of misconduct, the complaint has alleged—but it has not 'shown'—'that

the pleader is entitled to relief.'"  Iqbal, 556 U.S. at 679.  The "plausibility" determination is a

"context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id.

IV.   ANALYSIS

In the Complaint, Plaintiff asserts the following claims against Defendants:

- Count I:  False arrest and malicious prosecution, in violation of Plaintiff's Fourth and Fourteenth Amendment rights, against all Defendants.

- Count II:  Established policies, practices, customs, in violation of Plaintiff's Fourth, Fourteenth and First Amendment rights, against DA Krasner and the City of Philadelphia.

(Doc. No. 1 at ¶¶ 431-475.)  Such claims may be brought under the civil rights statute, 42 U.S.C. § 1983, which provides a remedy for the deprivation of a right established under the Constitution and federal law when the deprivation is done by a state officer.  Estate of Smith v. Marasco, 318 F.3d 497, 505 (3d Cir. 2003).  Section 1983 provides in pertinent part that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

42 U.S.C. § 1983.  Thus, in order to properly plead a constitutional claim under Section 1983, Plaintiff must allege (1) conduct by a person, (2) who acted under color of state law, (3) which caused a deprivation of a federally protected right.  West v. Atkins, 487 U.S. 42, 48 (1988).  Here, it is uncontested that DA Krasner, ADA Tripp and Sergeant Rocks "acted under color of state law" and whose conduct forms the basis of this case.  Only the third prong is in dispute—whether Defendants caused a deprivation of Plaintiff's constitutional rights.

19

### A.    Individual Defendants' Motion to Dismiss

In the Complaint, Plaintiff alleges claims for false arrest and malicious prosecution (Count I against all Defendants, and a <u>Monell</u> claim against DA Krasner and the City (Count II).  (Doc. No. 1 at 59-67.)  In their Motion to Dismiss, Individual Defendants argue that (1) Plaintiff's false arrest claim is time-barred, and (2) he failed to state a claim for malicious prosecution.  (Doc. No. 41-1 at 10-12, 18.)  In addition, DA Krasner contends that the <u>Monell</u> claim is also time-barred.[15] (<u>Id.</u> at 12.)  Finally, Individual Defendants contend that that they are entitled to absolute immunity or, in the alternative, to qualified immunity.  (<u>Id.</u>)  These arguments will be discussed seriatim.

### 1.    Plaintiff's Claim for False Arrest is Time-Barred and will be Dismissed

In Individual Defendants' Motion to Dismiss, they assert that Plaintiff's Section 1983 claim for false arrest in Count I is time-barred because the statute of limitations for a false arrest claim is two (2) years from the date Plaintiff was arrested and released.  (<u>Id.</u> at 10.)  In other words, they submit that the statute of limitations began on either: (1) June 1, 2020, the date of the incident that underlies the charges,  (2) June 5, 2020, the day Plaintiff was arrested, or (3) January 15, 2021, the date of Plaintiff's first preliminary hearing.  (<u>Id.</u> at 11; Doc. No. 54 at 12.)  As such, they assert that the last applicable statute of limitations for the false arrest claim expired after January 15, 2023, two years after Plaintiff's first preliminary hearing.  (<u>Id.</u>)  And since the Complaint was filed on July 19, 2024, Individual Defendants seek dismissal of the false arrest claim because it is time-barred.

The United States Supreme Court held that for statute of limitation purposes, Section 1983 actions are classified as claims for personal injury.  <u>Wilson v. Garcia</u>, 471 U.S. 261, 270

---

[15]    DA Krasner's arguments regarding the <u>Monell</u> claim are similar to those made by the City of Philadelphia in its Motion to Dismiss.  Therefore, the issues regarding timeliness and the merits of the <u>Monell</u> claim will be discussed under the City's Motion to Dismiss, <u>infra</u>, in Section B.

(1985).  In Pennsylvania, the statute of limitations for personal injury claims is two years.  Thus,

the statute of limitations for Section 1983 claims is also two years.  <u>Wallace v. Fed. Emp. of U.S.</u>

<u>Dist. Ct., EDPA</u>, 325 F. App'x 96, 100 (3d Cir. 2009) (citing <u>Kost v. Kozakiewicz</u>, 1 F.3d 176,

189-90 (3d Cir. 1993)).  The limitations period for a false arrest claim begins "when the alleged

false imprisonment ends."  <u>Wallace v. Kato</u>, 549 U.S. 384, 389 (2007).

　　　Here, Plaintiff was arrested on June 5, 2020.  (Doc. No. 54 at 12.)  Plaintiff alleges that he

spent seven (7) hours in police custody and was released on his own recognizance the same day.

(Doc. No. 1 at ¶ 326.)  His false arrest claim would have accrued when he was "detained pursuant

to [the] legal process," i.e., on June 5, 2020, the date of his arrest.  <u>Wallace</u>, 549 U.S. at 397.  Since

Plaintiff did not file this lawsuit until July 19, 2024, any claims that are based on his alleged false

arrest are time-barred.  Moreover, even if the date of the incident or the date of Plaintiff's first

preliminary hearing applies, the two-year statute of limitations period still would have lapsed, and

the false arrest count would be barred.

　　　Plaintiff attempts to overcome the statute of limitations hurdle by alleging that Count I of

his Complaint is based on false arrest <u>and</u> malicious prosecution, and because the statute of

limitations on a malicious prosecution claim does not begin until the end of a plaintiff's criminal

case, then Plaintiff's claim for false arrest would be covered by the limitations period for the

malicious prosecution claim and thus would be timely.  (Doc. No. 42 at 13; Doc. No. 53 at 18.)

He relies on <u>McDonough v. Smith</u>, 588 U.S. 109 (2019) for this proposition.  But in <u>McDonough</u>,

the plaintiff brought claims for malicious prosecution and fabrication of evidence.  <u>Id.</u> at 113.

There was no false arrest claim.  And in <u>McDonough</u>, the Court relied on <u>Wallace</u>, noting that

"<u>Wallace</u> held that the limitations period begins to run on a § 1983 claim alleging an unlawful

arrest under the Fourth Amendment as soon as the arrestee 'becomes detained pursuant to legal process,' not when he is ultimately released."[16] Id. at 121-122 (quoting Wallace, 549 U.S. at 397).

This notion is also supported by the logic applied to damages for false arrest and malicious prosecution claims. For a false arrest claim, the damages "cover the time of detention up until issuance of process or arraignment, but no more." Heck v. Humphrey, 512 U.S. 474, 484 (1994) (quoting W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keton on Law of Torts 888 (5th ed. 1984)). But for a malicious prosecution claim, a plaintiff may recover damages "imposed pursuant to the legal process," that is, to the end of a criminal case. Id. Thus, Plaintiff's claims of false arrest and malicious prosecution are different, and while conduct to commit them may overlap in part, a false arrest claim is distinct from a malicious prosecution claim. Therefore, Plaintiff's false arrest claim is not subject to the same statute of limitations as his malicious prosecution claim. See Sample v. City of Phila., No 19-51, 2024 WL 3696466, at *5 (E.D. Pa. 2024) (finding false arrest and false imprisonment claims are not subject to accrual); Mills v. City of Phila., No. 14-593, 2023 WL 6520488, at ** 8-9 (E.D. Pa. 2023) (finding the plaintiff's false arrest claim was time barred, but her conspiracy claim based on malicious prosecution had not expired); Black v. W. Virginia State Police, No. 3:22-96, 2023 WL 2667754, at *7 (S.D.W.Va. Mar. 28, 2023) (finding that false arrest is an 'entirely distinct' tort from malicious prosecution) (quoting Wallace, 549 U.S. at 389-90).

Accordingly, Plaintiff's false arrest claim in Count I is time-barred and will be dismissed. Insofar as Plaintiff's claim of malicious prosecution as alleged in Count I is concerned, Defendants

---

[16]  At the hearing on the Motions to Dismiss, Plaintiff further argued that his false arrest claim is based upon fabricated evidence. (Doc. No. 48 at 28:9-31:22.) But, as noted by the Court, Plaintiff "styled his complaint as a false arrest [claim]," not a fabricated evidence claim. (Id. at 28:9-11.) Plaintiff was given the opportunity to file an Amended Complaint, but chose to stand on the original Complaint as filed.

do not argue it is barred by the statute of limitations and for this reason, and the one that follows, it will remain as a claim in this case.

### 2. Plaintiff's Malicious Prosecution Claim will Survive Individual Defendants' Motion to Dismiss

As noted, Plaintiff also alleges a malicious prosecution claim in Count I. (Doc. No. 1 at 59-63.) To sustain a malicious prosecution claim, a plaintiff must meet the following elements:

> (1) the defendant initiated the proceeding; (2) the criminal proceeding ended in his favor; (3) the defendant initiated the proceeding without probable cause; (4) the defendant acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding.

Johnson v. Knorr, 477 F.3d 75, 81–82 (3d Cir. 2007) (citing Estate of Smith v. Marasco, 318 F.3d 497, 521 (3d Cir. 2003)).

Here, it is undisputed that the first two elements have been satisfied—Defendants initiated a Criminal Complaint against Plaintiff, and Plaintiff was acquitted of all claims at his trial in February 2024. (Doc. No. 1-3 at 14 ("Ex. G"); Doc. No. 1 at ¶ 394.) As to the third and fourth elements, whether there was probable cause for Plaintiff's arrest and whether Defendants acted with malice, these are not addressed in Individual Defendants' Motion to Dismiss, but in any event will be covered by the Court. The only claim averred by Defendants is that Plaintiff has failed to sufficiently support the last element, a seizure, with plausible facts. (Doc. No. 41-1 at 12.)

### a. Probable Cause Element[17]

Under the Fourth Amendment, police officers must have probable cause before making an arrest. Papachristou v. City of Jacksonville, 405 U.S. 156, 169 (1972); Reedy v. Evanson, 615 F.3d 197, 211 (3d Cir. 2010). A police officer has probable cause to arrest "when the facts and

---

[17] This analysis is partially adopted from the Court's prior Opinion in Round v. City of Phila., No. CV 19-3513, 2022 WL 2916681 (E.D. Pa. July 22, 2022).

circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested." Merkle v. Upper Dublin Sch. Dist., 211 F. 3d 782, 788 (3d Cir. 2000) (citation omitted). Probable cause does not require proof of guilt beyond a reasonable doubt, but only a fair probability that the arrestee committed the crime at issue. Dempsey v. Bucknell Univ., 834 F. 3d 457, 467 (3d Cir. 2016) (quoting Wilson v. Russo, 220 F.3d 781, 789 (3d Cir. 2000)).

In reviewing an officer's determination of probable cause, a court must evaluate the totality of the circumstances to determine whether the objective facts available to the officer were sufficient to justify a reasonable belief that a suspect had committed or was committing a crime. Merkle, 211 F.3d at 789. Nevertheless, because a "determination [of probable cause] is necessarily fact-intensive, [ ] it will usually be appropriate for a jury to determine whether probable cause existed." Macolino v. McCoy, Civ. No. 18-1476, 2022 WL 1203565, at *4 (E.D. Pa. Apr. 22, 2022) (citing Dempsey, 834 F.3d at 468).

In this case, Plaintiff was arrested pursuant to an Affidavit of Probable Cause prepared by Individual Defendants, namely Sergeant Rocks.    (See Doc. No. 1-3 at 12 ("Ex. E").) Plaintiff asserts that Individual Defendants lacked probable cause to arrest him because they omitted material information from the Affidavit of Probable Cause, including that Gorski resisted officers' commands, interfered with the arrest of another protestor and was struck on his back, not his head, with the baton.

The Third Circuit has set forth a test to determine when a false statement or material omission in an arrest warrant affidavit gives rise to a Fourth Amendment violation.  In Wilson v. Russo, 212 F.3d 781 (3d Cir. 2000), the Third Circuit referred to the seminal holding in Franks v. Delaware, 438 U.S. 154 (1978), and noted as follows:

> In <u>Franks</u>, the Court held that where a defendant showed by the preponderance of the evidence that a false statement necessary to the finding of probable cause was made "knowingly and intentionally, or with reckless disregard for the truth," the constitution requires that any evidence derived from the exercise of that warrant [must] be excluded from a criminal trial. <u>Id.</u> at 155, 98 S.Ct. 2674. But as the Court of Appeals for the District of Columbia Circuit has lamented, "[u]nfortunately, the Supreme Court in <u>Franks</u> gave no guidance concerning what constitutes a reckless disregard for the truth in [F]ourth [A]mendment cases, except to state that 'negligence or innocent mistake[is] insufficient.'" <u>United States v. Davis</u>, 617 F.2d 677, 694 (D.C. Cir. 1979) (quoting <u>Franks</u>, 438 U.S. at 171, 98 S.Ct. 2674). This case, with its hybrid allegation (Russo purportedly doctored some facts and failed to inform the judge of others) requires us to acknowledge that reckless disregard for the truth means different things when dealing with omissions and assertions, and to explain the different methodologies for dealing with each.

<u>Wilson</u>, 212 F.3d at 787.

With <u>Franks</u> and its progeny in mind, the Third Circuit in <u>Wilson</u> noted two factors to consider when deciding whether material omissions or false statements constitute a Fourth Amendment violation. To demonstrate that an arrest warrant lacked probable cause, a plaintiff must show: (1) the police officer knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for a warrant; and (2) such statements or omissions are material, or necessary, to the finding of probable cause. <u>Wilson</u>, 212 F.3d at 786–87 (quotation marks omitted). In practice, courts in the Third Circuit have performed a three-step analysis to assess these factors:

> We follow the three-step procedure we described in <u>Wilson</u> . . . First, we assess the evidence the plaintiff asserts was recklessly omitted from the affidavit. Next, we reconstruct an affidavit that includes any recklessly omitted information. And finally, we assess the materiality of the omitted information to the probable cause determination.

<u>Dempsey</u>, 834 F.3d at 470. Here, the Court will follow each of the three steps identified in <u>Dempsey</u> in relation to the claims made by Plaintiff of reckless omission of information material to probable cause.

### i.  Reckless Omissions

Plaintiff contends that Individual Defendants recklessly omitted material information regarding the events surrounding Gorski's arrest and the use of force on Gorski from Sergeant Rocks' Affidavit of Probable Cause.  "To determine whether information was recklessly omitted, we ask whether the officer withheld a fact in his ken that any reasonable person would have known that this was the kind of thing the [magistrate] judge would wish to know."  Dempsey, 834 F.3d at 470 (citation and alteration omitted).  In conducting this inquiry, the Court must determine whether:  (1) the officer had knowledge of the alleged information that was recklessly omitted; and (2) that the alleged information is relevant to the existence of probable cause.  Id. at 471.

The Affidavit of Probable Cause submitted by Sergeant Rocks attests the following information:

> On June 3rd 2020 the Philadelphia District Attorney's Office Special Investigation Unit received information and video evidence from Attorney Emmett Madden regarding an alleged use of excessive force committed by Staff Inspector Joseph Bologna of the Philadelphia Police Department. Your Affiant received and reviewed two videos which showed interaction between Police and protestors in the area of 299 N. 22nd street in Philadelphia Pa. at approximately 6:00pm.

> The videos reviewed showed the incident from two different angles and showed Philadelphia Police on bicycles attempting to control a crowd of protestors at that location. During the altercation, a black male Police Officer in a blue bike uniform attempted to pull a white male in a black t-shirt and black backpack toward the line of bike Officers. While attempting to gain control of the [w]hite male (black t-shirt) another white male with long hair wearing an Eagles jersey (later identified as complainant [Gorski]) approached them and grabbed the shirt of the unidentified white male attempting to pull him away from Police.

> At that time Staff Inspector Bologna grabbed [Gorski] as he pulled away Bologna struck [Gorski] with his ASP knocking him to the ground at which time [Gorski] took Bologna's ASP and threw it away from him. Bologna eventually gained control of [Gorski] taking him into custody.  [Gorski] was arrested and transported to the hospital for injuries received during the incident.

> On June 5th 2020 your affiant conducted a recorded interview via Zoom call with [Gorski] and his attorney. [Gorski] related the following in summary: [Gorski] was

involved in a protest in the area of 22nd and Vine streets in Philadelphia where Police were "enforcing the line pulling protestors in and pushing protestors out". [Gorski] stated he witnessed Police grabbing the shirt of a protestor pulling him into the bike line when he decided to intervene and pull the protestor away from the Police. [Gorski] stated he next saw the person who hit him with his weapon already out and the next thing he knew he was on the ground. [Gorski] described the Officer who hit him as being "in a white shirt a heavier set guy". [Gorski] stated the Officer hit him one time causing a cut on the back of his head, which required stitches and staples to close.

(Doc. No. 1-3 at 12 ("Ex. E").)

In Plaintiff's Supplemental Memorandum (Doc. No. 53), he states that, inter alia, the following information should have been included in the Affidavit of Probable Cause:

- Beginning on May 30, 2020, violence, looting, and arson wracked the City. ([Doc. No. 1] ¶ 50);

  ***

- Just prior to the incident with Gorski, Bologna and other officers were responding to the attempt by protestors to re-enter and block Interstate 676. (id. ¶ 168-169);

  ***

- Most protestors were compliant and moved away from the on ramp to I 676 "but a small group resisted. This resistance was organized and directed by leaders within the crowd of protestors." (id. ¶¶ 175);

- The small group "ignored the police commands and instead pushed up against the bike fence screaming at the officers, calling them "pigs", "Nazis" and "fascists" (id. ¶¶ 176);

- Gorski "was one of the leaders of the group that pushed and antagonized the officers." (id. ¶¶ 177);

- Gorski was equipped with a mask, gloves and a backpack "being carried in his role as a leader of the protestors assaulting and harassing police." (id. ¶¶ 179-80);

  ***

- According to several witnesses, protestors in Gorski's group were kicking and punching officers during this confrontation. (id. ¶¶ 182);

  ***

- The contact between Bologna and Gorski began when a protestor assaulted a police officer, knocking him down and attempted to pull the officer's bicycle into the crowd; this officer then attempted to arrest the person grabbing the bicycle. (id. ¶¶ 184-87);

- Bologna rendered assistance to the officer who had been attacked (id. ¶ 188);

- Gorski interfered with the arrest, grabbing the bicycle thief's arm and pulling him away from the officers with the assistance of other protestors (id. ¶¶ 189-90);

  ***

- Bologna hit Gorski once with an ASP on Gorski's back, not Gorski's head, while Gorski was interfering with an arrest (id. ¶¶ 193-96);

- The video of the incident shows Bologna striking Gorski on the back when Gorski is interfering with an arrest. (id. ¶ 2, 194, 262, 346, 361, 365 and Ex. A);

- Gorski and Bologna fell to the ground, and Gorski grabbed Bologna's ASP and threw it (id. ¶ 197);

- Bologna's helmet made an incidental contact with Gorski's scalp during Gorski's arrest; Bologna's ASP strike did not cause the cut on Gorski's scalp (id. ¶ 198);

  ***

-  After Gorski was arrested, Bologna asked him why he had acted the way he did and Gorski apologized. (id. ¶ 200-201)

  ***

- Gorski falsely stated that he was peacefully protesting when in fact he interfered with a lawful arrest and resisted arrest (id. ¶¶ 189-90, 193-97, 240-42).

(Doc. No. 53 at 6-8.)

First, the Complaint demonstrates that at the time Individual Defendants sought the arrest warrant, they had knowledge of the above bulleted information.  For example, the Complaint alleges that DA Krasner reviewed the video of the incident between Plaintiff and Gorski, elected not to continue the prosecution of Gorski and instead to investigate Plaintiff.  (Doc. No. 1 at ¶ 4.)

Additionally, the Affidavit of Probable Cause reveals that Sergeant Rocks reviewed two videos of the incident between Plaintiff and Gorski. Next, the Complaint further alleges that DA Krasner set up a meeting with ADA Tripp and Sergeant Rocks to interview Gorski and elicited false testimony that Gorski was struck in the head even though the video footage allegedly revealed otherwise. (Id. at ¶ 10, 11.) These examples are supported and expanded upon in the above bullet points.

Second, to determine whether the above information is relevant to the probable cause determination, the Court must determine whether "any reasonable person would know that a judge would want to know a particular statement in making a probable cause determination." See Dempsey, 834 F.3d at 469. At the motion to dismiss stage and in viewing the Complaint in the light most favorable to Plaintiff, the Court agrees that "in the context of this case and the allegations that were included in the affidavit," the bulleted information noted above is relevant to the probable cause determination. Id. at 473. A reasonable person would know that a magistrate should have been given this information when deciding whether probable cause existed at the time of Plaintiff's arrest. For example, the magistrate judge should have been informed that Gorski's group was allegedly combative and resisting an arrest at the time of altercation. And, more importantly, Plaintiff did not strike Gorski in the head with the baton but rather his bicycle helmet scraped Gorski's head while the struggled ensued.[18] The above information is relevant to the probable

---

[18] The Court has not seen video footage of the altercation because it was not part of the Complaint and makes no finding at this stage as to whether Plaintiff struck Gorski in the head or back. Plaintiff's Complaint, however, does contain screenshots from the video that portray Plaintiff using his baton to strike Gorski. Plaintiff alleges that these photographs show him striking Gorski on the back. Individual Defendants, however, contend that based upon these photographs, it was reasonable for them to conclude that Gorski was struck on the head. (Doc. No. 54 at 11.) Taking the facts alleged in the Complaint as true, however, Plaintiff's version that he did not strike Gorski in the head must be accepted as true.

cause determination and thus will be included in a reconstructed affidavit for purposes of the

materiality analysis.  See id. at 470, 473 (noting that "[w]here there are improperly omitted or

included facts, we have previously instructed district courts to perform literal, word-by-word

reconstructions of challenged affidavits.")

### ii. Reconstructed Affidavit

The next step in the Court's analysis is to reconstruct the affidavit of probable cause with

the alleged recklessly omitted information included.  Id. at 475.  The reconstructed affidavit, with

both the original information and the additional information described above, would read as

follows:[19]

> On June 3rd 2020 the Philadelphia District Attorney's Office Special Investigation Unit received information and video evidence from Attorney Emmett Madden regarding an alleged use of excessive force committed by Staff Inspector Joseph Bologna of the Philadelphia Police Department. Your Affiant received and reviewed two videos which showed interaction between Police and protestors in the area of 299 N. 22nd street in Philadelphia Pa. at approximately 6:00pm.
>
> **Bologna and other officers were responding to the attempt by protestors to re-enter and block Interstate 676.** The videos reviewed showed the incident from two different angles and showed Philadelphia Police on bicycles attempting to control a crowd of protestors at that location. **Most protestors were compliant and moved away from the on ramp to I 676 but a small group resisted. This resistance was organized and directed by leaders within the crowd of protestors. The small group "ignored the police commands and instead pushed up against the bike fence screaming at the officers, calling them "pigs", "Nazis" and "fascists." Gorski was one of the leaders of the group that pushed and antagonized the officers. According to several witnesses, protestors in Gorski's group were kicking and punching officers during this confrontation. Gorski was equipped with a mask, gloves and a backpack being carried in his role as a leader of the protestors assaulting and harassing police.**
>
> During the altercation, a black male Police Officer in a blue bike uniform attempted to pull a white male in a black t-shirt and black backpack toward the line of bike Officers. While attempting to gain control of the [w]hite male (black t-shirt) ~~another white male with long hair wearing an Eagles jersey (later identified as complainant~~

---

[19]  The additional information is demarcated in bold lettering, and the deleted portions are indicated in lettering with strikes.

[Gorski]} approached them and grabbed the shirt of the unidentified white male attempting to pull him away from Police. **Gorski interfered with the arrest, grabbing the bicycle thief's arm and pulling him away from the officers with the assistance of other protestors.**

At that time Staff Inspector Bologna grabbed [Gorski] [and] as he pulled away Bologna struck [Gorski] with his ASP **on Gorski's back, not Gorski's head, while Gorski was interfering with an arrest**, knocking him to the ground at which time [Gorski] took Bologna's ASP and threw it away from him. **Bologna's helmet made an incidental contact with Gorski's scalp during Gorski's arrest. Bologna's ASP strike did not cause the cut on Gorski's scalp**. **The video of the incident shows Bologna striking Gorski on the back when Gorski is interfering with an arrest.** Bologna eventually gained control of [Gorski] taking him into custody. [Gorski] was arrested and transported to the hospital for injuries received during the incident. **After Gorski was arrested, Bologna asked him why he had acted the way he did and Gorski apologized.**

**IAD is investigating whether Bologna's use of force to arrest [Gorski] was reasonable.**

On June 5th 2020 your affiant conducted a recorded interview via Zoom call with **ADA Tracy Tripp**, [Gorski] and his attorney. [Gorski] related the following in summary: [Gorski] was involved in a protest in the area of 22nd and Vine streets in Philadelphia where Police were "enforcing the line pulling protestors in and pushing protestors out". [Gorski] stated he witnessed Police grabbing the shirt of a protestor pulling him into the bike line when he decided to intervene and pull the protestor away from the Police. **Gorski falsely stated that he was peacefully protesting when in fact he interfered with a lawful arrest and resisted arrest.** [Gorski] stated he next saw the person who hit him with his weapon already out and the next thing he knew he was on the ground. [Gorski] described the Officer who hit him as being "in a white shirt a heavier set guy". [Gorski] stated the Officer hit him one time causing a cut on the back of his head, which required stitches and staples to close.

### iii.  Materiality of Omitted Information to Probable Cause

At this step, the question is "whether the recklessly omitted statements, considered in the context of the affidavit as a whole, were omissions material, or necessary to the finding of probable cause." Dempsey, 834 F.3d at 477 (citing Wilson, 212 F.3d at 787) (internal quotation marks omitted).

At the motion to dismiss stage, given the allegations in the reconstructed affidavit and in viewing the allegations made in the Complaint as true and drawing all reasonable inferences in favor of Plaintiff, the question remains as to whether Individual Defendants had probable cause to arrest Plaintiff. First, Plaintiff maintains that Individual Defendants reviewed the video of the incident prior to creating the Affidavit of Probable Cause, knew that Plaintiff did not hit Gorski on the head with his baton and knew that Gorski interfered with the arrest of another protestor. (Doc. No. 1 at ¶ 211.) He further maintains that Individual Defendants conducted their own pre-probable cause investigation and solicited false testimony from Gorski, even after they reviewed the video footage, where Gorski stated that Plaintiff hit him in the head. (Id. at ¶¶ 266-271.) Second, he alleges that "Krasner and Tripp also knew that [Plaintiff]'s conduct was not criminal because they had extensive experience with 18 PA. CONS. STAT. § 508 and they knew that under that statute [Plaintiff] was '. . . justified in the use of any force which he believes to be necessary to effect the arrest . . . .'" (Doc. No. 1 at ¶ 13 (quoting 18 PA. CONS. STAT. § 508).)

Based on these facts, Plaintiff argues that Individual Defendants could not reasonably believe that Plaintiff hit Gorski over the head with his baton, and for this reason and other factual ones, they lacked probable cause to arrest Plaintiff. Thus, in viewing the totality of the circumstances alleged in the reconstructed affidavit in the light most favorable to Plaintiff, it is evident that the reconstructed affidavit contains information central to the probable cause determination that was not included in the original affidavit presented to a magistrate judge. Simply put, information that any reasonable person would have known that a magistrate judge would wish to review was omitted.

In their Motion to Dismiss, Individual Defendants do not argue that they had probable cause to arrest Plaintiff. And in their Supplemental Memoranda, they merely submit that it was

"imminently reasonable [that Individual] Defendants conclu[ded] that Gorski was struck on the head with Plaintiff's baton." (Doc. No. 54 at 11.) Therefore, although it is questionable given the content of the reconstructed affidavit as to whether Defendants had probable cause to initiate proceedings against Plaintiff, that should be explored further during the discovery phase of this litigation. But at the motion to dismiss stage, and based on the reconstructed affidavit, it does not appear that there was probable cause to arrest Plaintiff for the offenses charged.

### b. Malice

The next element that must be proven in a claim for malicious prosecution is malice. Pennsylvania courts have held that malice may be inferred from the absence of probable cause. See Kelley v. General Teamsters, Chauffeurs, and Helpers, Local Union, 544 A.2d 940, 941 (Pa. 1988); see also Bristow v. Clevenger, 80 F. Supp. 2d 421, 435 (M.D. Pa. 2000).

Here, Plaintiff has shown at the motion to dismiss stage that Defendants acted maliciously or for a purpose other than bringing Plaintiff to justice. Viewing Plaintiff's allegations in the Complaint as true, Individual Defendants continued to investigate and eventually pursued criminal charges against Plaintiff even though they had reviewed the video footage showing that Plaintiff did not strike Gorski over the head and followed the requirements of Section 508 of the Pennsylvania Crimes Code. And that conduct was the sole basis for Plaintiff's Criminal Complaint. (See Doc. No. 1-3 at 14 ("Ex. G") ("While on duty . . . [Plaintiff] struck [Gorski] once in the back of the head with his ASP [baton], in violation of police directives, sending [Gorski] to the ground and causing a serious laceration to his head requiring multiple staples and stitches, along with multiple scrapes and bruises. The force used was not reasonable and showed a reckless disregard to the value of human life.")

Plaintiff further pleads that "[DA] Krasner knew a fair investigation of the [Plaintiff]'s use of force would not support his malicious pre[-]investigation decision to charge [Plaintiff] with a crime, so he pre-empted and obstructed the Internal Affairs Division investigation and orchestrated his own corrupt pre-probable cause investigation."  (Doc. No. 1 at ¶ 4.)  And again, Defendants provided no argument disputing whether they acted with malice in prosecuting Plaintiff. Therefore, Plaintiff has satisfied the fourth element of the malicious prosecution claim.

### c.  Seizure

In Individual Defendants' Motion to Dismiss, the real crux of their argument that a malicious prosecution claim is not sufficiently set forth in Count I is that Plaintiff did not suffer a deprivation of liberty, i.e., a seizure.  (Doc. No. 41-1 at 18.)

Malicious prosecution requires a "deprivation of liberty consistent with the concept of seizure." Marasco, 318 F.3d at 521.  To determine whether a seizure occurred:

> The alleged seizure must occur as a result of the malicious prosecution, and thus, it must occur chronologically after the pressing of charges (citations omitted). The court of appeals has narrowed the applicable definition of seizure to when a criminal defendant is subject to either pretrial custody or 'some onerous type of pretrial, non-custodial restrictions.'

Basile v. Twp. of Smith, 752 F. Supp. 2d 643, 659 (W.D. Pa. 2010) (quoting DiBella v. Borough of Beachwood, 407 F.3d 599, 603 (3d Cir. 2005)).  Thus, Third Circuit precedent guides what may or may not constitute a seizure within the meaning of the Fourth Amendment.  For example, in Gallo v. City of Phila., the court denied a motion for summary judgment on a malicious prosecution claim because there was a proper seizure when the plaintiff was subject to a $10,000 bond, required to attend court hearings, contacted pre-trial services weekly and was restricted from traveling outside of New Jersey and Pennsylvania.  161 F.3d 217, 222 (3d Cir. 1998).  Alternatively, in DiBella, the court found that the plaintiffs were not seized within the meaning of the Fourth

Amendment because they were never arrested, never posted bail, were free to travel, and they did not have to report to pre-trial services. 407 F.3d at 603.

Plaintiff argues that the Court should adopt the "continuing seizure doctrine" set forth in Justice Ruth Bader Ginsburg's concurring opinion in Albright v. Oliver, 510 U.S. 266 (1994) and adopted by the Third Circuit in Black v. Montgomery Cnty., 835 F.3d 358, 367 (3d Cir. 2016), as amended (Sept. 16, 2016). In her concurrence, Justice Ginsburg considered the meaning of a seizure in the Fourth Amendment context:

> This view of the definition and duration of a seizure comports with common sense and common understanding. A person facing serious criminal charges is hardly freed from the state's control upon his release from a police officer's physical grip. He is required to appear in court at the state's command. He is often subject, as in this case, to the condition that he seek formal permission from the court (at significant expense) before exercising what would otherwise be his unquestioned right to travel outside the jurisdiction. Pending prosecution, his employment prospects may be diminished severely, he may suffer reputational harm, and he will experience the financial and emotional strain of preparing a defense.
>
> A defendant incarcerated until trial no doubt suffers greater burdens. That difference, however, should not lead to the conclusion that a defendant released pretrial is not still "seized" in the constitutionally relevant sense. Such a defendant is scarcely at liberty; he remains apprehended, arrested in his movements, indeed "seized" for trial, so long as he is bound to appear in court and answer the state's charges. He is equally bound to appear, and is hence "seized" for trial, when the state employs the less strong-arm means of a summons in lieu of arrest to secure his presence in court.

Albright, 510 U.S. at 278-80 (Ginsburg, J., concurring).

The Third Circuit in Black applied Justice Ginsburg's concurrence in Albright into what is known as the "continuing seizure" doctrine. Black, 835 F.3d at 366. In Black, the plaintiff was required to travel to Pennsylvania for her arraignment, "spent more than an hour being fingerprinted and photographed at a police station," required to post bail of $50,000, and if she did not attend all court proceedings her bond would be forfeited. Id. The Third Circuit held that "[e]ven though Black was never incarcerated, that 'should not lead to the conclusion that a

defendant released pretrial is not still 'seized' in the constitutionally relevant sense.'" Id. (quoting Albright, 510 U.S. at 279).

Here, Plaintiff has sufficiently alleged a seizure for purposes of a Fourth Amendment malicious prosecution claim at the motion to dismiss stage. Following the Third Circuit's continuing seizure doctrine set forth in Black, Plaintiff was held in custody for seven (7) hours after his arrest to process him for fingerprinting, setting conditions for pretrial release by a magistrate judge, and forcing him to submit to ongoing legal proceedings for four (4) years. (Id. at 24.) He also asserts that his bail was set at $10,000, similar to the plaintiffs' bail conditions in Gallo and Black.[20] (Doc. No. 42 at 25 n.4; Doc. No. 53 at 16.) Additionally, Plaintiff was forced to retire from his job as a police officer and suffered reputational harm, including DA Krasner's condemnation of Plaintiff on national television and in the media, all as a result of Individual Defendants' prosecution against him. See Black, 835 F.3d at 368 (noting that the suffering of reputational harm can be considered in this context). While Plaintiff was not incarcerated as a result of his arrest nor subject to pre-trial services, he was still subject to a "seizure" under the law until his criminal case terminated. Accordingly, the above-described restrictions constitute the "onerous types of pretrial, non-custodial restrictions" that constitute a Fourth Amendment seizure at the motion to dismiss stage. DiBella, 407 F.3d at 603. Thus, viewing all the restrictions placed

---

[20]    Plaintiff did not plead in the Complaint that he was subject to $10,000 bail. He makes this assertion for the first time in his Opposition to Individual Defendants' Motion to Dismiss. (Doc. No. 42 at 25 n.4.) However, the Court may consider matters of public record when deciding a motion to dismiss. See Senju Pharm. Co., Ltd. v. Apotex, Inc., 921 F. Supp. 2d 297, 306 (D. Del. 2013) (explaining that, when reviewing a motion to dismiss filed under Rule 12(b)(6), "[a] court may consider the pleadings, public record, orders, exhibits attached to the complaint, and documents incorporated into the complaint by reference").

on Plaintiff in their totality, Plaintiff has adequately pled that he was seized for the purposes of his malicious prosecution claim.

In sum, Plaintiff has sufficiently alleged in the Complaint the elements of a malicious prosecution claim, and therefore Individual Defendant's Motion to Dismiss Plaintiff's malicious prosecution claim will be denied.

### 3. Individual Defendants are not Entitled to Absolute Immunity or Qualified Immunity

Next, Individual Defendants argue that they are entitled to absolute, or in the alternative, qualified immunity from Plaintiff's Section 1983 claims. (Doc. No. 41-1 at 15-17.) Specifically, they maintain that the initiation of Plaintiff's criminal case was part of the prosecutorial functions of the District Attorney's Office and is therefore protected under absolute immunity. (Id.) Additionally, they aver that their conduct prior to the commencement of Plaintiff's criminal case is subject to qualified immunity. (Id.)

### a. Absolute Immunity

Absolute immunity "embodies the 'right not to stand trial,' and is properly raised in a Rule 12(b)(6) motion to dismiss." Odd v. Malone, 538 F.3d 202, 207 (3d Cir. 2008) (quoting In re Montgomery Cnty., 215 F.3d 367, 373 (3d Cir. 2000)). Once absolute immunity is asserted, the onus is on the prosecutor to demonstrate "that absolute immunity should attach to each act he allegedly committed that gave rise to a cause of action." Fogle v. Sokol, 957 F.3d 148, 160 (3d Cir. 2020) (quoting Light v. Haws, 472 F.3d 74, 80-81 (3d Cir. 2007)). Indeed, "[a]sserting a[n] . . . immunity defense via a Rule 12(b)(6) motion[] subjects the defendant to a more challenging standard of review than would apply on summary judgment." Id. at 161 (quoting Behrens v. Pelletier, 516 U.S. 299, 309 (1996)). As a result, to earn the protection of absolute immunity, a

defendant must show that the conduct triggering absolute immunity "clearly appear[s] on the face of the complaint." Id. (quoting Wilson v. Rackmill, 878 F.2d 772, 776 (3d Cir. 1989)).

The United States Supreme Court has held that "in initiating a prosecution and in presenting the State's case, [a] prosecutor is immune from a civil suit for damages under § 1983." Imbler v. Pachtman, 424 U.S. 409, 431 (1976). But later, in Buckley v. Fitzsimmons, the Supreme Court noted that Imbler did not "describe the line between a prosecutor's acts in preparing for those functions, some of which would be absolutely immune, and his acts of investigation or 'administration,' which would not." 509 U.S. 259, 270 (1993) (quoting Imbler, 424 U.S. at 431 n.33).

The Supreme Court has reviewed several cases to determine what conduct and circumstances warrant absolute immunity. For example, in Burns v. Reed, the Court held that while a prosecutor's proffer of legal advice as to whether probable cause existed to arrest a suspect was not entitled to absolute immunity, the prosecutor's participation in a probable cause hearing was entitled to absolute immunity. 500 U.S. 478 (1991). In noting this distinction, the court reasoned that it would be "incongruous to allow prosecutors to be absolutely immune from liability for giving advice to the police, but to allow police officers only qualified immunity for following the advice." Id. at 495. "We do not believe, however, that advising the police in the investigative phase of a criminal case is so 'intimately associated with the judicial phase of the criminal process' . . . that it qualifies for absolute immunity." Id. at 493.

Additionally, in Buckley, the Court differentiated between the prosecutorial and administrative/investigative functions of a prosecutor:

> There is a difference between the advocate's role in evaluating evidence and interviewing witnesses as he prepares for trial, on the one hand, and the detective's role in searching for clues and corroboration that might give him probable cause to recommend that a suspect be arrested, on the other hand. When a prosecutor

performs the investigative functions normally performed by a detective or police officer, it is "neither appropriate not justifiable that, for the same act, immunity should protect the one and not the other." Hampton v. Chicago, 484 F.2d 602, 608 (CA7 1973) (internal quotation marks omitted), cert. denied, 415 U.S. 917, 94 S.Ct. 1414, 39 L.Ed.2d 471 (1974).

509 U.S. at 273-274.

A two-step analysis must be undertaken to determine if the defense of absolute prosecutorial immunity applies. Schneyder v. Smith, 653 F.3d 313, 332 (3d Cir. 2011) (citing Odd, 538 F.3d at 208). The first step is to "ascertain just what conduct forms the basis for the plaintiff's cause of action." Id. The second step is to "determine what function (prosecutorial, administrative, investigative, or something else entirely) that act served." Id.; see also Van de Kamp v. Goldstein, 555 U.S. 335, 342 (2009) ("To decide whether absolute immunity attaches to a particular kind of prosecutorial activity, one must take account of the 'functional' considerations discussed [in other cases].") (citations omitted).

### i. First Prong of Absolute Immunity: Conduct of Individual Defendants Underlying Plaintiff's Cause of Action

Under the first prong of the two-part absolute immunity analysis, the Court must first "ascertain just what conduct forms the basis for the plaintiff's cause of action." Schneyder, 653 F.3d at 332 (citing Odd, 538 F.3d at 208).

As noted in Plaintiff's Opposition to Individual Defendants' Motion to Dismiss, he asserts the following conduct in the Complaint as the basis for his claims against Individual Defendants:

- "Krasner's pre-investigation decision to charge Bologna with a crime without probable cause was consistent with his long-standing pattern, practice, and policy as District Attorney to deprive police officers of their constitutional rights by tampering with evidence," See Complaint at ¶ 4 (emphasis added).

- "Krasner and Tripp as prosecutors might enjoy absolute immunity for their official actions, in this case they were both acting outside their "District Attorney" capacities as advocates and were instead engaged in "investigative",

pre-probable cause activities outside of court and prior to the initiation of any judicial phase of the prosecution." <u>Id.</u> at ¶ 5.

• "By falsifying evidence and manipulating witness testimonies, among other things, as here, Krasner and Tripp were not performing tasks which are entitled to absolute immunity." <u>Id.</u> at ¶ 6.

       ***

• "Krasner and Tripp acted outside the scope of their prosecutorial functions as advocates when they bypassed and obstructed an existing pre-probable cause law enforcement investigation – the Internal Affairs Division's investigation – and conducted their own corrupt investigation. Acting as investigators and administrators, Krasner and Tripp worked together with Rocks to deprive Bologna of his rights under the Federal Constitution by charging him with a crime without probable cause." <u>Id.</u> at ¶ 33.

• "Krasner and Tripp were not acting in their prosecutorial role as advocates when they decided to (i) review the video, (ii) interview a witness, and (iii) make investigative findings prior to the establishment of "probable cause"— they engaged in all of these pre-probable cause investigative activities with a malicious intent to manipulate evidence in order to charge Bologna with a crime he did not commit." <u>Id.</u> at ¶ 216.

• "Their acts during the pre-probable cause Krasner investigation were carried out in their investigative and administrative capacity and not in preparation for any pending judicial process." <u>Id.</u> at ¶ 217.

• "Krasner and Tripp's conduct in interfering with the IAD investigation and conducting their own corrupt pre-probable cause investigation falls outside of the scope of their prosecutorial function as advocates. They both acted in a pre[-]probable cause investigative and administrative capacity." <u>Id.</u> at ¶ 230.

• "The Gorski interview was not conducted in preparation for any judicial process." <u>Id.</u> at ¶ 231.

• "Krasner and Tripp's conduct during this pre-probable cause interview was outside the scope of their prosecutorial function as advocates. They both acted as pre-probable cause investigators and administrators and not in preparation for any judicial process." <u>Id.</u> at ¶ 239.

• "In order to charge Bologna with a crime, Krasner and Tripp maliciously falsified the evidence, omitted material facts, gave Rocks intentionally, maliciously, misleading advice and direction on the law in order to concoct probable cause." <u>Id.</u> at ¶ 290.

(Doc. No. 42 at 17-18.)  In sum, Plaintiff alleges that Individual Defendants' conduct occurred prior to the commencement of his criminal proceedings, including reviewing video footage, obtaining untruthful witness testimony and "making investigative findings prior to the establishment of probable cause."  (Id.)

### ii. Second Prong of Absolute Immunity: Function Served by Conduct of Individual Defendants

Next, the Court must "determine what function . . . [those] act[s] served."  Schneyder, 653 F.3d at 332.  The issue presented in Buckley is precisely the task presented before the Court in this case:  whether Individual Defendants were acting in their prosecutorial capacity or whether they were engaging in investigatory conduct prior to the initiation of the judicial process.

Here, taking the facts in the Complaint as true, Individual Defendants' acts were administrative and investigative in nature and not part of their "prosecutorial functions followed by the initiation of the judicial process."  As alleged in the Complaint, Individual Defendants conducted a pre-probable cause investigation into the altercation between Plaintiff and Gorski. Separate from the Internal Affair Division's investigation, DA Krasner and ADA Tripp on their own, and with Sergeant Rocks as lead detective, reviewed the video footage, interviewed Gorski and obtained false testimony in order to draft an Affidavit of Probable Cause against Plaintiff.  As noted by the Third Circuit in Pownall v. Krasner, "[c]ertain pre-filing interactions with the police are investigative, such as directing evidence gathering, or giving probable cause advice . . . This may also include situations in which the allegations establish that the solicitation or coercion of false statements from a witness occurred while the prosecutor was acting in an investigative capacity."  No. 23-2049, 2024 WL 4164621, at *4 (3d Cir. Sept. 12, 2024) (internal citations omitted).

The interview with Gorski was not in preparation for trial or another proceeding; rather, it was to determine whether or not probable cause existed. Thus, "[w]hen the functions of prosecutors and detectives are the same, as they were here, the immunity that protects them is also the same." Buckley, 509 U.S. at 276. And, as noted by Plaintiff, Individual Defendants should have known that there was no probable cause to arrest him based upon the video footage alone, yet they continued to investigate further in order to find the probable cause they were looking for which, according to Plaintiff, never materialized. For these reasons, Plaintiffs have alleged the type of "detailed investigative prosecutorial conduct [that] can overcome immunity." Pownall, 2024 WL 4164621, at *5. Because Individual Defendants' pre-probable cause conduct falls within their investigative duties, not their prosecutorial ones, DA Krasner, ADA Tripp and Sergeant Rocks are not entitled to absolute immunity.[21],[22]

---

[21] Notably, Individual Defendants recognize the distinction between their conduct prior to and after the initiation of Plaintiff's criminal case. In their Motion to Dismiss, they acknowledge that Plaintiff's claims in the Complaint involve only their conduct "before the initiation of the judicial process." (Doc. No. 41-1 at 15 (quoting Doc. No. 1 at ¶ 322).) But they further argue that "to the extent Plaintiffs base their claims on any of the prosecutorial functions performed by the Individual Defendants following the initiation of the judicial process against [Plaintiff,] any such actions taken by the Individual Defendants are protected by absolute immunity." (Id.) Plaintiff submits that his Complaint "clearly identifies [ ] pre-judicial conduct that gives rise to [his ] 1983 claims" and that "[n]one of the 1983 claims in the Complaint involve the performance of a prosecutorial function or an act committed as part of the judicial process." (Doc. No. 42 at 16-17.)

[22] In Plaintiff's Opposition to Individual Defendant's Motion to Dismiss, he argues that Sergeant Rocks cannot invoke absolute immunity as a police officer. (Doc. No. 42 at 16.) But Individual Defendants submit that Sergeant Rocks worked under the direction of the District Attorney and was not employed by the Police Department. (Doc. No. 54 at 3 n.2 (citing Fuchs v. Mercer Cnty., 260 F. App'x 472 (3d Cir. 2008).) Therefore, as an investigator for the District Attorney's Office, Sergeant Rocks could be entitled to absolute immunity. But for the reasons discussed above, none of the Individual Defendants are entitled to absolute immunity. And because the Court finds that DA Krasner and ADA Tripp are not entitled to absolute immunity, Sergeant Rocks would not be entitled to absolute immunity for essentially the same conduct.

### b. Qualified Immunity

The next issue is whether DA Krasner, ADA Tripp and Sergeant Rocks are entitled to qualified immunity for their conduct prior to the commencement of Plaintiff's criminal case.

"Qualified immunity protects a government official from liability for civil damages as long as his conduct did not violate clearly established rights of which a reasonable person would have known." Naisha v. Metzger, No. 20-3056, 2021 WL 5632063, at *2 (3d Cir. Dec. 1, 2021) (citing Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). Because qualified immunity is an affirmative defense, a defendant has the burden of proving he is entitled to such a defense. Gomez v. Toledo, 446 U.S. 635, 640 (1980). The qualified immunity analysis is two-fold, as a court must determine: (1) "whether the facts alleged by the plaintiff show the violation of a constitutional right"; and (2) "whether the law was clearly established at the time of the violation." Jefferson v. Lias, 21 F.4th 74, 80 (3d Cir. 2021) (citing Kelly v. Borough of Carlisle, 622 F.3d 248, 253 (3d Cir. 2010)).

### i.     Third Circuit Decision Stringer v. County of Bucks

In the recent Third Circuit decision Stringer v. County of Bucks, the court held that "qualified immunity will be upheld on 12(b)(6) motion only when the immunity is established on the face of the complaint." No. 23-1373, 2025 WL 1701775, at *4 (3d Cir. June 18, 2025). But the court cautioned that "the second prong of a qualified immunity analysis—whether the right alleged violated was 'clearly established'—" may be difficult to find at the motion to dismiss stage because the complaint may lack specific facts to conduct such an analysis. Id. However, it also noted that in conducting a review of qualified immunity, all of the plaintiff's allegations in the Complaint are accepted as true and all inferences are drawn in the plaintiff's favor. Id.

In this case, the Complaint contains 482 paragraphs detailing the conduct committed by DA Krasner, ADA Tripp and Sergeant Rocks.  (See generally Doc. No. 1.)  As such, this is not a case where the Complaint "lack[s] the case-specific details needed to conduct the clearly established analysis."  Stringer, 2025 WL 1701775, at *4.  Therefore, the Court will examine the qualified immunity analysis next.  And for the reasons stated below, Individual Defendants are not entitled to qualified immunity at the motion to dismiss stage, but are not precluded from raising this defense at a later stage in this case if the facts marshalled in discovery do not confirm the accuracy of the facts alleged in the Complaint.

### ii.    Constitutional Right at Issue

In accordance with the two-part test set forth above, the Court will first examine whether a constitutional violation as alleged by Plaintiff actually exists.  A court must avoid defining the contours of a constitutional right "at a high level of generality."  Spady v. Bethlehem Area Sch. Dist., 800 F.3d 633, 638 (3d Cir. 2015) (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 742 (2011)).  Stated differently, the context of each case is crucial to defining the constitutional right at issue.  See Sauers v. Borough of Nesquehoning, 905 F.3d 711, 719 (3d Cir. 2018).

As noted above, Plaintiff's Complaint alleges Fourth and Fourteenth Amendment violations for malicious prosecution and targeting police officers pre-probable cause.  Specifically, he submits that DA Krasner, ADA Tripp and Sergeant Rocks:

- ". . .violated Bologna's Fourth and Fourteenth Amendment rights to be free from false arrest and malicious prosecution without probable cause and without due process as they knowingly and willfully solicited false testimony, omitted material facts, ignored evidence of innocence, and pursued false charges against Bologna." Complaint at ¶ 439.

- ". . . conspired and/or acted in concert to institute criminal proceedings for falsified criminal charges without probable cause against Bologna." Id. at ¶ 440.

- ". . . tamper[ed] with witnesses, suppress[ed] exculpatory evidence and solicit[ed] false statements in order to fabricate probable cause." Id. at ¶ 442.

(Doc. No. 42 at 21 (cleaned up).)

These allegations, along with those mentioned earlier, establish that Plaintiff has sufficiently alleged a violation of his constitutional rights.  Plaintiff maintains that Individual Defendants did not have probable cause to charge him with a crime and instead charged him based upon testimony they knew was false, especially when video footage showed him acting in accordance with police directives.  He further submits that they recklessly omitted material facts in the Affidavit of Probable Cause.  (Doc. No. 53 at 12.)  This conduct is sufficient to establish Fourth and Fourteenth Amendment violations at the motion to dismiss stage.  Thus, the constitutional right at issue here is the right not to be prosecuted based on evidence that the charging authorities know is false and to recklessly ignore evidence showing innocence of the crimes charged.

### iii.  Right at Issue was Clearly Established

Moving to the second inquiry, it must be determined whether the constitutional rights were clearly established at the time of Individual Defendants' submission of the affidavit of probable cause and "whether the right was sufficiently clear that a reasonable official would understand that what he is doing violates that right."    Jefferson v. Lias, 21 F.4th 74, 81 (3d Cir. 2021) (quoting Peroza-Benitez v. Smith, 994 F.3d 157, 165 (3d Cir. 2021) (citations and some quotations omitted)).   "This is an objective (albeit fact-specific) question, where an officer's subjective beliefs . . . are irrelevant."   Id.  And once a defendant raises the defense of qualified immunity, the plaintiff bears the burden of overcoming that defense by showing that the defendant violated the plaintiff's clearly established right.  Sherwood v. Mulvihill, 113 F.3d 396, 399 (3d Cir. 1997).

45

The Third Circuit has explained what authority may be relied upon in determining whether the constitutional right at issue was clearly established:

> With respect to determining whether this right was "clearly established" at the time of the shooting, we first turn "to factually analogous Supreme Court precedent, as well as binding opinions from our own Court." Peroza-Benitez, 994 F.3d at 165 (citing Fields v. City of Phila., 862 F.3d 353, 361 (3d Cir. 2017)). Following that, we determine whether there exists a "robust consensus of cases of persuasive authority in the Courts of Appeals." Fields, 862 F.3d at 361 (quoting L.R. v. Sch. Dist. of Phila., 836 F.3d 235, 247–48 (3d Cir. 2016)). "We may also take into account district court cases, from within the Third Circuit or elsewhere." Peroza-Benitez, 994 F.3d at 165–66.

Jefferson v. Lias, 21 F.4th 74, 81 (3d Cir. 2021).  Further, it is not necessary that there be "a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate."  al-Kidd, 563 U.S. at 741; see Psota v. New Hanover Twp., Civ. No. 20-5004, 2021 WL 6136930, at *28 (E.D. Pa. Dec. 29, 2021).  Thus, a court may rely upon "controlling authority in their jurisdiction at the time of the incident," as well as "a consensus of cases of persuasive authority such that a reasonable officer could not have believed that his actions were lawful" to determine whether the right was clearly established.  Wilson v. Layne, 526 U.S. 603, 617 (1999).

This Court's analysis in Round v. City of Philadelphia is again relevant because the constitutional right at issue there is similar to the one at issue here:  whether a police officer used false statements and/or recklessly omitted information in an arrest warrant affidavit resulting in the defendant's arrest without probable cause.  In Round, the Court analyzed relevant United States Supreme Court and Third Circuit case law covering such inclusion or reckless omission of material information in an affidavit of probable cause in order to establish whether the defendant's constitutional rights were clearly established and whether the officer was entitled to qualified immunity:

46

[T]he Supreme Court held in <u>Franks</u> that where a defendant makes a "substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendants request." 438 U.S. 154, 156 (1978).  Thus, the fountainhead decision in <u>Franks</u> made clear that "falsehoods are deemed material to the finding of probable cause if the affidavit, 'with the . . . false material set to one side . . . is insufficient to establish probable cause.'"   <u>Id.</u>   Although <u>Johnson</u> and <u>Franks</u> involve search warrant affidavits, the uniting principle is clear: a magistrate judge, not a police officer, is the ultimate arbiter of whether probable cause exists, and thus an affidavit must not contain reckless falsehoods.

Moreover, under <u>Franks</u>, it is clearly established that a deliberate or reckless falsehood in an affidavit can be either "an affirmative misrepresentation or a material omission."  <u>Sherwood v. Mulvihill</u>, 113 F.3d 396, 399 (3d Cir. 1997).  In <u>Sherwood</u>, the Third Circuit explained that, although the process of evaluating a falsehood by omission differs from the literal approach in <u>Franks</u>, the Fourth Amendment prohibition against falsehoods created by omissions is established "[u]nder <u>Franks</u> and its progeny."  <u>Id.</u> at 399.

***

Further, in April 2017 . . . the Third Circuit reversed a district court's grant of qualified immunity in a case involving false arrest and malicious prosecution, where the Third Circuit found that the officer's omissions were material to finding probable cause to arrest.  <u>Andrews v. Scuilli</u>, 853 F.3d 690, 703 (3d Cir. 2017). Citing <u>Wilson</u> and <u>Dempsey</u>, the Third Circuit ultimately concluded that "it would be clear to a reasonable officer that [the officer's] conduct was unlawful in the situation he confronted" and found, based on "well-settled law," that these omissions and misstatements of material facts would be a violation of a Fourth Amendment right that was clearly established at the time he prepared his affidavit in 2012.  <u>Id.</u> at 705.

<u>Round</u>, 2022 WL 2916681, at *21.

Additionally, the Third Circuit in <u>Andrews</u>, noting that "a certain tension exists when probable cause is at issue . . . " held that "the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported."  <u>Andrews</u>, 853 F.3d at 698 (internal citations omitted).  In that case, a young woman was approached by a man who told her to get in his car.  <u>Id.</u> at 694.  When she refused, she returned

home to her mother's house and her mother called the police.  Id.  The daughter described the man as a white male with dark hair, approximately 35 years old, and driving a red, four-door sedan.  Id. at 694-95.  The next day, the woman believed she saw she the red car and the man again and reported it to the police, but this time with a different license plate number and that he was driving a red, three-door coupe.  Id. at 695.  The officer, among other things, failed to state in the affidavit of probable cause that one car was a four-door sedan and the other was a three-door coupe.  Id. at 698.  The Third Circuit found that the officer had "'obvious reason' to doubt his assertion" because he was aware of the differences between the two vehicles.  Id. at 699.  Specifically, after speaking with the woman and her mother after the second sighting, the officer went to see the car and was aware at that time it was not a four-door sedan.  Id.  The Third Circuit stated "[w]hen an officer submits a sworn affidavit of probable cause, he or she 'is not free to disregard plainly exculpatory evidence, even if substantial inculpatory evidence (standing by itself) suggests that probable cause exists.'"  Id. (quoting Dempsey, 834 F.3d at 469).

Here, Plaintiff has carried his burden that it was clearly established, in the Fourth Amendment context, that a District Attorney, Assistant District Attorney and Chief of County Detectives may not intentionally or recklessly include false information or omit material information in an affidavit of probable cause.  For example, it should have made clear in the affidavit that Gorski's group of protestors were kicking and punching officers during the altercation.  It also failed to mention that Gorski was equipped with a mask, gloves and backpack "being carried in his role as a leader of the protestors assaulting and harassing police."  (Doc. No. 1 at ¶¶ 179-80.)  Additionally, like the court's finding in Andrews, and as alleged in the Complaint, DA Krasner, ADA Tripp and Sergeant Rocks were aware that some statements in the Affidavit of Probable Cause may not have been truthful.  Specifically, the Affidavit of Probable Cause states

"[Gorski] stated the Officer hit him one time causing a cut on the back of his head, which required stitches and staples to close." (Doc. No. 1-3 at 12 (Ex. E).) But Plaintiff notes that Individual Defendants reviewed the video footage of the incident which shows that Plaintiff struck him on the upper back, not his head. The Affidavit of Probable Cause also failed to mention that the Philadelphia Police Department Internal Affairs Division was already investigating Plaintiff's use of force during the incident. Therefore, they "failed to entertain serious doubts" about some statements made in the Affidavit of Probable Cause and had sufficient reason to doubt the accuracy of the Affidavit because the video footage reveals otherwise. See Andrews, 853 F.3d at 699 (finding that the officer had "good reason to doubt . . . the truthfulness of his affidavit" based upon his personal observation of the red three-door coupe). Accordingly, Individual Defendants are not entitled to absolute or qualified immunity.

In sum, DA Krasner, ADA Tripp and Sergeant Rocks' Motion to Dismiss will be granted as to the false arrest claim in Count I, the intentional infliction of emotional distress claim in Count III and the loss of consortium claim in Count IV. The Motion to Dismiss will be denied as to the malicious prosecution claim in Count I.

### B. Plaintiff's Monell Claim in Count II

In Count II of the Complaint, Plaintiff brings a Monell claim against DA Krasner and the City of Philadelphia.[23] (Doc. No. 1 at 63.) Specifically, he maintains that DA Krasner is a

---

[23] As discussed further below, a Monell claim for an unconstitutional policy, practice or custom may be brought against local governments and municipalities under Section 1983. Monell v. New York City Dep't of Soc. Servs., 436 U.S. 658, 690-91 (1978). However, courts in this district have also found that "a [Monell] claim against a government employee named in his official capacity is indistinguishable from a claim against the governmental entity that employs the defendant." Brown v. City of Phila., No. 24-1019, 2024 WL 1660544, at *5 (E.D. Pa. April 17, 2024) (citing Kentucky v. Graham, 473 U.S. 159, 165-66 (1985)). In Brown, the court allowed the plaintiff's Monell claim to proceed against the City of Philadelphia as well as the former

policymaker who establishes the policies, practices and customs at the District Attorney's Office and his policies violated Plaintiff's First, Fourth and Fourteenth Amendment rights by targeting police officers through malicious prosecution. (Id. at 64.) In Individual Defendant's Motion to Dismiss, DA Krasner submits that this claim is time-barred for the same reasons previously stated regarding the false arrest claim. (Doc. No. 41-1 at 12.)

Additionally, in Defendant City of Philadelphia's (the "City") Motion to Dismiss, it argues that (1) Plaintiff cannot establish any City policy or custom that caused the alleged harm and (2) "the District Attorney is plainly not a [municipal] policymaker when investigating crime." (Doc. No. 52 at 3.) The City also contends that Plaintiff does not have Article III standing because he has not alleged facts to establish that his injuries were the result of any conduct attributable to the City. (Doc. No. 20 at 15.) It maintains that "Plaintiff[] claim[s] injury based solely on the alleged conduct of the [Individual] Defendants" and, again, the City cannot be liable for the prosecutorial decisions of DA Krasner. (Id.)

Each of these arguments will be discussed next.

## 1. __Monell__ Claim against DA Krasner and the City is not Time-Barred

DA Krasner argues that the Monell claim brought in Count II is time-barred. (Doc. No. 41-1 at 12.) Like tort claims under § 1983, a claim based on an established policy and/or custom, otherwise known as a Monell claim, has a statute of limitations of two (2) years.

In Bullock v. Borough of Roselle, the court noted that a Monell claim is "subject to the same two-year statute of limitations as the underlying § 1983 tort." No. CV 17-13208 (KM), 2018 WL 4179481, at *8 (D.N.J. Aug. 31, 2018). Here, the underlying tort is malicious prosecution

---

District Attorney of Philadelphia Seth Williams because he was sued in his official capacity. Id. at *6. Therefore, Plaintiff's Monell claim here against the City of Philadelphia and DA Krasner is proper because DA Krasner was sued in Count II in his official capacity as the District Attorney of Philadelphia. (See Doc. No. 1 at 63.)

which has a two-year statute of limitations.  The accrual time begins at the same time as Plaintiff's malicious prosecution claim, that is, February 2024 when plaintiff's criminal case ended.  The Complaint was filed on July 19, 2024, which is within the two-year statute of limitations.

Therefore, the Monell claim in Count II is timely.

### 2.  City's Motion to Dismiss the Monell Claim will be Denied

In the City of Philadelphia's Motion to Dismiss, it argues that Plaintiff's Monell claim should be dismissed because he failed to identify a municipal policy or custom responsible for the alleged constitutional violations and harm suffered.  (Doc. No. 20 at 11.)

In Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978), the United States Supreme Court held that municipal entities can be subject to Section 1983 liability in limited circumstances.  Id. at 690.  The gravamen of Monell and its progeny is that "recovery from a municipality is limited to acts that are, properly speaking, acts 'of the municipality' – that is, acts which the municipality has officially sanctioned or ordered."  Pembaur v. City of Cincinnati, 475 U.S. 469, 480 (1986). In other words, the constitutional deprivation must have had its origin in the policy or custom of the municipality, and liability based on the actions of city officials exists only where it can be shown that the officials acted in accordance with that policy or custom.  Monell, 436 U.S. at 694.

Accordingly, municipalities cannot be held liable under Section 1983 for the acts of its employees based on the doctrine of respondeat superior or for other forms of vicarious liability. See Monell, 436 U.S. at 692 (noting that the language of Section 1983 "cannot easily be read to impose liability vicariously on government bodies solely on the basis of the existence of an employer-employee relationship with a tortfeasor"); see also Reitz v. County of Bucks, 125 F.3d 139, 146 (3d Cir. 1997) ("[L]iability simply cannot be predicated upon a showing of respondeat superior.")

Thus, under <u>Monell</u>, to state a Section 1983 claim against a municipality, a plaintiff must establish that (1) a constitutionally protected right has been violated, and (2) the alleged violation resulted from a municipal policy, custom, or deliberate indifference to a violation of a constitutional right.[24]  <u>Monell</u>, 436 U.S. at 694-95, 98; <u>see also</u> <u>Andrews v. City of Phila.</u>, 895 F.2d 1469, 1480 (3d Cir. 1990).

A municipality is not liable under <u>Monell</u> for the actions of its District Attorney undertaken in his or her "role as a prosecutor."  <u>Whitfield</u>, 587 F. Supp. 2d at 672.  Put differently, "a municipality can only be held liable for the acts of its officials undertaken in an administrative capacity."  <u>Id.</u> at 671 (citing <u>Williams v. Fedor</u>, 69 F. Supp. 2d 649, 663 (M.D. Pa. 1999) (concluding that a municipality "cannot be held liable on the basis of the challenged 'prosecutorial decisions'")).

In its Motion to Dismiss, the City, bypassing the first step in the <u>Monell</u> analysis, contends that Plaintiff failed to allege a municipal policy or custom in the Complaint.  (Doc. No. 20 at 11-14.)  Instead, it avers that "[t]he only policies Plaintiff[] identif[ies] are those of the District Attorney's Office."  (<u>Id.</u> at 14.)  It contends that DA Krasner is not a municipal policymaker when serving in his prosecutorial capacity under <u>Monell</u>, and because the District Attorney represents the Commonwealth of Pennsylvania, and not the City, when pursuing criminal prosecution, he is a state actor only in his role as a prosecutor.  (<u>Id.</u> at 12.)

### a. Complaint Alleges a Municipal Policy and Custom

As noted above, to plead a <u>Monell</u> claim, a plaintiff must allege sufficient facts showing that a municipal policymaker established a policy or custom that was the moving force behind the constitutional violation experienced.  <u>See</u> <u>Monell</u>, 436 U.S. at 694.  The Third Circuit has

---

[24]  In this case, Plaintiff does not rely on the "deliberate indifference" prong.

explained that a policy is made when a decisionmaker with final authority to establish municipal

policy issues an official proclamation, policy, or edict.  Wright v. City of Phila., 685 F. App'x 142,

146 (3d Cir. 2017) (citing Andrews, 895 F.2d at 1480).  Custom, however, is not specifically

endorsed or authorized by law.  Id.  Rather, custom results from policymakers' "acquiescence in a

longstanding practice or custom, which constitutes the 'standard operating procedure' of the local

government entity."  Id. (quoting Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 737 (1989)).

There are numerous ways a plaintiff can sufficiently allege the existence of a municipal

policy or custom needed to establish a Monell claim.  For example, regarding the policy prong, a

plaintiff can cite to an official policy.  See Monell, 436 U.S. at 690 (stating that a municipality

may be sued under Section 1983 when it "implements or executes a policy statement, ordinance,

regulation, or decision officially adopted and promulgated by that body's officers").  Additionally,

"[a] policy need not be passed by a legislative body, or even be in writing, to constitute an official

policy for the purposes of § 1983."  Porter v. City of Phila., 975 F.3d 374, 383 (3d Cir. 2020).

Alternatively, regarding the custom prong, a plaintiff can make specific reference to "multiple

incidents" implicating a particular custom.  See Harris v. City of Phila., 171 F. Supp. 3d 395, 401-

02 (E.D. Pa. 2016) (finding a custom where there were "multiple incidents" of police officers using

reckless and excessive force in their use of batons).

Here, accepting the factual allegations as true, Plaintiff has sufficiently pled a policy and/or

custom of the District Attorney's Office conducting pre-probable cause investigations and

depriving police officers of constitutional rights.  Specifically, the Complaint states the following:

> The well-settled policies, procedures, customs, and/or practices created by these
> defendants which permitted the outrageous actions with indifference to obvious and
> known constitutional violations include, without limitation:

a) Pre-empting and obstructing active law enforcement investigations in order to prevent the accumulation of exculpatory evidence of innocence and instead solicit and utilize knowingly false evidence of guilt;

b) Concealing, perverting or otherwise mischaracterizing legal authority and or giving an investigating officer misleading or false advice or instructions with regard to the law governing the use of force in order to justify a pre-investigation decision to charge a police officer with a crime;

c) Illegally tampering with evidence including coaching witnesses to provide false testimony;

d) Intentionally concealing and or omitting material evidence of actual innocence;

e) Conducting truncated, knowingly corrupt pre-probable cause investigations in order to obtain an arrest warrant or some other illicit result;

f) Intentionally and deliberately targeting peace officers for malicious purposes other than the pursuit of justice; and

g) Maliciously, intentionally and deliberately depriving police officers of due process and constitutional rights, including the rights of police officers to use legally justified, reasonable force in the lawful pursuit of their duties."

(Id. at 15 (quoting Doc. No. 1 at ¶ 156).)  Plaintiff further submits that "Defendants enforced these policies and customs by pre-empting and obstructing the IAD investigation related to [Plaintiff], and conducted their own fraudulent pre[-]probable cause investigation to conceal evidence obtained by the IAD, and then manipulate false evidence as a means to bring charges that were not supported by probable cause."  (Id. at 15-16.)  The decision of a district attorney to investigate police officers without probable cause falls within the Monell standard for policy.  See Porter, 975 F.3d at 383 ("A pertinent decision by an official with decision-making authority on the subject constitutes official policy.")

And as for custom, the Complaint cites several other instances where Defendants allegedly pre-empted an investigation of a police officer.  For example, Plaintiff references Officer Ryan Pownall, who was involved in a police officer shooting that killed a civilian in 2017.  (Id. at 89.)

54

Although Officer Pownall was cleared of any wrongdoing, DA Krasner, during his campaign for District Attorney of Philadelphia, allegedly promised members of the civilian's family that, if he were re-elected, he would re-open Pownall's case and charge him with murder.  (Id. at ¶¶ 89-91.) And after DA Krasner was re-elected, he, with the help of ADA Tripp, indicted Pownall for murder.  (Id. at ¶¶ 97-103.)  However, as alleged in the Complaint, the Court of Common Pleas and the Pennsylvania Supreme Court found that ADA Tripp had "mislead the grand jury" by failing to inform the grand jurors about the justification defense under Section 508 of the Pennsylvania Crimes Code.[25]  (Id. at ¶¶ 104-108.)

Additionally, in 2019, DA Krasner filed charges against Officer James Saxton for allegedly lying under oath about a drug test.  (Id. at ¶ 109.)  Plaintiff alleges that, while an IAD investigation was underway, DA Krasner and ADA Tripp pre-empted the IAD investigation and conducted their own investigation into the incident.  (Id. at ¶¶ 111-116.)  He further alleges that, although a police captain informed them that there was no probable cause to charge Officer Saxton with a crime,

---

[25]  As noted earlier, 18 PA. CONS. STAT. § 508 states in pertinent part:

(1) A peace officer, or any person whom he has summoned or directed to assist him, need not retreat or desist from efforts to make a lawful arrest because of resistance or threatened resistance to the arrest. He is justified in the use of any force which he believes to be necessary to effect the arrest and of any force which he believes to be necessary to defend himself or another from bodily harm while making the arrest. However, he is justified in using deadly force only when he believes that such force is necessary to prevent death or serious bodily injury to himself or such other person, or when he believes both that:

(i)     such force is necessary to prevent the arrest from being defeated by resistance or escape; and

(ii)    the person to be arrested has committed or attempted a forcible felony or is attempting to escape and possesses a deadly weapon, or otherwise indicates that he will endanger human life or inflict serious bodily injury unless arrested without delay.

DA Krasner and ADA Tripp did so anyway before the IAD investigation was completed.  (Id. at ¶¶ 116-118.)  Plaintiff also claims that DA Krasner charged two (2) other police officers, James Smith and Patrick Smith, with assault.  These charges were allegedly "based upon a corrupt investigation by Krasner's office during which his investigators ignored evidence of innocence." (Id. at ¶¶ 121-127.)

He also references Officer Richard Nicoletti, another police officer working during the George Floyd protests, who was charged with assault for using pepper spray on protestors.  (Id. at ¶¶ 128-148.)  Plaintiff contends that the District Attorney's Office falsely portrayed to the media that Officer Nicoletti used tear gas on protestors, which Plaintiff submits was false, and "Krasner's effort to poison the public—by releasing false and inflammatory statements about an accused officer—is part of his establish policy of taking steps to deny police officers due process and the benefit of the legal process."  (Id.)  Lastly, Plaintiff alleges that DA Krasner released videos of a shooting involving Officer Mark Dial and a civilian while the investigation of the shooting was ongoing.  (Id. at ¶¶ 149-155.)  Plaintiff submits that Officer Dial's charges were dismissed by the judge because he had reasonable belief that the civilian was armed.  (Id.)  And, even after the charges were dismissed, DA Krasner allegedly continued to make comments to the media suggesting that the judge's decision was "corrupt" and "not based on evidence."  (Id.)  Plaintiff also references DA Krasner's alleged public comments demonstrating his administrative policy to target police officers.  (See Doc. No. 1 at ¶¶ 65-153, 299-302, 306-309.)

These instances, taken together with the events involving Plaintiff as described above and in viewing them in the light most favorable to him, show that Plaintiff has sufficiently alleged that Defendants have a policy and/or custom of conducting pre-probable cause investigations,

interfering with the Internal Affairs Division of the Philadelphia Police Department and depriving police officers of the same constitutional rights at issue here.

### b.  District Attorney Krasner is a Municipal Policymaker

"It is clear under either route [policy or custom] that a plaintiff must show that an official who has the power to make policy is responsible for either the affirmative proclamation of a policy or acquiescence in a well-settled custom."  Watson v. Abington Twp., 478 F.3d 144, 156 (3d Cir. 2007) (internal citations omitted).  A plaintiff must "allege and prove that the official established or enforced policies and practices directly causing the constitutional violation."  Chavarriaga v. New Jersey Dep't of Corr., 806 F.3d 210, 223 (3d Cir. 2015).  And the policymaker in question must possess the authority to make a final policy.  City of St. Louis v. Praprotnik, 485 U.S. 112, 127 (1988).  When the claim involves the District Attorney's Office, it is "undeniable" that the District Attorney "is the highest policymaker within the office."  Whitfield v. City of Phila., 587 F. Supp. 2d 657, 670 (E.D. Pa. Nov. 19, 2008).

The Third Circuit has explained, though, that prosecutors have "a dual or hybrid status" when enforcing the law and performing administrative tasks.  Coleman v. Kaye, 87 F.3d 1491, 1499 (3d Cir. 1996).  The line between prosecutorial and administrative functions is a thin one.  And, like absolute immunity, the Court must distinguish between where one line begins and the other one ends.  As noted by the Third Circuit in Carter v. City of Philadelphia:

> [M]aking and applying the county-wide policy differs from carrying out state-wide policy and they have, therefore, repeatedly differentiated between administrative and prosecutorial functions, generally finding the former to be local and the latter to be state.
>
> ***
>
> The reoccurring theme that emerges . . . is that county or municipal law enforcement officials may be State officials when they prosecute crimes or otherwise carry out

policies established by the State, but serve as local policy makers when they
manage or administer their own offices.

181 F.3d 339, 351-52 (3d. Cir. 1999).

Here, Defendants contend that DA Krasner is not a municipal policymaker when
conducting his prosecutorial duties.  But, as described above, DA Krasner was not engaging in his
prosecutorial functions, but rather his administrative ones, when conducting a pre-probable cause
investigation.  The relevant events at issue here relate to Defendants' conduct in investigating the
incident between Plaintiff and Gorski before probable cause was established, including reviewing
the video footage, setting up an interview with Gorski and his attorney and obtaining a statement
from Gorski.  Moreover, the allegations in the Complaint establish a policy of targeting police
officers regardless of the need to have probable cause.  For example, Plaintiff alleges that DA
Krasner created a transition committee and purposefully appointed people that were anti-police in
order to create policies that showed antipathy towards police.  (Doc. No. 1 at ¶¶ 68-74.)  He further
submits that DA Krasner uses the Special Investigations Unit in the District Attorney's Office to
investigate officers before probable cause is established.  (Id. at ¶¶ 85-88.)  As mentioned supra, a
prosecutor, and now a municipality, cannot shield themselves from liability while performing
investigative tasks.  See Buckley, 509 U.S. at 274 ("[A] prosecutor neither is, nor should consider
himself to be, an advocate before he has probable cause to have anyone arrested."); see also Carter,
181 F.3d at 351 (holding that the district attorney's office is not entitled to Eleventh Amendment
immunity when performing administrative functions).  Moreover, the alleged custom of targeting
police officers before pre-probable cause is a local and administrative decision that is orchestrated
through Krasner's role as District Attorney of Philadelphia.  Consequently, for Monell purposes,
DA Krasner is a policymaker.

### c. Plaintiff has Article III Standing Against the City

Finally, in the same vein, the City submits that Plaintiff does not have Article III standing against the City because he has "not alleged any facts that could establish [his] injuries were the result of any conduct attributable to the City." (Doc. No. 20 at 15.) In other words, the City contends again that Plaintiff's claims are based solely on the conduct of Individual Defendants and the City is not liable for the prosecutorial decisions of DA Krasner. But, for the same reasons noted above, DA Krasner was acting in his administrative capacity, not in his prosecutorial role, making the City liable for any constitutional violations. Therefore, Plaintiff has sufficient standing against the City.

## V.    CONCLUSION

Based on the foregoing, Individual Defendants' Motion to Dismiss (Doc. No. 20) will be granted in part and denied in part. Individual Defendants' Motion to Dismiss Plaintiff Joseph Bologna's false arrest claim (Count I, in part) and intentional infliction of emotional distress claim (Count III) will be granted. It will also be granted as to Plaintiff Diana Bologna's loss of consortium claim (Count IV). Individual Defendants' Motion to Dismiss the malicious prosecution claim (Count I, in part) and the Monell Claim (Count II) will be denied. Furthermore, Defendant City of Philadelphia's Motion to Dismiss (Doc. No. 20) will be denied. An appropriate Order follows.